# EXHIBIT B

IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT
IN AND FOR ORANGE COUNTY, FLORIDA
BUSINESS COURT

PORTRAIT CONSTRUCTION OF
FLORIDA, INC. f/k/a MARK BARON
CONSTRUCTION, INC. d/b/a MARK
PORTRAIT CONSTRUCTION, a Florida
corporation,

       Plaintiff,

                                Case No.  2023-CA-008213-O

vs.

LN APARTMENTS, LLC, a Florida limited
liability company,

       Defendant.
_____

## LN APARTMENTS, LLC's ANSWER AND AFFIRMATIVE DEFENSES TO AMENDED COMPLAINT AND AMENDED COUNTERCLAIM

Defendant, LN APARTMENTS, LLC ("LN"), by and through its undersigned

counsel, files its Answer and Affirmative Defenses to the Amended Complaint filed

by Plaintiff, PORTRAIT CONSTRUCTION OF FLORIDA, INC. f/k/a Mark Baron

Construction, Inc. d/b/a Mark Portrait Construction, ("PORTRAIT") and states:

### PARTIES, JURISDICTION AND VENUE

1.     Without knowledge, therefore denied.

2.     Without knowledge, therefore denied.

3.     Admitted for jurisdictional purposes only, otherwise denied.

4. Admitted for jurisdictional and venue purposes only, otherwise denied.

## **GENERAL ALLEGATIONS**

5. Admitted that Portrait served as General Contractor for the Project prior to being terminated for cause by LN on April 20, 2023.

6. Admitted.

7. Admitted only that the terms and provisions of the HUD Contract, the A201, the Ancillary Agreement and the Contract speak for themselves, otherwise, denied.

8. Admitted only that the terms and provisions of the HUD Contract, the A201, the Ancillary Agreement and the Contract speak for themselves, otherwise, denied.

9. Admitted.

10. Admitted only that the terms and provisions of the HUD Contract, the A201, the Ancillary Agreement and the Contract speak for themselves, otherwise, denied.

11. Admitted only that the terms and provisions of the HUD Contract, the A201, the Ancillary Agreement and the Contract speak for themselves; otherwise, denied.

12. Admitted.

13. Without knowledge, therefore denied.

14. Admitted the Portrait was terminated for cause. LN denies the allegation of paragraph 14 that insinuates LN terminated Portrait as a consequence of Portrait brining a lawsuit against LN.

15. Denied.

16. Denied.

17. Admitted that Portrait recorded a Claim of Lien on July 7, 2023, but denies that the dollar amount in Portrait's Claim of Lien is an accurate representation of what it is owed.

18. Admitted that Portrait served a Contractor's Final Payment Affidavit. Denied as to the representations made in the Contractor's Final Payment Affidavit.

19. Denied.

20. Denied.

21. Without knowledge, therefore denied.

22. Without knowledge, therefore denied.

**COUNT I – FORECLOSURE OF CONSTRUCTION LIEN**

23. LN realleges its responses as set forth above in Paragraphs 1-22 as if fully set forth herein.

24. Admitted only that this count appears to be a count for foreclosure of a Construction Lien.

4854-7803-8903 v.2 078615/01500

25. Without knowledge and therefore denied.

26. Without knowledge and therefore denied.

27. Denied.

28. Denied.

29. Denied.

30. Denied.

31. Admitted.

32. Without knowledge, therefore denied.

As to the unnumbered wherefore clause, LN denies that Portrait is entitled to any of the relief requested.

## COUNT II - BREACH OF CONTRACT AGAINST LN APARTMENTS FOR WRONGFUL TERMINATION

33. LN realleges its responses as set forth above in Paragraphs 1-22 as if fully set forth herein.

34. Admitted only that the documents attached as composite Exhibit A are documents that speak for themselves, otherwise denied.

35. Admitted only that the terms and provisions of the A201 Agreement speaks for itself, otherwise, denied.

36. Admitted only that the A201 Agreement speaks for itself, otherwise denied.

4854-7803-8903 v.2 078615/01500

37.     Denied. The April 10, 2023 letter referenced provides Portrait and Travelers with Notice of LN's intent to terminate the Contract if Travelers did not cure Portrait's breaches.

38.     Admitted only that the terms of termination letter speaks for itself, otherwise denied.

39.     Admitted only that the A201 Agreement is a document that speaks for itself, otherwise denied.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Admitted only that Exhibit F is a document that speaks for itself, otherwise denied.

44.     Denied.

    a. Denied.

        i. Denied.

        ii. Denied.

        iii. Denied.

        iv. Denied.

        v. Denied.

        vi. Denied.

4854-7803-8903 v.2 078615/01500

vii. Denied.

b. Denied.

c. Denied.

d. Denied.

45. Denied.

46. Denied.

47. Denied.

As to the unnumbered wherefore clause, LN denies that Portrait is entitled to any of the relief requested.

## COUNT III - BREACH OF CONTRACT AGAINST LN APARTMENTS FOR FAILURE TO MAKE PROGRESS PAYMENTS

48. LN realleges its responses as set forth above in Paragraphs 1-22 as if fully set forth herein.

49. Admitted only that the documents attached as composite Exhibit A are documents that speak for themselves, otherwise denied.

50. Admitted only that the terms and provisions of the HUD Contract, the A201, the Ancillary Agreement and the Contract speak for themselves; otherwise, denied.

51. Denied.

52. Denied.

4854-7803-8903 v.2 078615/01500

53. Denied.

54. Denied.

As to the unnumbered wherefore clause, LN denies that Portrait is entitled to any of the relief requested.

## COUNT IV - BREACH OF CONTRACT AGAINST LN APARTMENTS FOR OWNER INTERFERENCE

55. LN realleges its responses as set forth above in Paragraphs 1-22 as if fully set forth herein.

56. Admitted only that the documents attached as composite Exhibit A are documents that speak for themselves, otherwise denied.

57. Admitted only that the terms and provisions of the HUD Contract, the A201, the Ancillary Agreement and the Contract speak for themselves; otherwise, denied.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. The allegations set forth in Paragraphs 44(a), 58-61 are denied.

63. Denied.

64. Denied.

-7-

As to the unnumbered wherefore clause, LN denies that Portrait is entitled to any of the relief requested.

## COUNT IV – QUANTUM MERUIT AGAINST LN APARTMENTS

65.    LN realleges its responses as set forth above in Paragraphs 1-22 as if fully set forth herein.

66.    Denied.

67.    Denied.

68.    Denied.

69.    Denied.

70.    Denied.

71.    Denied.

As to the unnumbered wherefore clause, LN denies that Portrait is entitled to any of the relief requested.

## FIRST AFFIRMATIVE DEFENSE

As its First Affirmative Defense, LN asserts Portrait fails to state a claim for breach of contract insofar as Portrait's claimed damages are barred by the express terms of the Contract, including any damages specifically waived by the parties. Specifically, insofar as any claims alleged by Portrait are for consequential damages, inefficiencies, extended overhead, administrative expenses, and other similar

damages, all such damages are expressly waived by the terms of the Contract, including but not limited to Section 15.1.7 of the A201 Agreement.

## SECOND AFFIRMATIVE DEFENSE

As its Second Affirmative Defense, LN asserts that Portrait has waived its claims by virtue of its failure to comply with the claim notice requirements and procedures set forth in the Contract Documents, including the notice requirements of Article 15 of the A201 Agreement, causing prejudice to LN. In the event Portrait failed to provide proper notice and supporting documentation of the claims asserted in the Complaint within the time period required by its Contract, Portrait knowingly and intentionally waived its claims against LN. Insofar as Portrait waived its claims against LN, Portrait also therefore failed to perform a condition precedent to the initiation of this action.

## THIRD AFFIRMATIVE DEFENSE

As its Third Affirmative Defense, LN asserts that Portrait has unclean hands and acted in bad faith, including but not limited to, failing to honor the claim notice requirements of the Contract, failing to provide sufficient and competent manpower, refusing to comply with the Contract's administrative processes for claim resolution, failing to proceed with the work as required by the Contract, and knowingly and deliberately installing unapproved materials, defective Work and altered

4854-7803-8903 v.2 078615/01500

construction details in an effort to reduce costs contrary to the terms of the Contract Documents, to the benefit of Portrait and the detriment of LN.

## FOURTH AFFIRMATIVE DEFENSE

As its Fourth Affirmative Defense, LN asserts that Portrait has waived its claim asserted in the Complaint in whole or in part, by executing lien waivers. Specifically, in the course of Portrait's work on the underlying construction project, Portrait executed multiple interim waivers and releases, each expressly waiving and releasing any and all claims and acknowledging that upon receipt of payment from LN, such payment would constitute full and complete payment and the full and equitable adjustment and compensation attributable to such work though a certain date. Accordingly, Portrait's alleged damages must be reduced or barred insofar as they have been satisfied, released or waived.

## FIFTH AFFIRMATIVE DEFENSE

As its Fifth Affirmative Defense, LN asserts that it is entitled to set off/recoup of any and all damages (including liquidated damages) and costs for extra work that it may or will incur as a result of Portrait's breach of the Contract, including any additional costs and damages related to actual completion of the Project, and all of the additional costs and damages that the LN has or will incur in order to remediate the defective or noncompliant work supplied or installed by Portrait, including but not limited to the costs LN has or will incur in order to bring the Project into

compliance with the Contract Document and applicable building codes and regulations.

## SIXTH AFFIRMATIVE DEFENSE

As its Sixth Affirmative Defense, LN asserts Portrait has failed to mitigate its claimed damages to the extent that it caused certain delays and schedule impacts, by failing to provide adequate manpower, failing to diligently commence and complete the work, failing to proceed with disputed work as required by the terms of the Contract, failing to install material and work consistent with the Contract Documents including installation of low quality and substandard materials, failing to submit shop drawings and material product data, and committing other breaches as set forth in the counterclaim below.

## SEVENTH AFFIRMATIVE DEFENSE

As its Seventh Affirmative Defense, LN asserts that it is entitled to a set-off for actions of third parties not within the control of LN, which act as an intervening or superseding cause of Portrait's alleged damages. Portrait's claimed damages must be reduced or barred accordingly.

## EIGHTH AFFIRMATIVE DEFENSE

As its Eighth Affirmative Defense, LN asserts that Portrait's claims are barred and LN was excused from any further obligation to perform by reason of the fact that Portrait committed material breaches of the Contract alleged herein. Those

4854-7803-8903 v.2 078615/01500

breaches are more specifically identified in the counterclaim set forth below.

## NINTH AFFIRMATIVE DEFENSE

As its Ninth Affirmative Defense, LN asserts that Portrait's claims are barred by the doctrine of abandonment of contract in that Portrait abandoned the Contract prior to the completion of the Project referenced herein.

## TENTH AFFIRMATIVE DEFENSE

As its Tenth Affirmative Defense, LN asserts that to the extent Portrait seeks equitable relief herein, its claims are barred by the doctrine of unclean hands. A more specific recitation of the facts which support this affirmative defense is provided in the counterclaim set forth below.

## ELEVENTH AFFIRMATIVE DEFENSE

As its Eleventh Affirmative Defense, LN asserts that Portrait's own negligence in managing, constructing, and scheduling the Project caused or contributed significantly to the problems complained of. In particular, the damages claimed by Portrait are a direct result from its own lack of management and oversight, failure to adhere to the Contract Documents, and other breaches as set forth in the counterclaim below. Accordingly, Portrait's claims are barred or should be reduced to the extent caused by Portrait's own negligence, errors, or omissions.

## TWELFTH AFFIRMATIVE DEFENSE

As its Twelfth Affirmative Defense, LN asserts that Portrait is estopped from

4854-7803-8903 v.2 078615/01500

asserting its claim for delay, disruption, acceleration, and the like by misrepresenting to LN that it possessed the requisite skill and the ability to perform the scope contemplated within the time frame established by the Contract. LN relied upon these misrepresentations to its own detriment in awarding the Contract to Portrait.

## THIRTEENTH AFFIRMATIVE DEFENSE

As its Thirteenth Affirmative Defense, LN asserts that the sole consideration for the execution of Portrait's Contract with LN was Portrait's commitment to perform its work in accordance with the Contract requirements. Portrait's provision of labor, services, and materials was of sufficiently poor quality and so untimely that there was failure of consideration to justify Portrait's Contract.

## FOURTEENTH AFFIRMATIVE DEFENSE

As its Fourteenth Affirmative Defense, LN asserts that as a result of its failure to timely notify, submit, and quantify its claims to LN, Portrait's claims are barred by the doctrine of laches.

## FIFTEENTH AFFIRMATIVE DEFENSE

As its Fifteenth Affirmative Defense, LN asserts that during the Project, delays to the timely completion of the work were caused by the failure of Portrait and its subcontractors, suppliers, and agents to properly and timely perform work in accordance with the Contract. Portrait was either solely responsible for delayed completion of the Project or Portrait and others, for whose actions LN is not

4854-7803-8903 v.2 078615/01500

responsible, caused the delayed completion of the Project. Alternatively, the claims alleged by Portrait to be the responsibility of LN were at best concurrent to other delays caused by Portrait's breach of its contractual obligations. Accordingly, Portrait has suffered no injuries or damages as a result of the acts and omissions alleged in the complaint and fails to state a cause of action against LN for which relief can be granted.

## SIXTEENTH AFFIRMATIVE DEFENSE

As its Sixteenth Affirmative Defense, LN asserts that Portrait's claims are barred or limited to the extent that Portrait failed to mitigate its damages alleged in the Complaint by failing to take appropriate remedial action, including but not limited to: (1) failing to timely and properly notify LN of alleged impacts to Portrait's performance of the work; (2) failing to obtain appropriate written authorization to proceed with additional work or obtain appropriate extensions of time; (3) failing to quantify its claims for additional work and extensions of time as required by the Contract Documents; (4) failing to submit and update schedules for the Project in accordance with the Contract Documents; (5) failing to maintain adequate personnel including the contractually required scheduler during the terms of performance; (6) failing to properly and timely coordinate or sequence its work on the Project as required by the terms of the Contract; (7) breaching these terms of

the Contract for failing to complete the work in a timely and proper manner; (8) failing to quantify any claims it had relating to the alleged actions by LN as required by the Contract Documents; (9) failing to properly re-sequence its work to overcome the alleged impacts to its work; and (10) failing to provide proper and adequate credits to the Owner for any replacements or deviations in the Work from the Contract Documents.

## SEVENTEENTH AFFIRMATIVE DEFENSE

As its Seventeenth Affirmative Defense, LN asserts that Portrait's action for lien foreclosure should be dismissed because Portrait has acted willfully or with malice, gross negligence or willful exaggeration by filing an excessive Claim of Lien, as set forth in greater detail in LN's Counterclaim below.

## EIGHTEENTH AFFIRMATIVE DEFENSE

As its Eighteenth Affirmative Defense, LN asserts that Portrait's claims are barred by the doctrine of prior material breach, as a result of Portrait's failure to pursue its work in accordance with the Project Schedule and phasing plan, resulting in a delay to the Project's Substantial Completion date. Portrait further breached the Contract by failing to install the work correctly, failing to correct its defective or deficient work when brought to Portrait's attention, and failing to remedy its defaults, causing significant damages and delay to the Project.

## NINETEENTH AFFIRMATIVE DEFENSE

4854-7803-8903 v.2 078615/01500

As its Nineteenth Affirmative Defense, LN asserts that Portrait's claim for breach of contract for wrongful termination fails to state a claim upon which relief can be granted, as LN properly terminated Portrait for cause pursuant to Article 14.2 of the A201 Agreement. Article 14.2 does not require LN provide Portrait with an opportunity or instruction to cure its defaults. Rather, Article 14.2 only requires that LN provide Portrait with seven days notice of LN's intent to terminate Portrait. Furthermore, LN attached the required certification from the Architect, and Portrait's claims that the Architect did not render an impartial decision are baseless and not supported by the facts.

## TWENTIETH AFFIRMATIVE DEFENSE

As its Twentieth Affirmative Defense, LN asserts that Portrait's claim of lien is invalid as it is willfully exaggerated and thus a fraudulent lien pursuant to Section 713.31(2)(a), Florida Statutes, as set forth in greater detail in LN's Counterclaim below.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

As its Twenty-First Affirmative Defense, LN asserts that Portrait's claim of lien is invalid as Portrait failed to substantially complete its work and effectively abandoned the Project, as set forth in greater detail in LN's Counterclaim below.

## RESERVATION OF RIGHTS

4854-7803-8903 v.2 078615/01500

LN reserves their rights to allege any further affirmative defenses that become known in the course of this litigation and related discovery.

## AMENDED COUNTERCLAIM

Defendant/Counter-Plaintiff, LN APARTMENTS, LLC ("LN"), brings this Amended Counterclaim against Plaintiff/Counter-Defendant, PORTRAIT CONSTRUCTION OF FLORIDA, INC. f/k/a Mark Baron Construction, Inc. d/b/a Mark Portrait Construction ("Portrait") as set forth below.

1.     This is a Counterclaim for damages in excess of $3,600,000, exclusive of interest, costs and attorneys' fees, that arises from property located in and services performed in Orange County, Florida.

2.     LN Apartments is a Florida limited liability company licensed and authorized to conduct business in Orange County, Florida.

3.     Upon information and belief, Portrait is a Florida corporation licensed and authorized to do business in Orange County, Florida.

4.     Venue is appropriate in Orange County, Florida pursuant to Section 47.011, *Florida Statutes*, because the property that is the subject matter of this litigation is located in Orange County, Florida and all claims alleged herein occurred in Orange County, Florida.

5.     All conditions precedent to this initiation of this action have been met or waived by the Parties.

4854-7803-8903 v.2 078615/01500

## GENERAL ALLEGATIONS

6.      LN adopts and realleges the allegations contained in Paragraphs 1 through 5 above as though fully set forth herein.

7.      LN entered into the Contract with Portrait to serve as the General Contractor for the Construction of the Futura at Nona Cove Apartments located at 19465 Boggy Creek Road, Orlando, Florida ("the Project").

8.      On or about November 5, 2020, Portrait and LN Apartments entered into a U.S. Department of Housing and Urban Development ("HUD") Construction Contract (the "HUD Contract"); AIA A201-2017 Modified General Conditions of the Contract for Construction (the "A201"); and Ancillary Agreement to Construction Contract (the "Ancillary Agreement") (the HUD Contract, the A201, and the Ancillary Agreement are collectively referred to as the "Contract" or "Contract Documents") for the construction of the Project. A true and correct copy of the Contract was attached to Portrait's Complaint as "Composite Exhibit A" which is reincorporated into this Counterclaim.

9.      Portrait agreed to use its best skill and attention to timely and properly complete the work in strict accordance with the Contract Documents, plans, and specifications for the Project (the "work").

10.     Portrait committed numerous breaches of the Contract, including but not limited to, failing to pursue their work in accordance with the Project Schedule

and phasing plan, failing to provide sufficient and competent manpower, intentionally slowing down its work on the Project, failing to pay subcontractors despite having been paid for the work by LN, installing damaged and/or defective work, and failing and refusing to correct deficient and defective work. Portrait's failure to timely and properly pursue their work resulted in a delay to the Project's Substantial Completion date.

11.     Additionally, during the course of Portrait's performance of the work under the Contract, Portrait breached the Contract by failing to properly perform and complete its work pursuant to the Contract.  The work was defective and was not performed in a good, workmanlike fashion or in accordance with industry standards and the approved plans and specifications. Portrait failed to install the work correctly, failed to correct its defective or deficient work, and failed to remedy its defaults, causing significant damage and delay to the Project.

12.     At the outset of the Project, Portrait expressly assured LN that it had sufficient skill, experience, and competent team members to perform the work required by the Contract. As a result of these assurances, LN agreed to award the Project to Portrait.

13.     However, throughout the entirety of the Project, Portrait failed to properly and sufficiently staff the Project with skilled and competent workers as promised and as required by the Contract, and virtually abandoned the Project

4854-7803-8903 v.2 078615/01500

despite repeated requests from LN to sufficiently staff the Project in accordance with the Contract.

14.    Furthermore, Portrait intentionally slowed down its work and further delayed the Project Schedule, all while negotiating with LN on way to remediating and finalize the Project, in an attempt to facilitate Portrait Construction Inc.'s CEO, Thomas Day, improper purchase of the property at a significantly diminished value.

15.    Beginning in approximately June 2022, Thomas Day and LN entered into discussions regarding the potential for Mr. Day, in his individual capacity, to replace LN's equity investor on the Project.

16.    However, shortly thereafter, Mr. Day utilized his influence as CEO of Portrait Construction Inc. (which is part owner of the Defendant Portrait Construction of Florida) to slow down Portrait's work on the Project, creating additional delays and impacts to an already delayed Project, so as to impact the value of the Project and improperly attempt to purchase the entire Project at a significantly diminished rate, citing the delays and issues with the Project as the reason for the significantly undervalued offer.

17.    At the same time that Portrait was intentionally slowing down its work on the Project, it was also actively negotiating a "reset" of the Project with LN wherein the Parties were negotiating and attempting to resolve the outstanding issues

4854-7803-8903 v.2 078615/01500

and come to an agreement wherein Portrait would resolve the outstanding defects and deficiencies and complete the remaining work to the performed on the Project.

18. Portrait's actions were deceptive, improper, and caused significantly damage to LN.

19. On or about April 10, 2023, LN provided a Notice of Intent to Terminate the Contract to Portrait and Travelers, stating that LN would terminate Portrait's Contract within seven (7) days if Travelers did not cure Portrait's breaches. A copy of this notice of intent to terminate letter is attached to Plaintiff's Complaint as Exhibit E.

20. On April 20, 2023, LN terminated Portrait for cause in accordance with the Contract. A copy of this termination letter is attached to Plaintiff's Complaint as Exhibit F.

21. LN has been damaged and continues to be damaged by Portrait's actions and inactions, including but not limited to resulting damages such as the cost to complete Portrait's work to complete the Project, cost of replacement and correction of Portrait's deficient and defective work, liquidated damages/delay damages, cost for additional testing, inspections, cost for uncovering defective and replacement work, additional program and project management, additional compensation for replacement services, increased and extended insurance costs,

4854-7803-8903 v.2 078615/01500

additional lending and financing costs, lost revenue, loss of goodwill, and additional expenses made necessary by Portrait's default and termination of the Contract.

## COUNT I – BREACH OF CONTRACT

22.    LN adopts and realleges the allegations contained in Paragraphs 1 through 21 of this Counterclaim as though fully set forth herein.

23.    Portrait materially breached the Contract by failing to perform and timely complete the work in strict accordance with the Contract documents, plans, and specifications for the Project required under the Contract, including but not limited to:

  a. Failure to provide adequate Project labor and manpower, including but not limited to the failure to provide adequate and qualified Project management personnel. Portrait also failed to provide sufficient manpower necessary to perform their work in accordance with the Project Schedule. Throughout the Project, Portrait has failed to man the Project with adequate manpower to advance the work.

  b. Failure to supervise and direct the work using Portrait's "best skill and attention" as required by the Contract.

  c. Repeated replacement of project personnel without necessary approval by LN, resulting in a revolving door of project and site management with no continuity of leadership.

-22-

d. Failure to provide reliable construction schedule and construction schedule updates.

e. Failure to perform work in accordance with the logic and sequence as provided in the Construction Schedule.

f. Failure to meet and comply with schedule durations and milestones as set forth in the Construction Schedule.

g. Failure to implement necessary quality control and installation practices resulting in substandard work throughout the Project.

h. Failure to comply with applicable codes and regulations causing delay to the Project, including but not limited to at least two Project shutdowns by the Fire Marshal due to Portrait's failure to follow and comply with applicable codes and regulations.

i. Installation of damaged, defective, non-conforming product / work or material, including but not limited to the damaged, defective, non-complaint installation of the Project's: plumbing and HVAC system, roof and structure systems, window and door waterproofing, exterior stucco and painting, cabinetry and countertops, balconies, and various other defective and non-compliant work.

4854-7803-8903 v.2 078615/01500

j. Failure to take prompt and appropriate corrective action to repair its defective and non-compliant work, including those provided in the preceding paragraph.

k. Failure and deliberate refusal to conduct and/or schedule necessary inspections, including but not limited to inspections required by the threshold inspector.

l. Failure to comply with safety protocols, including but not limited to fall protection protocols.

m. Failure to complete all work as set forth in the Contract Documents, including but not limited to refusal to install the Project's catwalk and refusal to install portions of the work in accordance with the Interior Design Drawings.

n. Failure to install work according to Contract Documents, including Portrait's action of unilaterally, and without LN's authorization, installing simpler, cheaper products and features than those required by the Contract Documents. Moreover, Portrait failed to pass the cost-savings related to such actions to LN.

o. Failure to provide financial information as required by the Contract despite requests for same by LN.

4854-7803-8903 v.2 078615/01500

p. Failure to comply with the Contract's Pay Application process, including but not limited to failing to provide the required lien waivers as part of the payment applications.

q. Failure to complete the work within the established Contract time and subsequent delay in Substantial Completion.

r. Acting with bad faith by continually submitting incorrect and exaggerated pricing for changes or claims for additional costs to LN, causing delay and additional costs relating to LN's project management operations.

s. Failure to provide appropriate credits to LN for deductive changes, including but not limited to, for example, credits related to Value Engineering.

t. Abandoning the Project prior to Final Completion.

u. Failure to timely pay subcontractors despite receiving monies for the subs as paid by LN.

v. Failure to manage its subcontractors as to ensure adequate staffing and manpower of subcontractors to achieve schedule commitments and quality control requirements.

w. Failure to comply with applicable HUD guidelines and notice requirements.

4854-7803-8903 v.2 078615/01500

x. Failure to uphold express and implied contractual duties, including but not limited to Portrait's failure to act in good faith in the performance of the Contract.

24. These material breaches caused or substantially contributed to damages suffered by LN on the Project.

25. As a result of Portrait's material breaches of the Contract, LN has been and continues to be damaged, including but not limited to resulting damages such as the cost to complete Portrait's work to complete the Project, cost of replacement and correction of Portrait's deficient and defective work, liquidated damages/delay damages, cost for additional testing, inspections, cost for uncovering defective and replacement work, additional program and project management, additional compensation for replacement services, increased and extended insurance costs, additional lending and financing costs, lost revenue, loss of goodwill, and additional expenses made necessary by Portrait's default and abandonment of the Project, which necessitated LN's termination of the Contract.

26. LN hired the undersigned law firm to represent it in this matter and is obligated to pay reasonable fees for the firm's services.

WHEREFORE, Defendant/Counter-Plaintiff, LN APARTMENTS, LLC respectfully requests this Honorable Court enter judgment against Plaintiff/Counter-Defendant, PORTRAIT CONSTRUCTION OF FLORIDA, INC., and awarding

-26-

Portrait nothing on its complaint, and for all damages resulting from and related to its breach of contract, including costs and interest, and grant LN any such further relief as this Court deems just and proper.

## COUNT II – BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

27.    LN adopts and realleges the allegations contained in Paragraphs 1 through 26 of this Counterclaim as though fully set forth herein.

28.    LN and Portrait are parties to the written Contract attached to Portrait's Amended Complaint as Exhibit A, and under Florida law Portrait owes to LN an implied covenant of good faith and fair dealing associated with the Contract.

29.    The purpose of the implied covenant of good faith is "to protect the reasonable expectations of the contracting parties." *Ins. Concepts & Design, Inc. v. Healthplan Services, Inc.,* 785 So. 2d 1232, 1234-35 (Fla. 4th DCA 2001); *see also, Cox v. CSX Intermodel, Inc.,* 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999) ("[T]he implied covenant of good faith and fair dealing is designed to protect the contracting parties' reasonable expectations.").

30.    Portrait's conduct relating to every contractual provision cited in Count I (Breach of Contract) did not comport with LN's reasonable expectations related to Austin's performance under the Contract.

4854-7803-8903 v.2 078615/01500

31.     For example, Portrait failed to install its work in accordance with the Contract Documents, and in at least one instance, Portrait unilaterally and without LN's authorization, installed simpler, cheaper products and features for the Project's cabinets and countertops than those required by the Contract Documents, failed and refused to remove the non-conforming cabinets once directed, and subsequently failed to pass along the cost-savings related to such actions to LN.

32.     Furthermore, there are numerous instances of Portrait acting in bad faith by repeatedly submitting incorrect and exaggerated pricing for changes or claims for additional costs to LN and failing to provide appropriate credits to LN for deductive changes, or to provide credits to LN where otherwise due, causing delay and additional costs relating to LN's project management operations.

33.     Additionally, Portrait failed or refused to timely pay its subcontractors despite receiving payment for said subcontractors from LN.

34.     Finally, Portrait intentionally slowed down its work on the Project, which was already significantly behind schedule due to delays caused by Portrait, so as to further distress the Project and attempt to pressure LN to sell the Project to Portrait Construction Inc.'s CEO, Thomas Day, in his individual capacity, at a price substantially less than its value.

4854-7803-8903 v.2 078615/01500

35.     Portrait's failure to discharge its contractual responsibilities unfairly frustrated the purposes of the Contract and disappointed LN's reasonable expectations.

36.     Portrait's breaches unfairly interfered with LN's receipt of the benefits of the Contract, and LN has suffered damages as a result.

WHEREFORE, Defendant/Counter-Plaintiff, LN APARTMENTS, LLC respectfully requests this Honorable Court enter judgment against Plaintiff/Counter-Defendant, PORTRAIT CONSTRUCTION OF FLORIDA, INC., and awarding Portrait nothing on its complaint, and for all damages resulting from and related to its breach of the implied covenant of good faith and fair dealing, including costs and interest, and grant LN any such further relief as this Court deems just and proper.

## COUNT III – LIQUIDATED DAMAGES

37.     LN adopts and realleges the allegations contained in Paragraphs 1 through 21 and 23 of this Counterclaim as though fully set forth herein.

38.     Portrait breached the Portrait Contract by failing to pursue their work in accordance with the Project schedule. Portrait's failure to timely pursue their work resulted in a delay to the Project's Substantial Completion date.

39.     Article 3 of the Contract sets forth daily Liquidated Damages that shall be assessed against Portrait for failure to achieve the Project's Substantial

4854-7803-8903 v.2 078615/01500

Completion Deadline.

40. Portrait failed to meet the Project's Substantial Completion Deadline.

41. The Liquidated Damages are currently valued at $2,012,072. The Liquidated Damages will continue to accrue and increase until LN is able to achieve the Project's Substantial Completion Deadline of the Project using a replacement contractor.

42. As a direct and proximate result of Portrait's breaches, LN has incurred damages, including, but not limited to delays and delay damages, which the parties had contractually agreed would be addressed via the assessment of liquidated damages by LN.

43. LN hired the undersigned law firm to represent it in this matter and is obligated to pay reasonable fees for the firm's services.

WHEREFORE, Defendant/Counter-Plaintiff, LN APARTMENTS, LLC respectfully requests this Honorable Court enter judgment against Plaintiff/Counter-Defendant, PORTRAIT CONSTRUCTION OF FLORIDA, INC., and awarding Portrait nothing on its complaint, for all damages resulting from and related to its breach of contract, including costs and interest, and grant LN any such further relief as this Court deems just and proper.

## COUNT IV – FRAUDULENT LIEN

44. LN adopts and realleges the allegations contained in Paragraphs 1

through 21 and 23 of this Counterclaim as though fully set forth herein.

45. LN Apartments, LLC, as the record owner of the Property and the party who paid for the improvements on the Property, bring this action pursuant to Florida Statute § 713.31(2)(c) against Portrait for the declaration of a fraudulent lien as defined in Florida Statute § 713.31(2)(c), and for damages and all other appropriate statutory remedies available under Florida Statutes § 713.31(2)(b) and (c), plus an award of costs and attorney's fees pursuant to Florida Statutes § 713.29 and § 713.31(2)(c).

46. On or about July 7, 2023, Portrait recorded its Claim of Lien in the amount of $6,976,419.34. *See* Portrait's Amended Complaint Exhibit "C".

47. Portrait improperly and wrongfully recorded Portrait's Liens against the Property.

48. Portrait's Lien is a "fraudulent lien" under Florida law, because Portrait has asserted a lien which Portrait has "willfully exaggerated the amount for which such lien is claimed or in which [Portrait] has willfully included a claim for work not performed upon or materials not furnished for the property upon which he or she seeks to impress such lien or in which [Portrait] has compiled his or her claim with such willful and gross negligence as to amount to a willful exaggeration." *See* § 713.31, Fla. Stat. Pursuant to Florida Statute § 713.31, the lien "shall be deemed a fraudulent lien."

4854-7803-8903 v.2 078615/01500

49.     First, upon information and belief, Portrait's Claim of Lien is a "fraudulent lien" under Florida law because Portrait included amounts for (1) delays and (2) work which was not approved. For instance, despite the express provisions in the Contract that require changes to be approved in writing and other admonitions that Portrait would assume the risk of doing work without approval, Portrait improperly included in its Claim of Lien amounts for delays and unapproved change orders. *See* Contract Document A201, Article 7. *See also, Onionskin, Inc. v. Deciccio,* 720 So. 2d 257, 258 (Fla. 5th DCA 1998) (Lien willfully exaggerated amount when it included alleged breach of the contract costs, such as delay expenses, outside the fixed price contract amount); *Delta Painting v. Baumann,* 710 So. 2d 663, 664 (Fla. 3d DCA 1998) (Fraudulent lien determination supported by evidence that claim of lien included amounts for additional work unauthorized by owners.); *Hobbs Const. and Develop., Inc. v. Presbyterian Homes of the Synod of Florida,* 440 So. 2d 673 (Fla. 1st DCA 1983).

50.     Second, upon information and belief, Portrait's Claim of Lien is a "fraudulent lien" under Florida law because Portrait improperly included amounts for incomplete, defective, and/or deficient work, which, upon information and belief, included, but was not limited to, work performed on the main entranceway, defective installation of balcony / patio doors, balcony topping slabs with excessive slope, defective shoring support of the columns supporting the balconies, noncompliant

-32-

troughs and deficient stormwater roof drains, defective plumbing systems, deficient refrigerant piping, and failure to complete the Project's HVAC system. *See Onionskin, Inc. v. DeCicco,* 720 So. 2d at 258 ("…the basis of the lien is essentially for the value added to the property.") and *Viyella Co. v. Gomes,* 657 So. 2d 83 (Fla. 3d DCA 1995) (Lien deemed fraudulent where lienor had included claims for work even though lienor had not fully performed the contract.).

51.    Third, upon information and belief, Portrait's Claim of Lien is a "fraudulent lien" under Florida law because Portrait has failed to provide LN a credit for the liquidated damages incurred as a result of delays to the completion of the Project for which Portrait has acknowledged its responsibility for certain delays.

52.    Fourth, upon information and belief, Portrait's Claim of Lien is a "fraudulent lien" under Florida law because it includes costs associated with profit Portrait would have made had under the Contract and costs Portrait has not yet earned, including all retainage on the Project.

53.    As a direct and proximate result of Portrait's fraudulent lien, LN has sustained and will in the future continue to sustain losses, damages, and injury.

54.    Said losses, damages, and injury include, but are not limited to, court costs, clerk's fees, reasonable attorneys' fees and costs for services in securing the discharge of the lien, the amount of any premium for a bond given to obtain the discharge of the lien, interest on any money deposited for the purposes of

discharging the lien, and also costs to correct the defective and deficient work.

55.  LN is entitled to punitive damages in an amount not exceeding the difference between the amount actually due to Portrait, if any, and the amount of the fraudulent lien pursuant to Florida Statute § 713.31(2)(c).

56.  LN hired the undersigned law firm to represent it in this matter and is obligated to pay reasonable fees for the firm's services for which Portrait is liable pursuant to Florida Statutes § 713.29 and § 713.31.

WHEREFORE, Defendant/Counter-Plaintiff, LN APARTMENTS, LLC respectfully requests this Honorable Court to:

A.  Determine that Portrait's Claim of Lien is improper, unenforceable, and fraudulent;

B.  Enter an Order vacating and canceling Portrait's Claim of Lien;

C.  Award all statutory remedies, including losses, damages, and injury including, but not limited to, court costs, clerk's fees, reasonable attorneys fees and costs for services in securing the discharge of the lien, the amount of any premium for a bond given to obtain the discharge of the lien, interest on any money deposited for the purpose of discharging the lien, and also costs to correct the defective and deficient work.

D.  Award statutory punitive damages in an amount not exceeding the different between the amount actually due to Portrait, if any, and the

amount of the fraudulent lien pursuant to Florida Statute §713.31.

E. Award court costs and attorney's fees pursuant to Florida Statutes § 713.29 and/or §713.31; and

F. Award such other and further relief that this Court deems just, equitable and proper.

## COUNT V – VIOATION OF FLA. STAT. § 553.84

57.     LN adopts and realleges the allegations contained in Paragraphs 1 through 19 and 21 of this Counterclaim as though fully set forth herein.

58.     The purpose of the Florida Building Code (the "Code") is to establish minimum requirements to protect the health, safety, and welfare of the public. Its provisions apply to, among other things, construction, alteration, modification, and repairs of buildings and structures.

59.     At all times relevant to this cause of action, Portrait was required to perform its Work in accordance with the Code.

60.     Throughout the course of the Project, Portrait violated numerous sections of the Code while performing its Work, thereby giving rise to LN's claim for damages under § 553.84, Florida Statutes.

61.     At all times relevant to this cause of action, Portrait knew or reasonably should have known during its Work that Code violations existed. In addition to the numerous notices provided by LN during the course of the Project, LN also provided

Portrait with a copy of Partner Engineering and Science, Inc.'s ("Partner Engineering") June 14, 2023 detailed assessment and assessment of the Project, which outlined significant defects and deficiencies with Portrait's work. A true and correct copy of Partner Engineering's letter is attached hereto as **Exhibit "A"**.

62. As a direct and proximate result of Portrait's violations of the Code, LN has been damaged.

WHEREFORE, Defendant/Counter-Plaintiff, LN APARTMENTS, LLC respectfully requests this Honorable Court enter judgment against Plaintiff/Counter-Defendant, PORTRAIT CONSTRUCTION OF FLORIDA, INC., and awarding Portrait nothing on its complaint, for all damages resulting from and related to its negligence, including costs and interest, and grant LN any such further relief as this Court deems just and proper.

## COUNT VI – VIOLATION OF FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, *Fla. Stat. § 501.201, et seq.*

63. LN adopts and realleges the allegations contained in Paragraphs 1 through 19 of this Counterclaim as though fully set forth herein.

64. This count seeks damages against Portrait for violating Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Chapter 501.

65. FDUTPA broadly prohibits all "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the

-36-

conduct of any trade of commerce."

66.     Portrait has engaged in trade and/or commerce within the meaning of FDUTPA, and LN has the right to pursue remedies under the FDUTPA.

67.     LN is a consumer under § 501.203(7).

68.     At all material times, Portrait was engaged in trade or commerce as defined by § 501.203(8).

69.     At the outset of the Project, Portrait expressly assured LN that it had sufficient skill, experience, and competent team members to perform the work required by the Contract. As a result of these assurances, LN agreed to award the Project to Portrait.

70.     Furthermore, under the Contract, Portrait was to provide full and complete services necessary for the construction of the Project.

71.     Portrait engaged in deceptive or unfair practices in the course of trade or commerce by promising it could and would properly and sufficiently staff the Project with skilled and competent workers, but repeatedly and consistently failed and refused to do so.

72.     Portrait further engaged in deceptive or unfair practices in the course of trade or commerce by intentionally slowing down and delaying its work on the Project in an effort to decrease the value of the Project and aid Portrait Construction Inc.'s CEO Thomas Day 's efforts to purchase the Project at a significantly

-37-

diminished value.

73.     Portrait committed these intentional actions and inactions all while
actively negotiating a "reset" of the Project that would resolve the outstanding
defects and deficiencies in Portrait's work and provide for Portrait to complete the
remaining work on the Project.

74.     Shortly after Mr. Day's improper attempts to purchase the Project at a
significantly diminished amount, for which he cited the Project delays and issues as
justification for the significantly undervalued offer, LN terminated Portrait for cause
on or about April 20, 2023.

75.     As a direct and proximate result of Portrait's deceptive behavior and
injurious conduct, LN has sustained actual damages in an amount equal to the costs
associated with the extensive delays incurred as a result of Portrait's failure to
properly staff the Project, the costs necessary to remedy the various defects and
deficiencies in the work performed by Portrait, the costs to complete the remaining
work on the Project that Portrait abandoned, increased Project management costs,
increased interest costs, increased insurance premiums, costs incurred in hiring
consultants to evaluate and document Portrait's defective work, lost profits, loss of
reputation, and loss of good will.

WHEREFORE, Defendant/Counter-Plaintiff, LN APARTMENTS, LLC
respectfully requests this Honorable Court enter judgment against Plaintiff/Counter-

Defendant, PORTRAIT CONSTRUCTION OF FLORIDA, INC., and awarding Portrait nothing on its complaint, awarding LN actual damages, consequential damages, special damages, costs, attorney's fees pursuant to Section 501.2105, and grant LN any such further relief as this Court deems just and proper.

Respectfully submitted this 30th day of August, 2023.

> **NELSON MULLINS RILEY &**
> **SCARBOROUGH LLP**
>
> By: */s/ Michael K. Wilson*
> **MICHAEL K. WILSON, ESQ.**
> Florida Bar 0657069
> **PAUL A. BENNETT, ESQ.**
> Florida Bar 0106278
> 390 North Orange Avenue, Suite 1400
> Orlando, FL 32801
> T: 407.669.4200
> F: 407.425.8377
> mike.wilson@nelsonmullins.com
> paul.bennett@nelsonmullins.com
> tracy.wilson@nelsonmullins.com
> melissa.tejada@nelsonmullins.com
> *Attorneys For Defendant, LN Apartments,*
> *LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of August, 2023, a true and correct copy of the foregoing has been filed with the Clerk of Court by using the Florida Court's eFiling Portal, which will send notice and electronic copy to: **Brian P. Kirwin, Esq.** and **April A. Rocke, Esq.,** Kirwin Norris, P.A., 15 West Church

Street, Suite 301, Orlando, FL    32801 (bpk@kirwinnorris.com and

aar@kirwinnorris.com) *Counsel for Plaintiff)*.

By    */s/ Michael K. Wilson*
      **MICHAEL K. WILSON, ESQ.**
      Florida Bar 0657069

4854-7803-8903 v.2 078615/01500

# EXHIBIT "A"



# PROPERTY CONDITION REPORT

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832

June 14, 2023
Partner Project Number: 23-402327.2

Prepared for:

**Nelson Mullins**
**Futura**
Orlando, Florida 32801
Winter Park, Florida 32789



**Engineers who understand your business**



June 14, 2023

Mr. Michael Wilson, Esq.
Partner
Nelson Mullins
390 North Orange Ave., Suite 1400
Orlando, Florida 32801

Mr. Reinerio P. Faife
President
Futura
147 East Lyman Avenue, Suite C
Winter Park, Florida 32789

Subject:       Property Condition Report
               Futura at Nona Cove Apartments
               19465 Boggy Creek Road
               Orlando, Florida 32832
               Partner Project No. 23-402327.2

Dear Mr. Wilson:

Partner Engineering and Science, Inc. (Partner) is pleased to provide the results of the assessment performed on the above-referenced property. At a minimum, this assessment was performed in conformance with the scope and limitations as set forth by ASTM E2018-15 "Standard Guide for Property Condition Assessments: Baseline Property Condition Assessment Process" and as specified in the engagement agreement that initiated this work.

The purpose of this assessment is to describe the primary systems and components of the subject property and to identify conspicuous defects or material deficiencies.

This assessment was performed utilizing methods and procedures consistent with good commercial or customary practices designed to conform to acceptable industry standards. The independent conclusions represent Partner's best professional judgment based upon existing conditions and the information and data available to us during the course of this assignment.



We appreciate the opportunity to provide these assessment services. If you have any questions concerning this report, or if we can assist you in any other matter, please contact Drew McCreery at 310-357-8318 or dmccreery@partneresi.com.

Sincerely,

Partner Engineering and Science, Inc.

**DRAFT**

Justin M Lia P.E
Principal | Director, Institutional A.E Services

**DRAFT**

Drew McCreery
National Client Manager

# EXECUTIVE SUMMARY AND PROPERTY DESCRIPTION

**Executive Summary**

In accordance with the requirements of Futura, Partner Engineering and Science, Inc. (Partner) has performed a property condition assessment (PCA) of the parcel and improvements located at 19465 Boggy Creek Road, Orlando, Florida (subject property). The assessment was performed in accordance with ASTM E2018-15 "Standard Guide for Property Condition Assessments: Baseline Property Condition Assessment Process". The purpose of this PCA was to observe and document readily-visible materials and building system defects that might significantly affect the value of the subject property, and determine if conditions exist which may have a significant impact on the continued operation of the facility.

The subject property improvements are placed upon one parcel. Per the ALTA/ACSM survey, dated February 4, 2010, the parcel is irregularly-shaped and comprise 5.58 acres. The subject property is bound by Narcoossee Road to the Northeast, Boggy Creek Road to the South, adjacent single-family homes to the West, and retail properties to the East.

| Parcel | Assessor's Parcel Number (APN) | Square Feet | Acreage | Parcel Improvements |
|--------|-------------------------------|-------------|---------|---------------------|
| A | 32-24-31-5148-01-000 | 243,064 | 5.58 | One 5-story building with attached parking structure |
| | **Total:** | 243,064 | 5.58 | |

The subject property is a single-building, five-story multi-family residential property containing approximately 258,760 square feet of rentable space with an attached parking structure.

The subject property features 260 apartment units and amenity spaces. <u>The building is currently under construction and is approximately 80% complete.</u> Detailed physical measurements were not performed as part of this assessment. Parking is not included in the gross area calculations.

The subject property is located on a relatively flat parcel with access from street level from the North from Narcoossee Road and from the South from Boggy Creek Road.

Parking is provided by a six level, attached concrete parking structure and a small surface lot near the leasing office. According to the information provided, the subject property contains a total of 442 parking spaces, including nine surface spaces and 433 spaces within the parking garage. Parking spaces have not been striped yet, therefore no accessible spaces are currently in place.

The building is founded on a post tension reinforced concrete slab-on-grade system with perimeter strip footings and interior footings below bearing locations. Post tension rods provide reinforcement to the slab. The elevated floor systems for the building consist of conventional wood stud and joist platform framing. Roof framing appears to consist of wood trusses and joists supporting a plywood deck. Roof coverings consist of a single-ply thermoplastic (TPO) membrane over low-slope construction.

The exterior walls of the building consist of fiber cement board siding, stucco, and dry stack manufactured stone with caulked joints at each panel intersection as well as at the interface with dissimilar materials. The flat roofing areas consist of a single-ply, 60 mil, adhered thermoplastic polyolefin (TPO) roofing system. The



main entrance consists of a pair of aluminum-framed doors with full-height glazing set in an aluminum storefront system. Secondary doors are painted, hollow metal set in metal frames and tenant unit entrance doors are painted hollow metal set in metal frames.

Windows are part of the storefront entry system or are punch-type windows at the office floors. The windows consist of tinted, double-pane glazing in clear anodized-aluminum frames. A glass panel curtain wall system was observed at the main entrance and pool deck entrance of the subject building. The curtain wall consists of tinted insulated glass.

Single hung windows appeared to be double-pane fixed and operable units. Window framing was observed to be vinyl. Windows at the building entrances are part of a storefront window system consisting of full height, low-e glazing in aluminum frames that incorporates the entry doors.

Heating, ventilation, and air conditioning for the buildings are provided by direct expansion (DX) split systems. The residential apartment units are provided with units ranging in capacity from 1.5 to 2.5 tons, the common areas are provided with units ranging in capacity from 1.5 to 4 tons. Additionally, ductless mini-split systems are provided for the garage elevator lobbies and trash room areas. Outside air is directly introduced into the return air plenum of the residential apartment units via concealed ductwork from the exterior façade. Ventilation is further provided by a series of exhaust fans.

Domestic water is supplied from a single, 6-inch municipally owned and maintained water main entering the subject property from the northwest into the domestic water booster pump room in the ground floor level of the parking garage. Water distribution lines are CPVC and drainage lines are PVC. Sanitary drainage and vent piping were both reported and observed to be PVC. Natural gas was not observed to be provided.

The building is sprinklered with a wet pipe, automatic fire sprinkler system.

The residential apartment building is serviced with primary power at 4 locations on the ground floor, that each feed an additional 4 locations on the fourth floor. Power riser and meter centers tag: A1 & A4 are rated at 1,400 and 1,200 amps, respectively; power riser and meter centers tag: B1 & B4, C1 & C4, D1& D4 are rated at 1,600 and 1,200 amps, respectively. All residential services are 120 / 208 volts, 3 phase. The parking garage is fed separately by a dedicated 2,000 amp, 120 / 208 volts, 3 phase main, located on the ground floor at the northwest corner.

The subject property has 3 passenger elevators servicing the residential apartment units, rated at 3,500 lbs. capacity, each. Two are accessible from the parking garage and one is located centrally within the subject building. The elevators were manufactured by Otis Elevator Company. The elevators are traction with electronic controls.

**Overall Condition**

Based on the systems and components observed during the site visit, the subject property appeared to be in varied states of construction with numerous deficiencies and poor workmanship observed.. The detailed observations of reviewed systems are presented in the following Sections of this report, with tabulated summary of deficiencies provided in the Appendices.



**Reported Capital Expenditures**

Ongoing construction of the site building and site elements.

**Immediate and Short-Term Repair Items**

This report presents a list of deficiencies for items or conditions that require immediate action as a result of the following: Material existing or potentially unsafe conditions, material code violations, or any other physical deficiencies that if left uncorrected would be expected to result in or contribute to the failure of critical elements or systems within one year which may result in additional remediation. These items should be addressed at the first practical opportunity.

In addition, this report presents a list of deficiencies for items or conditions that may not require immediate action, but should be conducted on a priority basis..

Deferred maintenance items and/or physical deficiencies that are considered significant are also identified in the Deficiency Table - Immediate Repair and Short Term repair.

**Expected Useful Life**

Unless noted otherwise, the subject property appeared to be performing within its intended purpose. Assuming the collective building systems are maintained within industry-recognized standards of care with respect to scope and frequency and correction of apparent deficiencies, the remaining useful life of the subject property is estimated to be no less than 35 years from date of substantial completion. This opinion assumes indemnity from natural disaster and is based on observations within the limits of ASTM E 2018-15.

**Deviation from ASTM E2018**

The deviations listed below are part of the Partner standard operating procedures or were specified in the Client's scope of work.

- This report includes seismic zone information that is not required by the Standard.
- This report includes an evaluation of the condition of the observed components and systems.
- This report excludes Opinions of Costs for suggested remedies of the physical deficiencies identified.

**Recommendations for Additional Investigations**

During the observations at the subject property, the following suspect conditions were determined to warrant further investigation. Further detail of the issues observed is provided in the following sections of the report.

- Additional structural engineering assessment is recommended to evaluate the saw cut framing members in load bearing walls done by the general contractor to recess the refrigerators in the apartments to gain proper clearance for FHA regulations.
- Window Destructive Investigation - Contractor shall remove finishes so installation and repair methods for windows can be observed directly, and a corrective scope of work can be developed, citing reasonable doubt of proper installation of waterproofing details.
- Detailed analysis by an architect, interior designer, installer, and cabinet manufacturer should be performed to remedy non-compliant cabinet and island details to remedy FHA non-compliance



issues regarding knee space, distance between islands, and cabinets, poor installation details, and material defects citing reasonable doubt for proper installation.





**PARTNER**
Engineering and Science, Inc.

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-4023272
Project Type: Multi-Family
ber of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| | **§2.0 – RECON, REGULATORY & DOCUMENT REVIEW** | | | |
| | No significant items noted. | | | |
| | **§3.0 – PROPERTY CHARACTERISTICS** | | | |
| 3.2.4 | Verification that irrigation lines and drainage pipes are not encroaching on proposed landscaping needs (tree root balls, shrubs, etc) | 1 | AL | Underground utilities / irrigation lines should be surveyed to verify that all items are in proper locations per the construction plans. A number of issues arose during installation of landscaping, where irrigation and drain lines were located where trees were planned to be planted. |
| 3.2.5 | Replace deflecting retaining walls bordering the on-site retention pond near the pool area along the Western perimeter of courtyard A. | 2,500 | SF | The retaining wall between the retention pond and the site walkways in the Southern section of the site exhibit lateral movement as a result of heavy machinery driving too close to the retaining wall. |
| 3.2.8 | Replace damaged and non-compliant exterior lighting and complete the remaining installation. | 1 | AL | The exterior lighting installation was observed to be incomplete, damaged and non-compliant with the contract documents. An allowance for the replacement with the correct lighting and completion of the installation is recommended. |
| | **§4.1 & 4.2 – STRUCTURAL FRAME** | | | |
| 4.1 | Verification that all foundation post tension rods are present without slack. | 1 | AL | Post tension cables in select areas were reported to have excessive slack. Testing to verify that all tension rods are intact and properly tensioned is recommended to ensure proper reinforcement of the foundation slab. |
| 4.2 | Allowance for additional structural engineering assessment to evaluate the saw cut framing members in load bearing walls done by the general contractor to recess the refrigerators in the apartments to gain proper clearance for FHA regulations. | 1 | AL | Wood studs were saw cut to recess the fridges in the kitchens of the apartment units. Many of these framing members in load bearing walls were damaged due to over-cuts performed by the contractors as they cut into the walls. These cuts could compromise the structural integrity of these walls, therefore a structural analysis of these walls should be performed to determine the proper course of action to remedy the damaged framing members, and to verify that the building framing will be able to properly disburse loads. |
| 4.2 | Repair damaged framing members cut as a result of cuts made into the walls behind fridges in the apartments. | 104 | EA | Repair allowance to remedy the cut structural members in each unit following structural analysis. |



**PARTNER**
Engineering and Science, Inc.

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-402327.2
Project Type: Multi-Family
ber of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| **54.3 - FACADES OR CURTAIN WALLS** | | | | |
| 4.3.1 | Complete main entrance and pool deck entrance walls from the ground level to the parapet. | 1 | AL. | The main entranceway is not per plans and specifications. An allowance for removal and reinstallation, compliant with design documents is recommended. |
| 4.3.1 | Touch up of the sealant joints at the parking garage. | 1 | AL. | The tilt-wall panels that were observed to be exhibiting loss of adhesion. |
| 4.3.2 | Window Destructive Investigation - Contractor shall remove finishes so installation and repair methods for windows can be observed directly, and a corrective scope of work can be developed. | 1 | AL. | Remove siding / stucco around windows, remove the windows, repair waterproofing details around windows, repair weather barrier, apply self adhered flashing, and replace previously removed siding / stucco. |
| 4.3.2 | Repair waterproofing details on windows. | 152,880 | SF | Remove siding / stucco around windows, remove the windows, repair waterproofing details around windows, repair weather barrier, apply self adhered flashing, and replace previously removed siding / stucco. |
| 4.3.3 | Remove and reset patio / balcony doors that are inoperable. | 30 | EA | Balcony / patio doors were either inoperable or required excessive force to open. The door jambs and thresholds on these doors appeared to be too tight and not allowing the doors to open properly. The doors need to be removed, properly shimmed, then reinstalled and sealed. |
| 4.3.3 | Install proper weatherstripping on patio / balcony doors. | 260 | EA | Patio / balcony doors were observed with insufficient weatherstripping with a number of doors missing weatherstripping all together. Replace all weather stripping. |
| 4.5 | Remove and replace balcony topping slabs. | 16,900 | SF | Balcony topping slabs were observed with excessive slope, with many topping slabs observed to be higher than the interior finished floor in the apartments. The excessive height also becomes and ADA concern as the threshold is too high and creates a potential tripping hazard. |
| 4.5 | Destructive testing of deflected balcony columns at courtyard A and B. | 1 | AL. | The columns supporting the balcony stacks at the Southwest corners of courtyards A and B exhibit damage from previous shoring operations. It was reported that the footers of these columns were replaced as a result of the original footings sinking and causing the balcony stacks to deflect. When shoring operations were completed, no verification of condition of balcony framing was performed to verify that no damage to framing was present. |
| 4.5 | Allowance to repair deflected balconies in courtyard A and B | 10 | EA | Repair allowance to repair the stucco fascia, soffits, and any damaged framing members following the destructive testing of these balcony stacks. |


**PARTNER**
Engineering and Science, Inc.

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-4023272
Project Type: Multi-Family
ber of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| **S4.4 - ROOF** | | | | |
| 4.4.1 | Roof replacement and install tapered insulation. | 52,262 | SF | Remove roof membrane and install tapered insulation to provide proper slope to remedy ponding on roof surface. |
| 4.4.1 | Roof drain height adjustment / coordination. | 40 | EA | The stormwater roof drains were observed to be installed above the roof, at incorrect height levels, disallowing drainage of stormwater from the roof. The drains will been to be removed and reinstalled in coordination with the roof pitch. |
| **S5.1 - PLUMBING, DOMESTIC WATER, & SEWER SYSTEMS** | | | | |
| 5.1 | Clean / flush plumbing systems. | 1 | LS | The plumbing systems have been left in state of partial operation. Cleaning and flushing of the plumbing systems (i.e, domestic water and sanitary, drainage and vent piping systems) is recommended in order to ensure proper operation. |
| 5.1 | Energize /start / commission domestic water booster pump. | 1 | EA | The domestic water booster pump was observed to be off-line and was reported to have never been started. Start-up and commissioning by the manufacturer's representative is recommended. |
| 5.1 | Completion of the plumbing systems installation - Building - Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Building Plumbing line item to be used for completion of the Building Plumbing systems installation. |
| 5.1 | Completion of the plumbing systems installation - Building - plumbing retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Building Plumbing line item is recommended to be included for the completion of the Building Plumbing system installation. |
| 5.1 | Smoke testing, dye testing, and video scoping of underground sanitary sewer pipes to verify that all pipes are functional. | 1 | AL | Smoke tests, dye tests, and scoping of sanitary sewer systems is recommended to verify that drain plumbing is not leaking or blocked, and is venting properly. This testing can verify that all sewer mains tie into the municipal system and identify any potential problem areas. |
| 5.1 | Completion of the plumbing systems installation - Building - 10% of the scheduled value of the plumbing line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Building Plumbing line item is recommended to be included for the completion of the Building Plumbing system installation. |



**PARTNER**
Engineering and Science, Inc.

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-4023272
Project Type: Multi-Family
ber of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| | **S5.2 - HEATING, VENTILATION, & AIR CONDITIONING** | | | |
| 5.2 | Clean supply air ductwork and DX split system evaporator coils. | 270 | EA | The DX split system air handling units have been placed in operation, while construction activities were taking place. This has resulted in the evaporator coils and supply air ductwork being exposed to dust, etc. for which specialized professional cleaning is recommended. |
| 5.2 | Roof mounted DX split system refrigerant line-set coordination with condensing unit racks. | 20 | EA | The refrigerant piping for the DX split systems, between the gooseneck fittings and the condensing unit racks on the roof has been improperly coordinated. This has resulted in multiple areas of impeded accessibility and excessive refrigerant piping runs. Proper coordination and corresponding adjustment is recommended. |
| 5.2 | Completion of the HVAC systems installation - Building - Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Building HVAC line item to be used for completion of the Building HVAC systems installation. |
| 5.2 | Completion of the HVAC systems installation - Building - HVAC retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Building HVAC line item is recommended to be included for the completion of the Building HVAC system installation. |
| 5.2 | Completion of the HVAC systems installation - Building - 10% of the scheduled value of the Building HVAC line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Building HVAC line item is recommended to be included for the completion of the Building HVAC system installation. |
| 5.2 | Completion of the HVAC systems installation - Garage - Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Garage HVAC line item to be used for completion of the Garage HVAC systems installation. |
| 5.2 | Completion of the HVAC systems installation - Garage - HVAC retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Garage HVAC line item is recommended to be included for the completion of the Garage HVAC system installation. |
| 5.2 | Completion of the HVAC systems installation - Garage - 10% of the scheduled value of the Garage HVAC line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Garage HVAC line item is recommended to be included for the completion of the Garage  HVAC system installation. |

**PARTNER**
Engineering and Science, Inc.

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-402327.2
Project Type: Multi-Family
ber of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| **§5.3 - ELECTRICAL SUPPLY & NATURAL GAS** | | | | |
| 5.3 | Completion of the Electrical systems installation - Building - Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Building Electrical line item to be used for completion of the Building Electrical systems installation. |
| 5.3 | Completion of the Electrical systems installation - Building - Electrical retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Building Electrical line item is recommended to be included for the completion of the Building Electrical system installation. |
| 5.3 | Completion of the Electrical systems installation - Building - 10% of the scheduled value of the Building Electrical line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Building Electrical line item is recommended to be included for the completion of the Building Electrical system installation. |
| 5.3 | Completion of the Electrical systems installation - Garage - Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Garage Electrical line item to be used for completion of the Garage Electrical systems installation. |
| 5.3 | Completion of the Electrical systems installation - Garage - Electrical retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Garage Electrical line item is recommended to be included for the completion of the Garage Electrical system installation. |
| 5.3 | Completion of the Electrical systems installation - Garage - 10% of the scheduled value of the Electrical line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Garage Electrical line item is recommended to be included for the completion of the Garage Electrical system installation. |
| 5.3 | Completion of the DAS - Emergency Response RF systems installation - Building - Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Building DAS - Emergency Response RF line item to be used for completion of the Building DAS - Emergency Response RF systems installation. |
| 5.3 | Completion of the DAS - Emergency Response RF systems installation - Building - DAS - Emergency Response RF retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Building DAS - Emergency Response RF line item is recommended to be included for the completion of the Building DAS - Emergency Response RF system installation. |
| 5.3 | Completion of the DAS - Emergency Response RF systems installation - Building - 10% of the scheduled value of the Building DAS - Emergency Response RF line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Building DAS - Emergency Response RF line item is recommended to be included for the completion of the Building DAS - Emergency Response RF system installation. |
| 5.3 | Completion of the Low Voltage A/V systems installation - Building - Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Building Low Voltage A/V line item to be used for completion of the Building Low Voltage A/V systems installation. |



**Engineering and Science, Inc.**

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-403327.2
Project Type: Multi-Family
ber of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| 5.3 | Completion of the Low Voltage A/V systems installation – Building – Low Voltage A/V retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Building Low Voltage A/V line item is recommended to be included for the completion of the Building Low Voltage A/V system installation. |
| 5.3 | Completion of the Low Voltage A/V systems installation – Building – 10% of the scheduled value of the Building Low Voltage A/V line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Building Low Voltage A/V line item is recommended to be included for the completion of the Building Low Voltage A/V system installation. |
| **55.4 - VERTICAL CONVEYANCES** | | | | |
| 5.4.1 | Completion of the Elevator systems installation – Building – Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Building Elevator line item to be used for completion of the Building Elevator systems installation. |
| 5.4.1 | Completion of the Elevator systems installation – Building – Elevator retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Building Elevator line item is recommended to be included for the completion of the Building Elevator system installation. |
| 5.4.1 | Completion of the Electrical systems installation – Building – 10% of the scheduled value of the Building Elevator line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Building Elevator line item is recommended to be included for the completion of the Building Elevator system installation. |
| 5.4.1 | Completion of the Elevator systems installation – Garage – Remaining unbilled balance on contract (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The remaining unbilled balance of the Garage Elevator line item to be used for completion of the Garage Elevator systems installation. |
| 5.4.1 | Completion of the Elevator systems installation – Garage – Elevator retainage amount (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | The value of the retainage of the Garage Elevator line item is recommended to be included for the completion of the Garage Elevator system installation. |
| 5.4.1 | Completion of the Elevator systems installation – Garage – 10% of the scheduled value of the Elevator line item (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). | 1 | EA | An amount equal to 10% of the total scheduled value of the Garage Elevator line item is recommended to be included for the completion of the Garage Elevator system installation. |


PARTNER
Engineering and Science, Inc.

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-4023272
Project Type: Multi-Family
ber of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| **S5.5 - LIFE SAFETY & FIRE PROTECTION** | | | | |
| 5.5 | Fire Seal HVAC refrigerant line-set penetrations at gooseneck fittings on roof. | 30 | EA | The fire sealing of the DX split system refrigerant piping at the gooseneck fittings on the roof was noted to be missing. Per detail entitled "Roof Jack Installation Detail," on Dwg M7.02, fire stop compound is shown to be installed at the roof penetration points where the refrigerant lines enter and exit. |
| 5.5.1 | Revise hydraulic calculations. | 1 | LS | Revise hydraulic calculations to align with actual pump installed (Fairbanks Nijhuis 1000 GPM installed vs. Fairbanks Morse 500 GPM). (Note that a more recent hydrant flow test may be required.) |
| 5.5.1 | Sprinkler Installation Incomplete. | 60 | EA | Approximately 20% of units and hallways were observed to have protective covers installed. Remove/discard covers and install escutcheons in these locations. |
| 5.5.1 | Verification of Previous Sprinkler Work. | 80 | EA | If a new contractor is selected to complete work, they will want to verify that previous piping/sprinkler heads/equipment are installed properly. |
| 5.5.1 | Sprinkler Coordination. | 30 | EA | Sprinklers were observed to hang below ceiling in the fitness club, coworking space, and the two-story clubhouse areas. Unclear whether a drop ceiling is planned to be installed. Coordinate to ensure that sprinklers are installed at an appropriate height relative to the final planned ceilings. |
| 5.5.1 | Stair 1 Riser Uncharged. | 1 | LS | It was observed that Riser 1 was at 0 psi, implying that one of the risers was not charged with water. |
| 5.5.1 | Missing In-Unit Fire Extinguishers. | 130 | EA | Fire extinguishers were observed in roughly half of the units surveyed, under the kitchen sink. Provide fire extinguishers in the remaining half of units. |
| 5.5.2 | Fire Alarm Panel Installation Incomplete. | 1 | LS | Fire Elite ES-200X observed to be installed in fire alarm closet, but interior of panel appeared to be unfinished. Assumes programming sequence of operations and interfacing with relays has not been started. Complete installation of fire alarm panel. (Note that the FA drawings indicate a second fire alarm control panel in an electrical closet in the parking garage that was not accessible by JH on site, so the status of that panel could not be verified. It is assumed this second panel is in an equivalent state.) |
| 5.5.2 | Verification of Previous FA Work. | 80 | EA | If a new contractor is selected to complete work, they will want to verify that previous wiring/devices are installed properly. |
| 5.5.2 | Missing Smoke Detectors at Elevator. | 5 | EA | Elevator inside apartment building missing smoke detector. Wiring appears to have been pulled, install smoke detector. These detectors will also need to be interfaced with elevator controls/fire alarm system. |
| 5.5.2 | Covers Provided on Smoke Detectors. | 56 | EA | Nearly all smoke detectors installed in the building were covered by caps. These must be removed in order for them to function properly. |
| 5.5.4 | Corridor Smoke Barrier Door Installation Incomplete. | 6 | EA | Life safety drawings indicate cross-corridor doors on Level 1. Corridors are stated to be one-hour rated, and per Table 716.5, opening protectives in corridor walls must be 1/3 hour rated. Provide appropriately rated door and frame assembly in these locations. |
| 5.5.4 | Fire Barrier Door Installation Incomplete. | 10 | EA | Life safety drawings indicate doors in 3-hour fire-resistance rated barrier at building separations. Per Table 716.5, opening protectives in 3 hour fire barriers must be 3 hour rated. Provide appropriately rated door and frame assembly in these locations. |

# DEFICIENCY TABLE - IMMEDIATE AND SHORT TERM REPAIRS



**Engineering and Science, Inc.**

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-4023272
Project Type: Multi-Family
ber of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| 5.5.3 | Horizontal Exit Fire Door Swing. | 6 | EA | Verify the that the horizontal exit fire door from the garage to the apartment building (which acts as the second exit from each floor of the garage, in its southeast corner) swings into the apartment building. If it does not, reinstall door/frame so that the door swings in the direction of egress travel for the occupants. |
| **56.0 - INTERIOR ELEMENTS** | | | | |
| 6.0 | Detailed analysis by an architect, interior designer, installer, and cabinet manufacturer should be performed to remedy non-compliant cabinet and island details to remedy FHA non-compliance issues regarding knee space and distance between islands and cabinets. | 1 | AL | The cabinets and islands were observed to be non-compliant with current design drawings and FHA regulations. Clearance between islands and refrigerators is not sufficient to meet FHA standards. Many of the cabinet details called for in the original drawings do not match what was installed. |
| 6.0 | Refacing bathroom cabinets. | 1 | AL | The bathroom cabinets installed are not compliant with design drawings, an allowance for resurfacing the installed cabinetry is included. |
| 6.0 | Anticipated replacement of non-compliant cabinet and island details. | 1 | AL | Many of the cabinets installed are not compliant with design drawings and utilize improper hardware and excessive use of spacers. Cabinet hardware is not consistent throughout, and no soft-close drawers were installed. Replacement of the cabinetry should remedy the accessibility concerns flagged in the stand alone ADA report. |
| 6.0 | Allowance to send a sample of the counter top material to verify material installed. | 1 | AL | Concerns were raised that the countertop material installed is not actual quartz, as countertops are exhibiting excessive wear. A sample of the countertop material should be removed and sent to a lab to determine if the material installed is the material that was billed. |
| 6.0 | Anticipated replacement of non-compliant countertops. | 1 | AL | Countertops were observed to be poorly installed in a number of units with widespread damage (chipped corners, cracks, and scratches). Improper counter top sizes were observed on the islands where the overhangs were not sufficient enough to allow knee space for a person to sit at the islands. Installation of proper countertops with proper size details to provide the proper dearances for FHA compliance is recommended. |
| 6.0 | Replacement of damaged vinyl plank flooring in apartment units. | 124,900 | SF | Approximately 80% of the units were observed with excessive debris and cosmetic damage to the vinyl plank flooring. Damage was most likely caused during construction as the contractors did not utilize any paper floor protection after floors were installed. The damaged flooring will need to be replaced. |
| 6.0 | Re-level finished floors in apartment units. | 156 | APT | Approximately 60% of the units were observed with poor finish floor leveling details, leading to large gaps between baseboards and the finished floor. Proper leveling of the finished floor with Gypcrete is recommended to alleviate the gaps and provide a level floor. |



# DEFICIENCY TABLE - IMMEDIATE AND SHORT TERM REPAIRS

**Futura at Nona Cove Apartments**
19465 Boggy Creek Road
Orlando, Florida 32832
June 14, 2023

Project Number: 23-4023272
Project Type: Multi-Family
Number of Square Feet: 331,150
Year Built: 2024

| SECT. # | ITEM | QTY | UNIT | CONDITION |
|---|---|---|---|---|
| | **§7.0 - ACCESSIBILITY** | | | |
| 7.0 | Exterior Accessible Route. | 1 | AL | Please see standalone ADA report for an in depth analysis of this line item. |
| 7.0 | Interior Access and Access to Goods and Services. | 1 | AL | Please see standalone ADA report for an in depth analysis of this line item. |
| 7.0 | Dwelling Units. | 1 | AL | Please see standalone ADA report for an in depth analysis of this line item. |

**ABBREVIATIONS**

AL - Allowance  APT - Apartment  CD - Crew Day  EA - Each  AVG - Average
FL - Floor  MD - Man Day  LS - Lump Sum  SF - Square Feet  LF - Linear Feet
EUL - Expected Useful Life  RUL - Remaining Useful Life  EFF - Effective
QTY - Quantity

# TABLE OF CONTENTS

**1.0     INTRODUCTION** ......................................................................................................................... 1
  1.1     Purpose .............................................................................................................................. 1
  1.2     Scope of Work .................................................................................................................... 1
  1.3     Descriptive Qualifiers ........................................................................................................ 1
  1.4     User Reliance ..................................................................................................................... 1
**2.0     RECONNAISSANCE, REGULATORY AND DOCUMENT REVIEW** ........................................ 3
  2.1     Site Reconnaissance .......................................................................................................... 3
  2.2     Property Personnel Interviewed/Contacted .................................................................... 3
  2.3     Regulatory Compliance Inquiry ........................................................................................ 3
  2.4     Code Review ...................................................................................................................... 4
  2.5     Document Review .............................................................................................................. 4
**3.0     PROPERTY CHARACTERISTICS** ........................................................................................ 5
  3.1     Parcel Configuration ......................................................................................................... 5
  3.2     Site Improvements ............................................................................................................ 5
    3.2.1    Topography and Storm Water Drainage ...................................................................... 5
    3.2.2    Vehicular Access, Paving ............................................................................................. 5
    3.2.3    Walkways, Grade-Level Steps and Ramps .................................................................. 6
    3.2.4    Landscaping and Irrigation .......................................................................................... 6
    3.2.5    Retaining Walls ............................................................................................................ 6
    3.2.6    Site and Building Signage ............................................................................................ 7
    3.2.7    Perimeter Walls, Gates, and Fences ........................................................................... 7
    3.2.8    Exterior Lights .............................................................................................................. 7
    3.2.9    Site Amenities ............................................................................................................. 8
    3.2.10   Refuse Transfer Areas ................................................................................................. 8
    3.2.11   Special Utility Systems ................................................................................................ 8
    3.2.12   Utility Service Providers .............................................................................................. 8
**4.0     STRUCTURAL FRAME AND BUILDING ENVELOPE** ......................................................... 10
  4.1     Foundation/Substructure ................................................................................................ 10
  4.2     Building Frame ................................................................................................................ 10
  4.3     Facades or Curtain Walls ................................................................................................ 10
    4.3.1    Exterior Walls ............................................................................................................ 11
    4.3.2    Windows ................................................................................................................... 11
    4.3.3    Doors ........................................................................................................................ 12
  4.4     Roof ................................................................................................................................. 12
    4.4.1    Roofing Materials ..................................................................................................... 12
    4.4.2    Roof Drainage ........................................................................................................... 13
  4.5     Fire Escapes, Stairs or Balconies .................................................................................... 13
**5.0     MECHANICAL AND ELECTRICAL SYSTEMS** .................................................................. 15
  5.1     Plumbing, Domestic Hot Water, and Sewer Systems ..................................................... 15
  5.2     Electrical Supply and Natural Gas Distribution .............................................................. 16
  5.3     Vertical Conveyances ...................................................................................................... 17



    5.3.1    Elevators ................................................................................................ 17

    5.3.2    Escalators ............................................................................................... 18

  5.4    Life Safety and Fire Protection ................................................................... 18

    5.4.1    Fire Suppression Systems ....................................................................... 18

    5.4.2    Alarm Systems ....................................................................................... 20

    5.4.3    Means of Egress..................................................................................... 21

    5.4.4    Passive Fire Protection Systems ............................................................. 21

**6.0    INTERIOR ELEMENTS ........................................................................................ 23**

  6.1    Common Areas ........................................................................................... 23

  6.2    Amenities and Special Features.................................................................... 23

  6.3    Support Areas.............................................................................................. 23

  6.4    Commercial Tenant Spaces ......................................................................... 23

  6.5    Residential Spaces ...................................................................................... 23

    6.5.1    Unit Types and Quantities ...................................................................... 23

    6.5.2    Finishes.................................................................................................. 24

    6.5.3    Cabinetry and Fixtures ........................................................................... 24

    6.5.4    Soft Goods ............................................................................................. 25

    6.5.5    Hard Goods and Appliances.................................................................... 25

**7.0    ACCESSIBILITY .................................................................................................. 26**

**8.0    SUSPECT WATER INTRUSION AND MICROBIAL GROWTH..................................... 28**

**9.0    NATURAL HAZARD INFORMATION ..................................................................... 29**

  9.1    Flood Zone.................................................................................................. 29

  9.2    Seismic Zone .............................................................................................. 29

  9.3    Wind Zone .................................................................................................. 29

**10.0  OUT OF SCOPE CONSIDERATIONS ...................................................................... 30**

**11.0  LIMITATIONS ................................................................................................... 32**

**FIGURES AND APPENDICES**

The following report Figures and Appendices are attached at the end of this report.

    Figure 1:  Site Location Map

    Figure 2:  Site Plan

    Figure 3: Roof Map

    Appendix A: Site Photographs

    Appendix B: Supporting Documentation

    Appendix C: Qualifications



# 1.0   INTRODUCTION

## 1.1   Purpose

The purpose of this assessment is to provide information to evaluate the condition of the subject property in order to facilitate completion of due diligence by the addressee. The purpose is accomplished by describing the primary systems and components of the subject property, identifying conspicuous defects or material deferred maintenance, and presenting an opinion of cost to remedy the observed conditions. In addition, this report identifies systems or components that are anticipated to reach the end of their expected useful life during the specified evaluation period and includes an opinion of cost for future capital replacements.

## 1.2   Scope of Work

This assessment was performed in conformance with the scope and limitations as set forth by ASTM E2018-15 "Standard Guide for Property Condition Assessments: Baseline Property Condition Assessment Process" (the Standard) and as specified in the engagement agreement that initiated this work. Specific requirements or deviations from the minimum ASTM standard are described herein.

This assessment was performed utilizing methods and procedures consistent with good commercial or customary practices designed to conform to acceptable industry standards. The independent conclusions represent Partner's best professional judgment based upon existing conditions and the information and data available to us during the course of this assignment.

## 1.3   Descriptive Qualifiers

The following definitions and terminology are used in this report regarding the physical condition of the project, and the estimated life expectancies/age of the components and systems.

| | |
|---|---|
| Good | In working condition and does not require immediate or short-term repairs above an agreed threshold. |
| Fair | In working condition, but may require immediate or short-term repairs above an agreed threshold. |
| Poor | Not in working condition or requires immediate or short-term repairs substantially above an agreed threshold. |

The agreed threshold is presumed to be the de minimis reporting threshold, unless otherwise specified in this report.

Unless stated otherwise in this report, the systems reviewed are considered to be in good condition and their performance appeared to be satisfactory.

## 1.4   User Reliance

Partner was engaged by the Addressee, or their authorized representative, to perform this assessment. The engagement agreement specifically states the scope and purpose of the assessment, as well as the contractual obligations and limitations of both parties. This report and the information therein, are for the exclusive use of the Addressee. This report has no other purpose and may not be relied upon, or used, by



any other person or entity without the written consent of Partner. Third parties that obtain this report, or the information therein, shall have no rights of recourse or recovery against Partner, its officers, employees, vendors, successors or assigns. Any such unauthorized user shall be responsible to protect, indemnify and hold Partner, the Addressee and their respective officers, employees, vendors, successors and assigns harmless from any and all claims, damages, losses, liabilities, expenses (including reasonable attorneys' fees) and costs attributable to such use. Unauthorized use of this report shall constitute acceptance of, and commitment to, these responsibilities, which shall be irrevocable and shall apply regardless of the cause of action or legal theory pled or asserted. Additional legal penalties may apply.

## 2.0 RECONNAISSANCE, REGULATORY AND DOCUMENT REVIEW

### 2.1 Site Reconnaissance

| | |
|---|---|
| Date: | May 17th, 18th 22nd and 23rd, 2023 |
| Weather: | Sunny, approximately 90 degrees Fahrenheit |
| Observation Team: | The project observation was conducted by a Partner team comprised of TJ Magliano, Justin Lia, Tom Favino and Gerald Delaune. |
| Escort: | Reinerio Faife, Futura, President, 561-718-4648 |

**Limiting Conditions**

The performance of this assessment was limited by the following condition(s):

- No limiting conditions beyond those specified by ASTM were encountered while preparing this report.

### 2.2 Property Personnel Interviewed/Contacted

The site escort was interviewed during the course of the survey. Mr. Faife has been associated with the subject property since construction began and was cooperative during the property observations. Mr. Faife appeared to be knowledgeable about the subject property history and maintenance practices.

In addition to the above-referenced escort, the following personnel associated with the subject property were interviewed as part of the preparation of this report. Information obtained from the interviews is incorporated into the appropriate Sections of this report.

| Individual | Position or Title | Contact Number/Email |
|---|---|---|
| Ryan Mesce | Director of Operations | 561-727-9748 |
| Phil Davis, Sr. | President, PC Construction Solutions | 407-350-6215 |

The persons interviewed were cooperative and appeared to be knowledgeable about the subject property history and maintenance practices.

### 2.3 Regulatory Compliance Inquiry

| Building Codes | | | | |
|---|---|---|---|---|
| Contact: | N/A | | Telephone: | N/A |
| Findings: | ☐ No Violations | ☐ Violations | | ☐ Awaiting response |
| | Municipal inspections are performed following construction completion. Construction has not been completed, final inspections have not been performed, correspondingly, municipal records of violations are not likely. | | | |
| **Fire or Life Safety** | | | | |
| Contact: | N/A | | Telephone: | N/A |
| Findings: | ☐ No Violations | ☐ Violations | | ☐ Awaiting response |
| | Municipal inspections are performed following construction completion. Construction has not been completed, final inspections have not been performed, correspondingly, municipal records of violations are not likely. | | | |



| Zoning | | | | |
|---|---|---|---|---|
| Contact: | N/A | | Telephone: | N/A |
| Findings: | ☐ No Violations | ☐ Violations | | ☐ Awaiting response |
| | Municipal inspections are performed following construction completion. Construction has not been completed, final inspections have not been performed, correspondingly, municipal records of violations are not likely. According to a review of the zoning map obtained from the City of Orlando, the subject property is zoned PD (Planned Development). The permitted uses listed in the zoning regulations mixed use. Based on limited review, the subject property appeared to be compliant. | | | |

This information does not constitute a detailed regulatory-compliance investigation and any code compliance issues noted in this report are based on information provided by the regulatory agencies noted above. If possible, the provided information was confirmed with on-site observations. Additional information that is received within 30 days of the site visit will be forwarded upon receipt.

## 2.4 Code Review

The information provided below is generally obtained from the design documents and/or the building owner/manager.

According to information provided in the architectural drawings reviewed, the project was constructed under the 2017 Edition, Florida Building Code. General construction is as follows:

- Apartment Buildings – Type III-A Construction, One Hour Sprinklered, R2 Occupancy
- Parking Garages – Type II-A Construction, One Hour Sprinklered, S-2 Occupancy

## 2.5 Document Review

The following documents were readily available or provided to Partner for reference as part of this assessment.

- Tax Assessor property information
- Zoning Map
- On-line building code violation database
- Federal Emergency Management Agency (FEMA) flood hazard layer map
- Architectural Plans
- Previous consulting reports



## 3.0 PROPERTY CHARACTERISTICS

### 3.1 Parcel Configuration

The subject property improvements are placed upon one parcel. The parcel is rectangular-shaped and comprises approximately 5.58 acres.

### 3.2 Site Improvements

#### 3.2.1 Topography and Storm Water Drainage

The general vicinity is relatively flat with mild slopes. The subject property slopes gradually West. Most areas within the subject property are hardscaped for erosion control.

Storm water is removed primarily by sheet flow action across the paved surfaces towards storm water drains located throughout the subject property and in the public right of way. A large storm water retention pond is located in on the West edge of the property to collect runoff from storm drains on site. Roof drainage flows into internal roof drains provided at the edges of low-slope roof areas. Internal roof leaders are connected to the underground storm drain system. Through-parapet scuppers are also provided at the building edges and appear to be designed as primary drainage and not as overflows. Storm water at paved and landscaped areas is directed to various area drains distributed throughout the subject property. Storm water at the upper-level parking area is collected by area drains located at intervals on the deck and piped to the city storm system.

**Survey Condition and Analysis**

The topography appeared to be in varied states of construction. Civil, site work and grading activities appeared to be mostly complete.

Precipitation was not present during the walk-through survey; consequently, direct observation of the operation of the storm water drainage system was not possible. Evidence of improper operation was not readily apparent or reported. Routine maintenance, including clearing of debris from inlets, channels, piping, and outlets, is anticipated throughout the evaluation period.

#### 3.2.2 Vehicular Access, Paving

The subject property is bound by Boggy Creek Road to the South, and Narcoossee Road to the Northeast and is accessed from one entrance from Boggy Creek Road, and one entrance from Narcoossee Road. There are no signals at any of the subject property entrances.

Pedestrian access is provided via sidewalks that run along Narcoossee Road and Boggy Creek Road.

Concrete pavement is provided at the right-of-way approaches. Asphalt is utilized throughout the subject property in drive aisles that have been completed. According to the construction drawings, the asphalt pavement section consists of a two-inch wear course over an eight-inch binder course, over a twelve-inch compacted gravel sub-base.

Curbing placed at the parking area perimeters and interior islands consists of cast-in-place concrete.

On-site parking consists of surface lots and a multi-level parking garage discussed further in Section 3.2.9



According to the construction drawings, parking areas provide a total of 442 spaces, accessible spaces have not yet been striped. According to the construction documents, 13 accessible spaces are proposed, eight in the 12 in the parking garage and one in the surface lot.

***Survey Condition and Analysis***

Pavement appeared to be in varied states of construction. The parking garage and the access drive aisle providing access to the entrance appears to be complete and in good condition. The surface lot at the main entrance to the leasing office is incomplete and is currently gravel. Installation of remaining pavement can be completed as part of normal construction activities.

### 3.2.3 Walkways, Grade-Level Steps and Ramps

Broom-finish concrete sidewalks lead from the parking areas to the building entrances. Grade changes were minimal, therefore significant ramps are not provided. Cast in place concrete steps accommodated grade changes between ground floor patios and courtyard areas in courtyards C and D.

***Survey Condition and Analysis***

The pedestrian walkways appeared to be in good overall condition. However, several areas remain incomplete. Installation of remaining walkways can be completed as part of normal construction activities.

### 3.2.4 Landscaping and Irrigation

Landscaping has not been completed at the time of this assessment. Based on review of landscaping plans, the landscaping at the subject property will consist of grass-covered lawns, floral plantings, trees, and shrubs provided in areas not occupied by the building, walkways, or pavement.

Landscaped areas are serviced by an underground irrigation system.

***Survey Condition and Analysis***

Vegetative materials appeared to be minimal, with many elements yet to be installed. Installation of remaining landscaping can be performed as part of normal construction activities.

Concerns were raised about locations of underground irrigation and drainage not in the designated locations based on the plans, causing issues when planting trees and landscaping etc. A survey should be completed to verify location of underground utilities and irrigation lines. A summary of this deficiency has been included in the Deficiency Table.

### 3.2.5 Retaining Walls

Retaining walls with an average height of six feet were observed along the Eastern perimeter of the retention pond which runs along the pedestrian walkway by courtyard B and courtyard A. The walls are constructed with stacked segmental concrete blocks. According to the construction drawings provided, a crushed stone drainage system protected with filter fabric is provided behind the retaining wall.



***Survey Condition and Analysis***

The retaining walls appeared to be in fair overall condition.

The walls appeared to exhibit lateral movement along the section bordering courtyard A and the pool area. Movement was reported to be as a result of heavy machinery driving too close to the wall, causing the wall to bow outward towards the retaining pond. Replacement of damaged sections of retaining wall is recommended. A summary of this deficiency has been included in the Deficiency Table.

### 3.2.6   Site and Building Signage

Site identification signage is provided by façade mounted metal signage. Temporary paper signage was located adjacent the apartment entry doors. Apartment units had unit numbers removed by the general contractor prior to vacating the project. Units are primarily identified by spray painted numbers on floors in front of the entry doors, or handwritten numbers adjacent to the unit.

***Survey Condition and Analysis***

Exterior signage appeared to be complete while unit identification signage has not been installed or was removed prior to the site assessment. Installation of unit number plaques can be completed as part of normal construction activities.

### 3.2.7   Perimeter Walls, Gates, and Fences

Temporary chain link security fencing is present around all perimeters of the subject property. Security fencing is expected to be removed from the property upon completion of construction.

### 3.2.8   Exterior Lights

Outdoor lighting is provided by pole-mounted light fixtures generally located in parking areas and along the subject property drive aisles. The fixtures are equipped with LED lamps. The poles are constructed with elevated concrete bollard bases. Timers and photocells control exterior lighting.

The parking garage has LED fixtures mounted to the undersides of the ceilings.

***Survey Condition and Analysis***

The walk-through survey was conducted during daylight hours and lighting operation could not be verified. Based on the number of lights provided and the spacing, the lighting appeared to be adequate and was reported to be sufficient for the subject property.

The exterior lighting installation is incomplete. In addition, several of the previously installed lighting fixtures were observed to be damaged and constructed of fiberglass, inconsistent with contract documents. Replacement with light poles compliant with contract documents is recommended. A summary of this deficiency has been included in the Deficiency Table.



### 3.2.9 Site Amenities

Recreational facilities and additional site have not been completed and are in varied stages of construction.

Parking is provided in a five-level parking structure located at the Northwest corner of the site building.

The property has one in-ground, outdoor swimming pool located to the West of courtyard A, adjacent the retention pond. The pool foundation is constructed of concrete. The pool did not have any finishes or mechanical equipment installed at the time of this assessment. A large deck is provided to the West of the pool area, extending over a portion of the retention pond. The deck is constructed with wood joists and posts, while the top decking is composite planks.

**Survey Condition and Analysis**

The recreational facilities and site amenities appeared to be in various states of construction with many elements still requiring completion. Completion of the site amenities should be performed as part of normal construction activities.

### 3.2.10 Refuse Transfer Areas

A refuse collection enclosure is located along the North exterior wall of the parking structure. The enclosure is constructed with CMU block with painted stucco cladding and is open on one side.

**Survey Condition and Analysis**

The refuse transfer areas appeared to be in good overall condition and appeared to be mostly complete. Completion should be performed as part of normal construction activities.

### 3.2.11 Special Utility Systems

Special utility systems are not present.

### 3.2.12 Utility Service Providers

Domestic water service is provided from the northwest section of the subject property, entering the domestic water booster pump room located in the ground floor level of the parking garage. A backflow preventer is provided at the service entrance location. Sanitary Sewer service is provided from an 8 inch sanitary line at Christina Drive, entering the building at the northwest section. Utility-owned electrical transformers are located at the exterior of the electrical room at the northwest side of the parking garage.

| Utility | Provider | Meter configuration and location |
|---|---|---|
| Storm Water | Onsite stormwater retention pond | |
| Electric | Orlando Utilities Commission (O.U.C.) | Unit meters are located in dedicated meter bank utility rooms located on the ground and fourth floors. |
| Gas | Not provided | Not provided |
| Water | Orlando Utilities Commission (O.U.C.) | The building meter is located at the main service RPZ-backflow preventer assembly |
| Sanitary Sewer | Orlando Utilities Commission (O.U.C.) | |



***Survey Condition and Analysis***

No issues or service deficiencies were reported. Utility services are the responsibility of the various purveyors to maintain. The provided services are reported to be adequate. Routine maintenance is anticipated during the evaluation period.



## 4.0    STRUCTURAL FRAME AND BUILDING ENVELOPE

At the request of the Client, Partner performed a Building Envelope Specialty Evaluation, and a Roofing Specialty Evaluation.  The following information is a summary of the report findings.

### 4.1    Foundation/Substructure

Based on review of the provided construction documents, foundations are presumed to consist of a conventional reinforced-concrete slab-on-grade with continuous strip footings at the perimeter and continuous grade beams at interior bearing locations According to the various construction documents, the system includes the following attributes:

| Governing code | ACI-301 |
|---|---|
| Soil-bearing capacity | 3,000 PSF for the apartments and 5,000 PSF for the garage |
| Foundation thickness | 12" depending on location |
| Foundation reinforcement | ½" post tension rods in various configurations depending on location |
| Slab thickness | 3" to 5" depending on location |
| Slab reinforcement | ½" post tension rods |

*Survey Condition and Analysis*

Foundations appeared to be in functional condition with no significant movement anticipated. Note; Post tension cables in select areas were reported to have excessive slack. Concerns were raised due to saw cuts through the concrete slab performed by the contractors resulting in tension cables being cut. Testing to verify that all tension rods are intact and properly tensioned is recommended to ensure proper reinforcement of the foundation slab. A summary of this deficiency has been included in the Deficiency Table.

### 4.2    Building Frame

The apartment building is constructed of conventional, wood-stud platform framing with isolated areas of concrete masonry unit (CMU) walls.  Upper floors consist of wooden beams and joists with concrete-topped, wooden sheathing supported by interior wooden columns. The pitched roof structure consists of engineered-wood trusses with wooden decking.

The parking garage walls are primarily constructed of precast concrete panels. The upper floors are constructed with precast concrete T-form panels.

*Survey Condition and Analysis*

Wood studs were saw cut to recess the fridges in the kitchens of the apartment units. Many of these framing members in load bearing walls were damaged due to over-cuts performed by the contractors as they cut into the walls. These cuts could compromise the structural integrity of these walls; therefore, a structural analysis of these walls should be performed to determine proper course of action to remedy the damaged framing members, and to verify that the building framing will be able to properly disburse loads. A summary of this deficiency has been included in the Deficiency Table.

### 4.3    Facades or Curtain Walls

At the request of the Client, Partner performed a Building Envelope Specialty Evaluation. The following information is a summary of the report findings.



### 4.3.1   Exterior Walls

The exterior walls of the building consist of fiber cement board siding, stucco and dry stack manufactured stone with caulked joints at each panel intersection as well as at the interface with dissimilar materials. Single hung windows and fixed windows with tinted insulated glazing at the tenant units. Storefront framing systems with tinted insulated glass at the main and pool deck entrances.

Horizontal and vertical sealant joints are provided between dissimilar materials. According to the drawings provided, wall insulation consists of R-19 batt with an exterior vapor barrier.

The exterior wall extends to the parapet and is covered by a metal parapet cap.

***Survey Condition and Analysis***

The exterior walls appeared to be in generally good overall condition. Routine maintenance is anticipated during the evaluation period.

The main entrance (east side) and the pool deck entrance (west side) from the ground floor to the parapet cap requires completion. The balcony topping slabs require waterproofing repair as well as finish materials installed over the exterior sheathing/waterproofing layers. The separation wall between units to the left of the Clubhouse require rework due to an out of plumb condition.

Cleaning of exterior walls is considered normal maintenance and should be performed as needed.

The sealant joints appeared to be in generally good-fair overall condition. Routine maintenance is anticipated during the evaluation period. Some touch-up is required as some of the sealant joints at the parking garage tilt-wall panels exhibit signs of loss of adhesion. A summary of these deficiencies has been included in the Deficiency Table.

### 4.3.2   Windows

Windows are part of the storefront entry system or are punch-type windows at the office floors. The windows consist of tinted, double-pane glazing in clear anodized-aluminum frames. A glass panel curtain wall system was observed at the main entrance and pool deck entrance of the subject building. The curtain wall consists of a tinted insulated glass.

Single Hung Windows appeared to be double-pane fixed and operable units. Window framing was observed to be vinyl. Windows at the building entrances are part of a storefront window system consisting of full height, low-e glazing in aluminum frames that incorporates the entry doors.

Windows are aluminum-framed storefront units with fixed panes of tinted, insulated glazing. Vinyl gaskets are used at the joints between glazing panes and the framing.

***Survey Condition and Analysis***

Single Hung Windows were reported and appeared to be in varying condition due to number of windows observed to be improperly installed. No signs of window leaks or condensation were evident during the observation. However, reports of improper waterproofing and weather barrier details around the windows have been observed. An investigation is recommended to remove the wall finishes and inspect the as built condition to determine the proper repair methods and scope of work to be developed. In addition, the bottom sash did not close and lock at approximately 75% of the windows. The bottom sill member is pushed



up and creates a crown in the middle of the sill stopping the window sash from seating correctly. The locks do not align causing an unlocked window as well as an avenue for moisture intrusion. Window sealants appeared to be intact, with no signs of deterioration. Window gaskets were found to be in new condition. This deficiency has been included in the Deficiency Table. These deficiencies were generally observed to be present in all units on the ground floor and second floor and were specifically observed in units: 102, 106, 238, 240, 245, 256, 307, 311, 312, 322, 326, 327, 331, 406, 407, 418, 503, 515, 518, 520, 529, 548, 551, 552.

### 4.3.3 Doors

The main entrance consists of a pair of aluminum-framed doors with full-height glazing set in an aluminum storefront system. Hardware includes horizontal exit bars, exterior pulls, closers, and deadbolts.

Secondary doors are painted, hollow metal set in metal frames. The doors have horizontal exit bars, exterior lever handles, closers, and deadbolts.

Tenant unit entrance doors are painted hollow metal set in metal frames. The doors have twist knobs and deadbolts. Tenant unit balcony doors are painted hollow metal with glass set in metal frames. The doors have twist knobs and deadbolts.

**Survey Condition and Analysis**

Doors were reported and appeared to be in good overall condition. Routine maintenance is anticipated during the evaluation period. The balcony door thresholds are crowned caused by the high level of the topping slab. Weatherstripping at the bottom of the doors is deteriorated and requires replacement. The doors and thresholds should be removed and reinstalled when the topping slab removal takes place. This deficiency has been included in the Deficiency Table.

## 4.4 Roof

At the request of the Client, Partner performed a Roofing Specialty Evaluation. The following information is a summary of the report findings.

### 4.4.1 Roofing Materials

Partner utilized in house Building Envelope consultants to assess the roofing systems. The following information is a summary of the report findings. The flat roofing areas consist of a single-ply, 60 mil, adhered thermoplastic polyolefin (TPO) roofing system. The roofs are generally sloped at the minimum slope of ¼". Internal roof drains are utilized for drainage of the roof system.

The roofing materials extend vertically up the inboard side of the parapet walls, terminating under counter-flashings and metal copings.

Flashing materials appeared to be similar to the roofing membrane.

Roof areas are accessible by an exit door from the stair.

According to provided information, the roofs are original and are under warranty.

Roof insulation was not observed; however, the architectural drawings reviewed specified that tapered rigid insulation was to be used for slope to drains.



### Survey Condition and Analysis

The roofing systems appeared to be in fair - poor overall condition. While the roofing system doesn't leak that Partner is aware of, the roofing system ponds water in locations around the roof drains of upwards of 1". The roof drains are not sumped as indicated within detail on 3/A7.51, of the drawings. The drain bowls currently sit proud of the roof membrane surface. A summary of the observed roof deficiencies has been included in the Deficiency Table.

In addition to the above corrections, it is also recommended that corrosion be removed/neutralized on the equipment screen panels and support structure and then prepped and painted.

## 4.4.2 Roof Drainage

The roofing slope appeared to be adequate and appears to meet industry standards for the type of roof installed. Storm water runoff for the roof is directed to roof drains connected to internal leaders that exit through the exterior walls and discharge at grade and directly into the storm drain collection system.

### Survey Condition and Analysis

Roof drains appeared to be in good - poor overall condition. Roof drains should be repaired or replaced as needed during roof replacement activities and set to the correct height with a sump.

Isolated areas of roof ponding were noted around most drains. Ponding typically occurs when the roof insulation or decking is not properly sloped to allow for complete drainage or water flow through the roof drainage system is impeded.

The ponding appears to be due to a lack of installed tapered insulation and drain sumps. This issue should be addressed in the immediate term. A summary of these deficiencies has been included in the Deficiency Table.

## 4.5 Fire Escapes, Stairs or Balconies

Balconies are constructed of concrete topping over OSB sheathing and elastomeric waterproofing. Balconies are supported by columns or walls at each corner. Guardrails are located at the open sides of the balcony and are constructed of metal.

### Survey Condition and Analysis

Balconies appeared to be in poor overall condition. The topping slabs were found to be poured high to the threshold, cupping the threshold causing doors to not close properly. In some cases, the threshold had to be lifted a minimum of 3/4" to meet the topping slab height. Counterflashings under the balcony door thresholds are bent and disfigured due to improper deck pour and threshold installation.

Partner recommends the topping slab be removed, waterproofing be repaired, thresholds and counterflashing be removed and reinstalled to the correct height to align with the interior finish out. Re-pour topping slab to the correct height and slope. This deficiency has been included in the Deficiency Table. Units where these conditions were specifically observed include 201, 223, 232, 245, 304, 325, 328, 349, 351, 356, 401, 402, 403, 404, 408, 409, 410, 412, 413, 414, 416, 417, 418, 427, 441, 452, 501, 510, 511, 514, 539, 546 and 551.



The columns supporting the balcony stacks at the Southwest corners of courtyards A and B exhibit damage from previous shoring operations. It was reported that the footers of these columns were replaced as a result of the original footings sinking and causing the balcony stacks to deflect. When shoring operations were completed, no verification of condition of balcony framing was performed to verify that no damage to framing was present. Destructive testing is required of deflected balcony columns at courtyard A and B. This deficiency has been included in the Deficiency Table. Units affected by this condition were observed to include: 107, 145, 207, 245, 307, 345, 407, 445, 507, 545.



## 5.0   MECHANICAL AND ELECTRICAL SYSTEMS

At the request of the Client, Partner performed an MEP Specialty Evaluation. The following information is the summary of the evaluation.

At the request of the Client, Partner retained Jensen Hughes to assess the Life Safety and Fire Protection systems. The following information is a summary of the report findings.

### 5.1   Plumbing, Domestic Hot Water, and Sewer Systems

The building is provided with domestic water from a single, 6-inch municipally owned and maintained water main entering the subject property from the northwest into the domestic water booster pump room, located in the ground floor level of the parking garage. Domestic water piping was reported to be CPVC by Mr. Phil Davis, Sr.. Observation of visible piping at water heaters and plumbing stub-outs indicates that the piping is CPVC. Backflow preventers were observed on the domestic and fire protection system supplies.

Sanitary drainage and vent piping was reported to be PVC by Mr. Phil Davis Sr. Observation of visible vent piping indicates that the piping is PVC.

Domestic hot water to the individual residential apartment unit spaces is provided by 38- and 45-gallon, tank-type, electric units; semi-instantaneous electric waters heaters supply the common area restrooms.

***Survey Condition and Analysis***

The residential apartment buildings plumbing systems were reported be 93% completed, as per the last payment application (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). Observation confirmed the installation of the plumbing systems to be incomplete and below the level of completion reported in the last application for payment. It is recommended that the installation be completed and that the plumbing piping systems be thoroughly cleaned and flushed. It is further recommended that the triplex domestic water booster pump be energized, started and commissioned by the pump equipment manufacturer's authorized representative. Numerous instances of remedial work were observed (i.e.; removal and reinstallation of improperly located shower installations, etc.) in addition to the incomplete work, that will also need to be completed. This deficiency has been included in the Deficiency Table.

Heating, Ventilation, and Air Conditioning

| HVAC unit Location | Building area served | Manufacturer name and date | Model number | Capacity (tons) | CFM |
|---|---|---|---|---|---|
| Units "A" & "S" | Residential Apartment Units | Goodman 2021 | AWUF019 (AHU) & GSZ14018 (Condenser) | 1.5 Tons | 600 |
| "B" Units | Residential Apartment Units | Goodman 2021 | AWUF025 (AHU) & GSZ14024 (Condenser) | 2 Tons | 800 |
| "C" Units | Residential Apartment Units | Goodman 2021 | AWUF030 (AHU) & GSZ14030 (Condenser) | 2.5 Tons | 1000 |
| | Common Area Units - Typical | Goodman 2022 | ASPT49D14AD (AHU) - Typical | 1.5 to 2- Tons | 400 - 1650 |
| | Elevator Lobbies, Trash room - Typical | Daikin 2022 | RXB18AXVJU (Condenser) - Typical | 1.5 | - |



Heating and cooling are provided by direct expansion HVAC split systems. Each residential apartment unit system has a condensing unit located on the roof (or at grade, for select common area units) and a fan coil/furnace unit located within a dedicated utility closet. Manufactured by Goodman, the condensing units have a typical input capacity of 1.5 to 2.5 tons and use R410A refrigerant. The furnace units provide heat through electric resistance coils. Distribution of the conditioned air is by concealed fiberglass-type ductwork and temperature control is by a local thermostat. Ductless mini-split systems are also utilized for heating and cooling at select common areas (i.e., elevator lobbies and the trash room).

Outside air is directly introduced into the return air plenum of the residential apartment units via concealed ductwork from the exterior façade. Ceiling mounted exhaust fans serve the residential apartment unit bathrooms. The parking garage is ventilated using natural ventilation.

***Survey Condition and Analysis***

The residential apartment building's HVAC systems were reported be 97% completed and the garage's were reported to be 85% completed, as per the last payment application (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). Observation confirmed the installation of the HVAC systems to be incomplete and below the level of completion reported in the last application for payment. It is recommended that the installations be completed.

The below instances of remedial work were observed in addition to the incomplete work, that will also need to be completed

- The DX split system air handling units have been placed in operation, while construction activities were taking place. This has resulted in the evaporator coils and supply air ductwork being exposed to dust and particulate, etc., for which specialized professional cleaning is recommended.
- The refrigerant piping for the DX split systems, between the gooseneck fittings and the condensing unit racks on the roof has been improperly coordinated. This has resulted in multiple areas of impeded accessibility and excessive refrigerant piping runs. Proper coordination and corresponding adjustment is recommended.
- The fire sealing of the DX split system refrigerant piping at the gooseneck fittings on the roof was noted to be missing. Per detail entitled "Roof Jack Installation Detail," on Dwg M7.02, fire stop compound is shown to be installed at the roof penetration points where the refrigerant lines enter and exit.

A summary of these deficiencies has been included in the Deficiency Table.

## 5.2 Electrical Supply and Natural Gas Distribution

Electrical service is delivered via several pad-mounted, utility-owned transformers located on the building's exterior at the northwest corner of the subject property. The residential apartment building is serviced by primary power at 4 locations on the ground floor, that additionally feed 4 locations on the fourth floor. Power riser and meter centers tag: A1 & A4 are rated at 1,400 and 1,200 amps, respectively; power riser and meter centers tag: B1 & B4, C1 & C4, D1& D4 are rated at 1,600 and 1,200 amps, respectively. All residential services are 120 / 208 volts, 3 phase. The parking garage is fed separately by a dedicated 2,000 amp, 120 / 208 volts, 3 phase main that is located on the ground floor at the northwest corner.

Breaker panels for the individual residential units are rated at 125 amps, 120/208 volts, 3 phase. Observed panels were manufactured by Siemens.



Electrical branch wiring was reported to be copper by Mr. Phil Davis, Sr.. Service panel covers were not removed to verify electrical panel feeds. Ground-fault circuit interrupter (GFCI) breakers were observed in either the code-mandated wet locations, or in the residential unit breaker panels.

Lighting throughout the subject property was observed to be LED-type fixtures.

Natural gas service was not observed.

***Survey Condition and Analysis***

The residential apartment building's Electrical systems were reported be 95% completed and the garage's were reported to be 95% completed, as per the last payment application (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r). Further, the residential apartment building's DAS and Low Voltage systems were reported to be 99% and 50% completed, respectively, as per the last payment application (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r).

Observation confirmed the installations of the above Electrical systems to be incomplete and below the level of completion reported in the last application for payment (i.e., lighting fixture installation incomplete, DAS and Low Voltage systems installations incomplete, etc.). It is recommended that the installations be completed.

A summary of these deficiencies has been included in the Deficiency Table.

## 5.3 Vertical Conveyances

### 5.3.1 Elevators

Overhead traction (machine room-less type) passenger elevators are provided. According to posted signs and placards, the elevators are manufactured by Otis Elevator Company.

| Elevator number | Serial number | Duty | Type | Capacity (lbs) | Speed (fpm) | Levels served |
|---|---|---|---|---|---|---|
| 1 | N1P026 | Passenger | Overhead traction | 3,500 | 150 | 1 though 5 |
| 2 | N1P027 | Passenger | Overhead traction | 3,500 | 150 | 1 though 5 |
| 3 | N1P028 | Passenger | Overhead traction | 3,500 | 150 | 1 though 5 |

Per the submittal data, the interior cab finishes consist of stainless-steel doors and panels, and metal handrails. Floors and the ceilings consist of metal panels with LED-type lighting. Elevators are machine room-less types, hoist motors are located within the respective elevator shafts.

According to the submittal data, the control panel are provided with illuminated push button floor indicators, alarm button and emergency outcall capability. The elevators are provided with audible floor indicators and manual sensors that automatically open the doors when an obstruction is encountered.

***Survey Condition and Analysis***

The residential apartment building's Elevator systems were reported be 95% completed and the garage's were reported to be 95% completed, as per the last payment application (per Fully Executed Draw #28 FHA #067-35564 Futura @ Nona Cove 3.20.23 r).



Observation confirmed that the installation of the Elevator systems to be incomplete and below the level of completion reported in the last application for payment (i.e., cabs inaccessible, call buttons at elevator lobbies not installed, etc.). It is recommended that the installations be completed.

A summary of these deficiencies has been included in the Deficiency Table.

### *5.3.2 Escalators*

Escalators are not provided.

## 5.4   Life Safety and Fire Protection

Below is a description of the fire protection and life safety systems of the buildings identified during the survey.

### *5.4.1 Fire Suppression Systems*

General – Both the apartment building and the parking garage are designed to be fully protected with NFPA 13-compliant sprinkler systems. All floors are sprinklered with a wet-pipe automatic sprinkler system. The sprinkler system installation appeared to be incomplete. Plugged-up blank spaces where sprinklers were seen on other floors were observed in select units and corridors. It is assumed sprinklers are installed underneath these plugged-up blank spaces. Additionally, one of the sprinkler risers was observed not to be charged.

Water Service/FDC – Permanent fire department connections were not observed to be installed. A temporary fire department connection was observed to be installed on the ground floor of one of the egress stairs.  The water service connection enters the Parking Garage at the Level 1 Fire Pump Room through a Zurn Wilkins 8-inch backflow preventer.

Sprinkler/Standpipe System Zones – The parking garage has one dry-pipe zone per floor, each provided with its own riser/dry-pipe valve. Inside the apartment building, half of each floor is served by a sprinkler riser in Stair 1, while the other half is served by a sprinkler riser in Stair 4. A floor control valve assembly is provided at each floor landing. Standpipes are similarly zoned by floor and are provided in the following locations: Stair 1, Stair 2, Stair 3, Stair 4, Stair 5, and in two locations in the corridor.

Water Tank – The apartment building and parking garage are not provided with a water tank.

Fire Pump – The building fire protection systems are supplemented by one (1) automatic fire pump and one (1) jockey pump that feed all building sections.  One (1) automatic centrifugal horizontal split-case fire pump is located on 1st floor fire pump room off of the parking garage. The automatic fire pump is Pentair Fairbanks Nijhuis model 5" 1822-CF (Serial #22 2629507) and provides 1,000 GPM at 90 PSI. A WEG electric motor provides 75 HP, which drives the automatic fire pump at 3550 RPM. The fire pump is controlled by an Eaton pump. An automatic jockey pump, controlled by an Eaton jockey pump controller, maintains pressure within the sprinkler system. A test connection for the automatic fire pump is provided outside the pump location. Emergency power is not provided for the fire pump.



Sprinklers – Recessed pendent sprinklers are installed in areas with suspended or finished ceilings, while upright sprinkler heads were installed in the garage. Apartment units were protected with residential recessed pendent sprinklers, Reliable model R3513, rated for 155°F. Garages were protected by standard response, extended coverage, dry upright sprinklers, Reliable model RA7326, rated for 200°F. Balconies were provided by dry pendent quick response sprinkler heads, Reliable model R5714, rated for 155°F. Electrical rooms were and similar spaces were protected with quick response pendent sprinkler heads, Reliable model RA1414, rated for 155°F. Sprinkler spacing and coverage, where fully installed, appears to be in accordance with NFPA 13 for the areas surveyed.

Special Suppression Systems – None provided.

Fire Extinguishers – Fire extinguishers were observed in some, but not all, individual dwelling units underneath the kitchen sink.

**Survey Condition and Analysis**

Sprinkler installation incomplete - Approximately 20% of units and hallways were observed to have protective covers installed. Removed and discard these covers and install escutcheons on their place so that recessed sprinklers may function as designed.

Sprinkler coordination required in common areas - Sprinklers were observed to hang below the ceiling in the fitness club, coworking space, and the two-story clubhouse areas. It is unclear whether a drop ceiling is planned to be installed in any of these locations. Coordinate to ensure that sprinklers are installed at an appropriate height relative to the final planned ceilings.

Revise hydraulic calculations - Provided hydraulic calculations specify a 500 GPM Fairbanks Morse fire pump, but a 1000 GPM Fairbanks Nijhuis fire pump was observed in the field. Revise the hydraulic calculations to reflect the installed conditions.

Verification of previous sprinkler work - If a new contractor is selected to complete the remaining sprinkler work, they will want to verify the previous piping/sprinkler heads/associated equipment have been installed properly before they take responsibility for the completion of the system.

Stair 1 sprinkler riser uncharged - It was observed that Riser 1 was at 0 psi water pressure, implying that one of the risers was not charged with water. The system will need to be charged once completed and tested for leaks.

Missing in-unit fire extinguishers - Per FBC Section 906.1.1's exception, fire extinguishers must be installed in each dwelling unit. Fire extinguishers were observed under the sink in roughly half of the units surveyed. Furnish the other half of the dwelling units with fire extinguishers.

A summary of these deficiencies has been included in the Deficiency Table.



### 5.4.2 Alarm Systems

<u>General</u> – The apartment building and parking garage are each designed to be protected by a Fire-Lite ES-200X fire alarm system by Honeywell. The apartment building fire alarm control panel sits in the fire alarm closet on the first floor, while the garage fire alarm control panel since in a fire alarm closet on the ground floor near the pump room (access was not provided to this room). The fire alarm systems are designed to monitor manual pull stations, smoke detectors, sprinkler waterflow switches, valve supervisory switches, fire pump status, and circuit integrity. Single station combination detectors that do not report to the panel are provided in each apartment unit. The fire alarm system was not observed to be fully installed/active during the inspection.

The fire alarm system provides audible and visual signal via low-frequency audible notification appliances in dwelling units and through audible/visual appliances in corridors and other shared spaces. The fire alarm systems are reportedly provided with battery backup.

<u>Devices and Appliances</u> – Per Section 907.2.9, fire alarm systems and smoke alarms shall be provided throughout Group R-2 occupancies as described in this section of the code. A manual fire alarm system is required in R-2 occupancies where any dwelling unit is located three or more stories above the lowest level of exit discharge. Single station smoke alarms are provided on the ceiling outside of each separate sleeping area and in each room used for sleeping purposes as required by Section 907.2.11.2 for Group R-2 occupancies. Low-frequency audible notification appliances are provided for each sleeping area as required by NFPA 72 Section 18.4.5.1 through 18.4.5.3. Manual pull stations are provided within the appropriate distance of each exit and at the proper height. Horn-strobes were provided throughout the corridors (using corridor spacing), in the garage, and in common amenity spaces in NFPA 72-compliant spacing.

#### Survey Condition and Analysis

Fire alarm panel installation incomplete -A Firelite ES-200X fire alarm control panel was observed to be installed in the ground floor apartment fire alarm closet, but the interior of the panel appeared to be unfinished. Based on the current condition, it is assumed that the interfacing the fire alarm system with other functions via relays and programming of the sequence of operations have not been started. Complete the installation of the fire alarm control panel. (Note that JH was unable to access the second fire alarm panel supposedly installed in the garage, so its installation status could not be verified. For the purpose of this report, it is assumed that this panel is in an equivalent state to that of the other panel.)

Verification of previous fire alarm work - If a new contractor is selected to complete the remaining fire alarm work, they will want to verify that previous wiring and devices are properly installed before they take responsibility for the completion of the system.

Missing smoke detectors at the elevator - The elevator serving the interior of the apartment building was missing a smoke detector at each floor landing. Wiring appears to have been pulled for these detectors, but the detector has yet to be installed. These detectors will also need to be interfaced with elevator controls and the fire alarm system.

Covers provided on smoke detectors - Nearly all smoke detectors in the building were observed to be covered by protective caps. These caps must be removed in order for them to function properly.

A summary of these deficiencies has been included in the Deficiency Table.



### 5.4.3 Means of Egress

General – All exits appear to provide adequate exit capacity for the anticipated occupant load of the buildings. Per the life safety plans, exits appear to be located such that adequate travel distances, common paths of travel, and limited dead-ends are achieved. All exits maintained a minimum clear height and width.

Exit Stairways – All exit stairs are at least 44 inches wide. Stairs have a tread depth of at least 11½ inches and a tread height of no greater than 7 inches. Handrails are provided on both sides of all stairways located at a height of approximately 36 inches above the tread nose.

Access Stairways – Not provided.

Dead-Ends – In accordance with the FBC Section 1020.4, in Group R-2 occupancies fully protected by a sprinkler system, the dead end in a corridor is not permitted to exceed 50 feet. Any dead-end corridors observed in the buildings at the time of the survey did not exceed 50 feet.

No dead ends were observed in the parking garage.

Separation of Exits – In accordance with FBC Section 1007.1.1, where two exits are required from any portion of the exit access, they shall be placed a distance apart equal not less than one third of the length of the overall diagonal dimension of the area served (where a building is fully sprinkler protected). This requirement is satisfied.

In the garage, where an NFPA 13 compliant sprinkler system is provided, where two exits are required, they shall be placed a distance apart equal to not less than one third of the length of the overall diagonal dimension of the area served. This requirement is also satisfied.

Signage – In accordance with FBC Section 1013, all building exits are provided with illuminated exit signs. Emergency lighting is provided within the stairways and common areas. Exit signs and emergency lighting are connected to battery backup for secondary power.

**Survey Condition and Analysis**

Horizontal exit fire door swing direction - Verify that the horizontal exit fire door from the garage into the apartment building (which acts as the second exit from each floor of the garage, in its southeast corner) swings into the apartment building. If it does not, reinstall door/frame so that the door swings in the direction of egress travel for the occupants.

A summary of these deficiencies has been included in the Deficiency Table.

### 5.4.4 Passive Fire Protection Systems

General – The apartment building is reportedly constructed of Type IIIA construction – combustible construction, based on the drawings and observed conditions. All walls and structural members are made of wood. In accordance with FBC Table 601 for Type 3A structures, the primary structural frame, floor construction and roof construction are required to be 1-hour rated.

The parking garage is reportedly constructed of Type IIA construction – noncombustible construction, based on the drawings and observed conditions. All walls and structural members are made of concrete. In accordance with FBC Table 602 for Type 2A structures, the primary structural frame, floor construction and roof construction are required to be 1-hour rated.



<u>Exit Stairways</u> – Stair enclosures in both buildings are made of gypsum board and appear to be 2-hour fire resistance rated. Most stair doors appear to have a 1½ hour FRR based on the manufacturer's labels.

<u>Interior Corridors</u> – In accordance with FBC Section 1017.1, in Group R-2 occupancies, corridors must be provided with a one-hour fire resistance rating. Corridor doors were observed to be the required 1/3-hour rated.

<u>Unit Separations</u> - 1-hour rated apartment unit separations were provided per FBC Section 708.3 and were not observed to have any unsealed penetrations between units.

<u>Building Separations</u> – Per FBC Section 706.4, a 3-hour fire resistance rated separation must be provided between adjacent, separate, buildings. While construction appeared consisted with this FRR and no unsealed penetrations were observed in the barriers, fire resistance rated doors were observed to be missing in the building separation walls.

<u>Other Fire Barriers</u> – 1/3 hour rated cross-corridor doors shown on the life safety drawings were observed as not installed in the corridors.

**Survey Condition and Analysis**

Fire Barrier Door Installation Incomplete – Life safety drawings indicate doors in the 3-hour fire resistance rated barrier between the two sections of the apartment building. Per Table 716.5, opening protectives in 3-hour fire barriers must be 3-hour rated. Provided appropriately rated door and frame assembly in these locations.

Corridor smoke barrier door installation incomplete - Life safety drawings indicate cross-corridor doors on Level 1. Corridors are stated to be one-hour rated, and per Table 716.5, opening protectives in corridor walls must be 1/3-hour rated. Provide an appropriately rated door and frame assembly in these locations.

A summary of these deficiencies has been included in the Deficiency Table.



## 6.0    INTERIOR ELEMENTS

### 6.1    Common Areas

Significant common areas at the subject property consist of the leasing office, clubhouse, fitness center, elevator cabs, stairwells, corridors, and elevator lobbies. In addition, restrooms are provided on the first floor near the fitness center.

Common area finishes have not yet been installed with the exception of drywall finishes. Flooring is not installed in corridors or amenity spaces.

Stairwell and interior corridor doors are solid-wood or painted metal doors equipped with panic-bar hardware and closers. The restrooms are mostly unfinished.

***Survey Condition and Analysis***

Common area finishes appeared to be in various stages of construction with many components / finishes awaiting installation. Unfinished common area elements should be installed during normal construction practices.

### 6.2    Amenities and Special Features

The building is constructed with spaces for a leasing office, clubhouse area with resident lounge, and fitness center, all located on the ground floor near the main entrance. The amenity spaces were observed to be incomplete and in the early stages of construction with minimal components installed.

***Survey Condition and Analysis***

Amenities and furnishings have not been completed as of the date of this assessment. Installation of finishes and amenity furnishings can be completed as part of normal construction activities.

### 6.3    Support Areas

No support areas are present.

### 6.4    Commercial Tenant Spaces

Commercial tenant spaces are not provided.

### 6.5    Residential Spaces

### 6.5.1    Unit Types and Quantities

| Type | Quantity | Average Area (SF) | Total Square Footage | Occupied Units | Vacant Units | Down Units |
|---|---|---|---|---|---|---|
| A1 (1 Bed / 1 Bath) | 25 | 799 | 19,975 | N/A | N/A | N/A |
| A2 (1 Bed / 1 Bath) | 2 | 873 | 1,746 | N/A | N/A | N/A |
| A3 (1 Bed / 1 Bath) | 60 | 888 | 53,280 | N/A | N/A | N/A |
| B1 (2 Bed / 2 Bath) | 40 | 1,125 | 45,000 | N/A | N/A | N/A |
| B2 (2 Bed / 2 Bath) | 54 | 1,158 | 62,532 | N/A | N/A | N/A |



| Type | Quantity | Average Area (SF) | Total Square Footage | Occupied Units | Vacant Units | Down Units |
|------|----------|-------------------|----------------------|----------------|--------------|------------|
| B3 (2 Bed / 2 Bath) | 44 | 1,168 | 51,392 | N/A | N/A | N/A |
| C1 (3 Bed / 2 Bath) | 15 | 1,425 | 21,375 | N/A | N/A | N/A |
| S1 (Studio) | 20 | 623 | 12,460 | N/A | N/A | N/A |
| **Total** | **260** | **1,007** | **258,760** | **0** | **0** | **0** |

100 % of the residential units were observed during this assessment.

Wide-ranging conditions were observed. Units are present in various stages of completion.

### 6.5.2 Finishes

Floors are typically finished with vinyl plank flooring throughout, while the bedrooms in upper floor units have carpet. Walls and ceilings are typically painted gypsum board.

Ceramic tile is used around the shower/tub enclosure.

Entrance doors are typically solid core wood set in metal frames. Hardware includes a handle, separate deadbolt, closer, and peep hole. Interior doors are hollow core wood set in wood frames with a locking lever handle.

***Survey Condition and Analysis***

The residential unit finishes appeared to be in varying stages of construction. They were present with multiple cosmetic defects relating to poor installation and improper protection of installed finishes. The vinyl plank flooring was not properly protected with any drop cloths or paper during construction, therefore most of the vinyl was observed to be damaged. Damage includes large paint drips / spills, chipped corners, and deep scratches. The damaged vinyl planks will need to be pulled up and new planks installed.

The finished floor in approximately 60% of the units was observed to be out of level with dips. When the sub-flooring was installed with a self-leveler (Gypcrete), the resultant finished sub-floor has excessive gaps in various sizes between the baseboards and the sub-flooring. Many of these conditions are visible where the gap in the center of the base boards is larger than at the cut edges. This deficiency was observed and documented in a report issued by the Calic Group on their last visit on February 2, 2023. The vinyl floor planks will need to be removed, and an appropriate self-leveling underlayment used bring the floor in plane and flat. This work is recommended to be completed before replacing the damaged vinyl planks previously mentioned.

A summary of these deficiencies has been included in the Deficiency Table.

### 6.5.3 Cabinetry and Fixtures

The kitchens are equipped with stainless steel sinks, composition board cabinets, and quartz countertops. Typical bathroom fixtures include a floor-mounted, tank-type commode, a lavatory with a vanity, and a shower/bathtub arrangement with a ceramic tile surround.



***Survey Condition and Analysis***

The cabinetry in the kitchens was observed to be non-compliant to the design requirements provided in the construction documents and were not FHA compliant. Many of the cabinets were observed with excessive use of filler panels as a result of installing cabinets that were not properly sized to fill the area required per design specifications. A number of cabinets were installed that were present with cosmetic damage (chipped corners, broken hinges, large scratches, and overspray from paint), or had doors that were improperly installed. Drawers were also not installed with soft-close hardware as specified in the design documents. Countertops in all units was observed to be non-compliant compared to the design documents and FHA regulations. Deficiencies regarding cabinets and countertops are described in depth in the standalone Accessibility report. A detailed analysis by an architect, interior designer, installer, and cabinet manufacturer should be performed to remedy non-compliant cabinet and island details and to redesign these items to be compliant with FHA regulations and develop a comprehensive plan of correction. A summary of these deficiencies has been included in the Deficiency Table.

### 6.5.4   Soft Goods

Soft goods are not provided.

### 6.5.5   Hard Goods and Appliances

Kitchens are provided with one-piece electric range-ovens with vent hoods, full size refrigerators, dishwashers, and built-in microwaves. All observed appliances were stainless steel.

Stackable or Side-by-side washers and dryers are provided in each of the units.

***Survey Condition and Analysis***

Hard goods and appliances were observed to be in various stages of construction with many of the units still requiring installation of appliances. These items can be installed as part of normal construction activities.



## 7.0 ACCESSIBILITY

### Americans with Disabilities Act

The Americans with Disabilities Act (ADA) of 1990 prohibits discrimination against people with disabilities in employment, transportation, public accommodation, communications, and governmental activities. Title III of the ADA covers the private sector. It requires that a wide range of public accommodations in the private sector remove physical, communication, and procedural barriers to access by people with disabilities. Title III addresses the widespread exclusion of people with disabilities from the routine activities of everyday life. Title III covers sales, rental, and service establishments, as well as educational institutions, recreation facilities and service centers.

As part of this assessment, Partner performed a standalone, accessibility survey which has been included in the appendices of this report.

#### *Survey Condition and Analysis*

Building components were observed that are not compliant with ADA regulations such as insufficient clearance between cabinets and islands, balcony door threshold heights, improper shower clearances in dwelling units, exterior site tripping hazards, non-conforming interior door widths etc. Please refer to the accessibility report for a comprehensive breakdown of observed deficiencies. A summary of these deficiencies has been included in the Deficiency Table of this report as well as the standalone accessibility report.

### Fair Housing Amendments Act

The Fair Housing Amendments Act of 1988 (FHAA) requirements cover buildings consisting of four or more dwelling units with first occupancy after March 13, 1991. If such buildings have one or more elevators, all dwelling units are covered by the Act; otherwise, in buildings without elevators, only ground floor dwelling units are covered by the Act. Townhouses are exempted from the Act. The Department of Housing and Urban Development (HUD) has published Final Design Guidelines (see Federal Register, 24 CFR, Vol. 56, No. 44, March 6, 1991, page 9497). The Act requires design and construction to meet the seven design requirements listed below.

1. An accessible building entrance on an accessible route that can be used by a person using a wheelchair must be provided.
2. Public and common use areas of the dwellings must be readily accessible to and usable by persons with disabilities.
3. Doors designed to allow passage into and within all premises, usable to a person in a wheelchair, must be provided.
4. An accessible route must be provided into and through the covered dwelling unit to allow passage by a person in a wheelchair.
5. All light switches, electrical outlets, thermostats and other environmental controls requiring access must be provided at accessible locations.
6. Bathroom walls must provide reinforcements to allow for later installation of grab bars and shower seats.



7. Kitchens and bathrooms must be designed to allow an individual in a wheelchair to maneuver about the space.

The subject property was first occupied after March 13, 1991; as such, it is required to comply with the provisions for new construction buildings under the FHAA. Based on our observations, violations were observed. Please reference the accessibility report for a comprehensive breakdown of observed deficiencies

A summary of these deficiencies has been included in the Deficiency Table of this report as well as the standalone accessibility report.



## 8.0 SUSPECT WATER INTRUSION AND MICROBIAL GROWTH

As part of performing this PCA, visual observations for overt signs of suspect mold growth were also performed. These observations were not performed to discover all affected areas, nor were areas of the subject property observed specifically for the purpose of identifying areas of suspect mold growth. The subject property areas viewed were limited to those necessary to perform the primary scope of this PCA.

***Survey Condition and Analysis***

Visual or olfactory indications of significant suspect microbial growth were not observed.



## 9.0 NATURAL HAZARD INFORMATION

Partner reviewed readily and publicly available maps, materials or models to obtain the following information related to the identification of natural hazards, including those caused by or made more extreme by climate change. Further evaluation of site specific conditions, and development of property adaptive resiliency measures and overall mitigation strategies is beyond the scope of this report and may require additional investigation.

### 9.1 Flood Zone

According to Flood Insurance Rate Map, Community Panel Number 12095C0675G, dated June 20, 2018, the subject property appears to be located in

Zone X (unshaded); defined as minimal risk areas outside the 1-percent and .2-percent-annual-chance floodplains.

### 9.2 Seismic Zone

According to the seismic zone map, published in the Uniform Building Code 1997, Volume 2, Table 16.2, the subject property appears to be located in Seismic Zone 0.

### 9.3 Wind Zone

Partner performed a review of the Wind Zone Map, published by the Federal Emergency Management Agency. According to the map, the subject property appears to be located in Wind Zone III, an area with design winds speeds up to 200 miles per hour. The subject property does appear to be located in a special wind region or hurricane-susceptible zone.



# 10.0  OUT OF SCOPE CONSIDERATIONS

These following items are categorically excluded from the scope of work.

- Utilities: Operating conditions of any systems or accessing manholes or utility pits.
- Structural Frame and Building Envelope:  Entering of crawl or confined space areas (however, the field observer will observe conditions to the extent easily visible from the point of access to the crawl or confined space areas), determination of previous substructure flooding or water penetration unless easily visible or if such information is provided.
- Roofs: Walking on pitched roofs, or any roof areas that appear to be unsafe, or roofs with no built-in access, or determining any roofing design criteria.
- Plumbing: Determining adequate pressure and flow rate, fixture unit values and counts, verifying pipe sizes, or verifying the point of discharge for underground systems.
- Heating: Observation of flue connections, interiors of chimneys, flues or boiler stacks, or tenant owned or maintained equipment.  Entering of plenum or confined space areas.
- Air conditioning & Ventilation: Process-related equipment or condition of tenant owned or maintained equipment. Entering of plenum or confined space areas.  Testing or measurements of equipment or air flow.
- Electrical: Removing of electrical panel and device covers, except if removed by building staff, EMF issues, electrical testing, or operating any electrical devices. Opining on process related equipment or tenant-owned equipment.
- Vertical Transportation: Examining of cables, sheaves, controllers, motors, inspection tags, or entering elevator/ escalator pits or shafts.
- Life Safety/ Fire Protection: Determining NFPA hazard classifications, classifying, or testing fire rating of assemblies. Determination of the necessity for or the presence of fire areas, fire walls, fire barriers, paths of travel, construction groups or types, or use classifications.
- Interior Elements: Operating appliances or fixtures, determining or reporting STC (Sound Transmission Class) ratings, and flammability issues/regulations.

**Activity Exclusions-** These activities listed below generally are excluded from or otherwise represent limitations to the scope of a PCA prepared in accordance with this guide (ASTM 2018-15). These should not be construed as all-inclusive or imply that any exclusion not specifically identified is a PCA requirement under this guide.

- Providing opinions of costs for identified deficiencies,
- Identifying capital improvements, enhancements, or upgrades to building components, systems, or finishes;
- Removing, relocating, or repositioning of materials, ceiling, wall, or equipment panels, furniture, storage containers, personal effects, debris material or finishes; conducting exploratory probing or testing; dismantling or operating of equipment or appliances; or disturbing personal items or property, that obstruct access or visibility;
- Determining adequate pressure and flow rate, fixture-unit values and counts, verifying pipe sizes, or verifying the point of discharge for underground drains;



- Determining NFPA hazard classifications, identifying, classifying, or testing fire rating of assemblies. Determination of the necessity for or the presence of fire areas, fire walls, fire barriers, accessible routes, construction groups or types, or use classifications;
- Preparing engineering calculations to determine any system's, component's or equipment's adequacy or compliance with any specific or commonly accepted design requirements or building codes, or preparing designs or specifications to remedy any physical deficiencies;
- Identification of code or OSHA compliance beyond what has been reported through communication with local regulatory offices.
- Taking measurements or quantities to establish or confirm any information provided by the owner or user;
- Reporting on the presence or absence of pests or insects;
- Reporting on the condition of subterranean or concealed conditions as well as items or systems that are not permanently installed or are tenant-owned and maintained;
- Entering or accessing any area deemed to potentially pose a threat of dangerous or adverse conditions with respect to the field observer's health or safety;
- Performing any procedure, that may damage or impair the physical integrity of the property, any system, or component;
- Providing an opinion on the operation of any system or component that is shut down;
- Evaluating the Sound Transmission Class or acoustical or insulating characteristics of systems or components;
- Providing an opinion on matters regarding security and protection of occupants or users from unauthorized access;
- Evaluating the flammability of materials and related regulations;
- Providing an opinion on matters regarding security of the subject property and protection of its occupants or users from unauthorized access;
- Operating or witnessing the operation of lighting or any other system controlled by a timer, operated by the maintenance staff, or operated by service companies;
- Providing an environmental assessment or opinion on the presence of any environmental issues such as potable water quality, asbestos, hazardous wastes, toxic materials, the location and presence of designated wetlands, IAQ, etc. unless specifically defined within the agreed scope;
- Evaluating systems or components that require specialized knowledge or equipment;
- Entering of plenum or confined space areas.



## 11.0 LIMITATIONS

This assessment is based upon the guidelines set forth by the ASTM Standard current to the issuance of this report and subject to the limitations stated therein. Our review of the subject property consisted of a visual assessment of the site, the structure(s) and the accessible interior spaces. Any technical analyses made are based on the appearance of the improvements at the time of this assessment and the evaluator's judgment of the physical condition of the subject property components, their ages and their EUL. Consequently, this report represents the condition of the subject property at the time of observation. Acceptance and use of this report infers acknowledgment that the condition of the property may have changed subsequent to site observations and/or that additional information may have been discovered, and that Partner, its officers, employees, vendors, successors or assigns, are not liable for changes in the condition of the property, failures in property components or systems, and damages that may occur as a result of the changes or failures.

Information regarding the subject property is obtained from a site walk-through survey, local government agency records review, interviews and client-, tenant- or property owner-provided documents. No material sampling, invasive or destructive investigations, equipment or system testing was performed. The observations and related comments within this report are limited in nature and should not be inferred as a full and comprehensive survey of the building components and systems.

Information regarding operations, conditions, and test data provided by the Addressee, property owner, or their respective representatives has been assumed to be factual and complete. Information obtained from readily-available sources, including internet research and interview of municipal officials or representatives is assumed to be factual and complete. No warranty is expressed or implied, except that the services rendered have been performed in accordance with generally-accepted practices applicable at the time and location of the study.

The actual performance of systems and components may vary from a reasonably expected standard and will be affected by circumstances that occur after the date of the evaluation. This assessment, analyses and opinions expressed within this report are not representations regarding either the design integrity or the structural soundness of the project.

The report does not identify minor, inexpensive repairs or maintenance items, which should be part of the subject property owner's current operating budget so long as these items appear to be addressed on a regular basis. The report does identify infrequently occurring maintenance items of significant cost, such as exterior painting, roofing, deferred maintenance and repairs and replacements that normally involve major expense or outside contracting.

The assessment of the roof, façade and substructure contained herein cannot specifically state that these items are free of leaks and/or water intrusion and should not be interpreted as such. Comments made with respect to the condition of the systems are limited to visual observation and information provided by the designated site contacts and/or on-site representatives and their contractors/vendors. The evaluation of these systems did not include any sampling and/or testing. A more extensive evaluation may be required if a comprehensive report on the condition of these systems is required.



Performance of a comprehensive building, fire or zoning code review is outside of the scope of work for this report. Information provided within this report is based on readily-available information or interview of municipal officials.

This report presents an evaluation of the accessibility of the subject property as specified in the engagement agreement. This report does not present an audit of all components specified in federal, state or local accessibility regulations. Instead, this review observed general design components such as routes of travel, door hardware, plumbing amenities, elevator controls and signals, basic emergency alarm components and signage. This report is not a comprehensive Americans with Disabilities Act review.



# FIGURES

**1. SITE LOCATION MAP**

**2. SITE PLAN**

**3. ROOF MAP**





KEY:
Subject Property ▱

**FIGURE 1: SITE LOCATION MAP**
Project No. 23-402327.2

**PARTNER**



 N

KEY:
Subject Property ▱

**FIGURE 2: SITE PLAN**
Project No. 23-402327.2

**PARTNER**

**PARTNER**

| | | | | |
|---|---|---|---|---|
| **Site & Location** | | SHEET 1 OF 1 | 23-402327.3 | **PROJ. # 23-402327.3** |
| **FUTURA AT NONA COVE** | | DATE | FILENAME | |
| 19465 BOGGY CREEK ROAD | | 6/14/2023 | | |
| ORLANDO ,FLORIDA 32832 | | REVIEWED BY | DRAWN BY | |
| **Figures:** | Site & Location | CB | CB | |
| | | SCALE | | |
| | | NOT TO SCALE | | |



SITE MAP

SITE LOCATION

PARTNER

PROJ. # 23-402327.3

| | 23-402327.3 | NOT TO SCALE |
| | FILENAME | SCALE |
| GD | GD | |
| REVIEWED BY | AIR DRAWN BY | |
| 6/14/2023 | | Roof Plan |
| DATE | DRAWN BY | |
| SHEET 1 OF 1 | | |

ROOF PLAN
FUTURA AT NONA COVE
19465 BOGGY CREEK ROAD
ORLANDO, FLORIDA 32832

Figures:

ROOF PLAN

N E S W (compass)

ROOF SECTION DESIGNATION

X

| ROOF SECTION | SECTION DESCRIPTION | | INSTALL DATE | APPROX. SQ. FT. |
|---|---|---|---|---|
| | ROOF SYSTEM | | | |
| A | Single-ply Thermoplastic Polyolefin (TPO) | | 2022 | 66,836 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | APPROX. TOTAL SQ. FT. | 66,836 |

# APPENDIX A: SITE PHOTOGRAPHS

**PARTNER**



1. Site identification signage



2. Main building entrance



3. Underground irrigation sprinkler head



4. On-site retention pond on the Western section of the property



5. Site landscaping



6. Retaining wall along Eastern edge of the pond


7. Pool area


8. Pool foundation


9. Pool foundation overview. Pool is currently unfinished


10. Composite deck near pool area


11. Pedestrian walkway along pond


12. Courtyard C





13. Concrete pedestrian walkway forms



14. Surface parking lot near leasing office



15. Surface parking lot near leasing office. Lot is currently unpaved



16. Parking garage overview



17. Stored materials observed in parking garage



18. Typical unfinished patio





19. East building elevation



20. North building elevation



21. West building elevation



22. South building elevation



23. Typical balcony



24. Column on balcony stack on courtyard B which had footer replaced





25. Courtyard C balcony stack



26. Typical window



27. Attached parking structure



28. Parking garage overview



29. Attached concrete parking garage



30. Parking garage T-form decking






31.  Typical HVAC closet in apartment

32.  Typical in unit fan coil unit




33.  Typical thermostat

34.  Pad mounted electrical transformer




35.  Typical unit circuit breaker panel

36.  Typical outlet





37. Typical in unit domestic water heater



38. Garage elevator lobby



39. Typical common corridor. Note no flooring has been installed



40. Clubhouse overview. Note minimal finishes installed



41. Fitness center overview. Note minimal finishes installed



42. Public restroom on first floor near fitness center. Note minimal finishes and fixtures installed




43. Typical apartment unit interior


44. Typical apartment living room


45. Typical apartment unit kitchen


46. Typical finished apartment kitchen


47. Typical kitchen island


48. Typical apartment refrigerator





49. Typical electric range and oven combination



50. In unit stackable washer / dryer



51. Typical apartment bedroom lacking flooring



52. Typical apartment bedroom minus flooring installation



53. Apartment bedroom with carpet installed



54. Typical apartment unit bedroom with vinyl flooring installed




55. Typical unfinished apartment bathroom


56. Typical shower pan


57. Typical apartment bathroom missing vanity


58. Typical finished bathroom


59. Excessive gap between floor and baseboard in unit 502


60. Retaining wall near courtyard A observed to be deflected as a result of heavy machinery traffic






61. Retaining wall near courtyard A observed to be deflected as a result of heavy machinery traffic

62. Retaining wall near courtyard A observed to be deflected as a result of heavy machinery traffic. Note cracks on right side




63. Excessive balcony door threshold height and balcony topping observed above finish floor in unit 206. This condition is a typical representation

64. Excessive balcony door threshold height and balcony topping observed above finish floor in unit 208. This condition is a typical representation





65. Excessive balcony door threshold height and balcony topping observed above finish floor in unit 304. This condition is a typical representation

66. Cracking in balcony column observed in B court yard balcony stack which had footer shored. Typical condition on all balconies in this stack

**PARTNER**



67. Cracked balcony due to column deflection on balcony stack on courtyard A



68. Cracked balcony due to column deflection on balcony stack on courtyard A



69. Improperly supported header over fire door in common hallway



70. Saw cut framing members as a result of recessing refrigerator into wall. Observed in unit 116



71. Saw cut framing members as a result of recessing refrigerator into wall. Observed in unit 116



72. Saw cut framing members observed in unit 456 as an attempt to recess fridge into wall



**PARTNER**



73. Saw cut framing members observed in unit 456 as an attempt to recess fridge into wall. This is a typical condition



74. Saw cut framing members observed in unit 330 as an attempt to recess fridge into wall. This is a typical condition



75. Saw cut framing members observed in unit 330 as an attempt to recess fridge into wall. This is a typical condition



76. Insufficient framing alterations observed in alcove created for fridge



77. Insufficient header detail in unit 503 closet



78. Incorrect header detail over door to parking garage elevator lobby. This condition is typical on all floors

**PARTNER**





79. Incorrect header detail over door to parking garage elevator lobby. This condition is typical on all floors

80. Excessive gap between floor and baseboard caused by poor leveling in unit 213. This is a typical representation of this condition





81. Excessive gap between flooring and baseboard in unit 503

82. Damaged flooring observed in unit 123





83. Typical damaged vinyl flooring due to insufficient floor protection during construction. General contractor attempted to wax floor to repair damage

84. Typical damaged vinyl flooring due to insufficient floor protection during construction







85. Note no floor protection and excessive construction debris on floor causing damage to vinyl flooring in unit 120. This is a typical representation

86. Typical apartment bathroom. Note no floor protection and excessive construction debris on floor





87. Poor bathroom cabinet / drawer details observed in unit 306. Doors and drawers are poorly mounted and not level

88. Poor bathroom cabinet / drawer details observed in unit 312. Doors and drawers are poorly mounted and not level





89. Poor cabinet detail and excessive use of filler panels observed in unit 210. This is a typical representation of this condition

90. Poor cabinet detailing (misaligned door)





91. Damaged cabinets observed from construction



92. Countertop cut into wall in unit 503 due to being incorrect size



93. Countertop cut into wall in unit 503 due to being incorrect size





1. Front entrance of the building.



2. Building elevation overview



3. Building elevation overview.



4. Building elevation overview.



5. Building elevation overview.



6. Building elevation overview.





7. Building elevation overview.



8. Building elevation overview.



9. Building elevation overview.



10. Building elevation overview.



11. Unfinished main entrance.



12. Unfinished pool deck entrance.





13. Partial elevation, dry stack, stucco and cementitious panel.



14. Cementitious panel.



15. Partial elevation – cementitious panel and windows.



16. Partial elevation – cementitious panel and windows.



17. Partial elevation – dry stack, cementitious panel and windows.



18. Partial elevation – dry stack, cementitious panel and windows.





19. Partial elevation – dry stack, cementitious panel and windows.



20. Column out of plumb and square



21. Deformed threshold-Topping slab too high



22. Unit 406 threshold



23. Unit 406



24. Bowed window sill – sash does not close fully and lock-(typical).





25. Poolside courtyard – Unfinished



26. Poolside courtyard - Unfinished



27. Main entrance courtyard – Unfinished



28. Unfinished



29. Main entrance courtyard



30. Poolside courtyard - unfinished





31. Example of storefront windows, southeast elevation of the building.



32. Unfinished poolside entrance.



33. Racked windows



34. Insulated glass at entrance storefront



35. Roof Overview



36. Roof Overview





37. Roof Overview.



38. Roof Overview.



39. Roof Overview.



40. Roof Overview.



41. Roof Overview.



42. Roof Overview.



43. Roof Overview.



44. Roof Overview.



45. Roof Overview.



46. Roof Overview.



47. Roof Overview.



48. Incomplete roofing membrane and door threshold.


49. Typical soils stack.


50. Incomplete detail – saddle flashing required.


51. Incomplete detail – saddle flashing required.


52. Incomplete detail.


53. Adhesion loss sealant to tilt-wall panel.


54. Incomplete detail – closure required.





55. Incomplete roofing membrane and door threshold.



56. Incomplete door required and stucco finish.



57. Incomplete detail – saddle flashing required.



58. Incomplete detail – saddle flashing required.



59. Ponding water – 1" deep.



60. Ponding water.





61. Incomplete detail – saddle flashing required.



62. Incomplete wall and transition to parapet cap.



63. Incomplete wall and termination at rise wall.



64. Incomplete parapet cap.



65. Expansion joint detail.



66. Expansion joint detail.





67. Expansion joint detail.



68. Expansion joint detail.



69. Cracks observed in the stack.



70. Unit 304 balcony door threshold.



71. Cracked deck at stanchion.



72. Cracked deck at stanchion.





1.	Incoming domestic water and fire water services



2.	Triplex domestic water booster pump



3.	Triplex domestic water booster pump panel – note deenergized status



4.	Electric tank-type domestic water heater unit 529 - typical



5.	Electric tank-type domestic water heater unit 538 - typical



6.	Remedial shower repair unit 440




7. Remedial shower repair unit 440 – note potential damage to mixing valve


8. Bathroom lavatory and toilet unit 347 – typical


9. Bathroom lavatory piping unit 347 – typical


10. Toilet at unit 347 – typical


11. 1.28 gpf toilet tank unit 347 – typical


12. Faulty roof drain installation – note height above ponding water



13. Faulty roof drain installation – note height above areas of ponding



14. Wall spigot at ground level



15. Direct expansion (DX) split system condenser units refrigerant piping at roof – note excessive pipe run



16. DX split system condenser units and refrigerant piping at roof – note excessive pipe runs



17. DX split system air handling unit (AHU) - unit 335 – typical



18. Dirt and construction dust, etc., in DX split system AHU – unit 335





19. Dirt and construction dust, etc., in DX split system AHU – unit 527



20. Dirt and construction dust, etc., in DX split system AHU – unit 529



21. Outside air electronic control damper unit 434 - typical



22. DX split system digital thermostat - unit 542 - typical



23. Common area DX split system AHU at ground floor – note incomplete installation – typical



24. Common area DX split system AHU at ground floor – note incomplete installation – typical





25. Elevator lobby mini split system fan coil unit (FCU) – note incomplete installation – typical



26. Elevator lobby mini split system condenser unit (CU) – note incomplete installation – typical



27. Mini split system CU installation at exterior grade



28. Mini split system FCU at parking garage electrical room



29. Pad mounted, utility owned primary electrical transformers



30. Garage panel GA – 1000 amps





31.    Power riser and meter center A1 – 1400 amps



32.    Power riser and meter center B1 – 1600 amps



33.    Power riser and meter center C1 – 1600 amps



34.    Power riser and meter center A4 – 1200 amps



35.    Power riser and meter center B4 – 1200 amps



36.    Power riser and meter center C4 – 1200 amps



37. Residential apartment unit circuit breaker panel – unit 538 – typical



38. Residential apartment unit circuit breaker panel – unit 538 – typical



39. Common area corridor – note incomplete lighting fixture installation – typical



40. Common area corridor – note incomplete lighting fixture installation – typical



41. Common area corridor – note incomplete lighting fixture installation – typical



42. Common area corridor – note incomplete lighting fixture installation – typical





43. Incomplete elevator installation – garage area – typical



44. Incomplete elevator installation – garage area – typical



45. Incomplete elevator installation – garage area – typical



46. Incomplete elevator installation – residential apartment unit core area – typical



47. Incomplete elevator installation – residential apartment unit core area – typical



48. Incomplete elevator installation – residential apartment unit core area – typical





1. Sprinkler with protective cap.



2. Uncharged sprinkler riser.



3. Sprinklers in Fitness area.



Missing fire extinguisher.



4. Incomplete fire alarm panel installation.



5. Missing smoke detector at elevator.





6.    Smoke detector with protective cap.

# APPENDIX B: SUPPORTING DOCUMENTATION

**PARTNER**



# ACCESSIBILITY COMPLIANCE REVIEW

Futura at Nona Cove Apartments
19465 Boggy Creek Road
Orlando, Florida 32832

Assessment Date: May 18 -19, 2023
Report Date: June 8, 2023 (*Revised June 29, 2023*)
Partner Project Number: 23-402327.4

Prepared for:

**Futura**

Boca Raton, Florida 33496



**Engineers who understand your business**


**PARTNER**
**Engineering and Science, Inc.**

June 29, 2023

Ryan Mesce
Futura
2901 Clint Moore Road, #408
Boca Raton, Florida 33496

Subject:     Accessibility Compliance Review
             Futura at Nona Cove Apartments
             19465 Boggy Creek Road
             Orlando, Florida 32832
             Partner Project No. 23-402327.4

Dear Ryan Mesce:

Partner Engineering and Science, Inc. (Partner) is pleased to provide the following Accessibility Compliance Report for the above-mentioned address (the "subject property"). For the purposes of this report, Partner was engaged to identify areas of the property that are not in compliance with the Americans with Disabilities Act Standards (ADA), Fair Housing Amendments Act (FHAA), and/or other applicable accessibility laws and codes.

This compliance review included observation of current site conditions in addition to a limited review of provided construction documents (post construction commencement) and a full review of prior applicable third-party reporting items, to better determine whether non-compliant observations are a result of design, installation, or both. The independent conclusions represent Partner's best professional judgment based upon easily visible conditions and readily-available information and data obtained during the course of this assignment. The site assessment was performed utilizing methods and procedures consistent with good commercial or customary practices designed to conform to acceptable industry standards.  See section 2.4 of this report for a list of documents assessed.

We appreciate the opportunity to provide these assessment services.  If you have any questions concerning this report, or if we can assist you in any other matter, please contact Drew McCreery at dmccreery@partneresi.com.

Sincerely,

Partner Engineering and Science, Inc.


**DRAFT**                                    **DRAFT**

Mari Miller, CASP                            Drew McCreery

Senior Advisor, Accessibility                National Client Manager

---

**2154 Torrance Boulevard, Suite 200, Torrance, California 90501  ◊  Phone 800-419-4923  ◊  Fax 866-928-7418**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| **1.0** | **PURPOSE, LIMITATIONS AND SCOPE** | **1** |
| 1.1 | ADA | 1 |
| 1.2 | FHAA | 2 |
| 1.3 | Rehabilitation Act of 1973 (HUD's Section 504) | 2 |
| 1.4 | State/Local | 3 |
| 1.5 | Purpose | 3 |
| 1.6 | Scope | 4 |
| 1.7 | Cost Analysis | 4 |
| 1.8 | Construction Tolerances | 4 |
| 1.9 | Statement of Limitations | 5 |
| 1.10 | User Reliance | 5 |
| **2.0** | **GENERAL INFORMATION** | **6** |
| 2.1 | Facility Overview | 6 |
| 2.2 | Site Visit | 7 |
| 2.3 | Interviews | 7 |
| 2.4 | Document Review | 7 |

**FIGURES AND APPENDICES**

The following report Figures and Appendices are attached at the end of this report.

Appendices     Appendix A: Figure 1

                       Appendix B: Non-Compliant Findings and Cost Table

                       Appendix C:  Qualifications



# 1.0    PURPOSE, LIMITATIONS AND SCOPE

## 1.1    ADA

The Americans with Disabilities Act ("ADA", or "Act") is a civil rights legislation that was enacted in 1990 to provide persons with disabilities access and accommodations equal, or similar, to that available to the general public. Title III of the ADA applies to privately-operated commercial facilities and places of public accommodation requiring newly constructed buildings or altered buildings to comply with the standards set forth in the 2010 ADA Standards for Accessible Design (2010 Standards).

The United States Department of Justice ("DOJ") adopted the ADA Accessibility Guidelines ("ADAAG") in 1991 as the 1991 Standards. In 2010 the DOJ adopted the updated ADA design standards, which incorporate the ADAAG. The following table, taken from 28 CFR part 36, Subpart D, outlines compliance dates and the applicable ADA Standards for new construction and alterations.

| Compliance Date for New Construction and Alterations | Applicable ADA Standard |
|---|---|
| On or after January 26, 1993 and before September 15, 2010 | 1991 Standards |
| On or after September 15, 2010, and before March 15, 2012 | 1991 Standards or 2010 Standards |
| On or after March 15, 2012 | 2010 Standards |

The DOJ provides property owners a safe harbor from civil liability associated with non-compliant ADA elements when they were built or altered in compliance with the ADA design standards in place during the time of original construction or alteration. For example, elements of an existing facility that have not been altered on or before March 15, 2012, and that comply with the 1991 Standards are not required to be modified in order to comply with the 2010 Standards. For existing facilities that have elements that are not in compliance with the 1991 Standards on or after March 15, 2012, are required to comply with the 2010 Standards. The safe harbor does not apply to the supplemental elements in the 2010 Standards.

Existing buildings prior to the implementation of the ADA are required to have complied with the 1991 Standards where it is considered readily achievable to do so. Elements that are not in compliance with the 1991 Standards are required to remove barriers up to what is readily achievable in compliance with the 2010 Standards.

### *Title III of the ADA*

*At multi-family properties with an onsite leasing office, compliance is typically reviewed for publicly accessible areas within the leasing office, parking serving the leasing office, and exterior routes leading to the leasing office. If there are areas within the common shared spaces that are rented or made available to the general public (not including residents and resident guests), these spaces would also be covered under the Title III of the ADA.*

*See Non-Complaint Findings and Opinion of Cost Table for description of issues and recommendation.*



## 1.2 FHAA

The Fair Housing Amendments Act of 1988 (FHAA) requirements cover multifamily dwelling units that were first occupied after March 13, 1991, or received the last building permit issued by a State, County or local government or renewal thereof, on or before June 15, 1990. The Act covers buildings with four or more dwelling units. All dwelling units are covered in building with one or more elevators. In buildings without elevators, only ground floor dwelling units are covered by the Act. The Department of Housing and Urban Development (HUD) has published Final Design Guidelines (see Federal Register, 24 CFR, Vol. 56, No. 44, March 6, 1991, page 9497). The Act requires design and construction to meet the seven (7) design requirements listed below.

1. An accessible building entrance on an accessible route that can be used by a person using a wheelchair must be provided.
2. Public and common use areas of the dwellings must be readily accessible to and usable by persons with disabilities.
3. Doors designed to allow passage into and within all premises, usable to a person in a wheelchair, must be provided.
4. An accessible route must be provided into and through the covered dwelling unit to allow passage by a person in a wheelchair.
5. All light switches, electrical outlets, thermostats and other environmental controls requiring access must be provided at accessible locations.
6. Bathroom walls must provide reinforcements to allow for later installation of grab bars and shower seats.
7. Kitchens and bathrooms must be designed to allow an individual in a wheelchair to maneuver about the space.

*The property was constructed in 2023, therefore is covered under the FHAA. See Non-Complaint Findings and Opinion of Cost Table for description of issues and recommendation.*

*Several issues were identified and are included in the Cost Table included with this report. Partner used the Fair Housing Act Design Manual as a safe harbor as identified on documents made available.*

## 1.3 Rehabilitation Act of 1973 (HUD's Section 504)

The Rehabilitation Act of 1973 (Section 504) is applicable for recipients of Federal financial assistance, including housing. Projects constructed after July 11, 1988 are required to be designed and constructed to be readily accessible to and usable by persons with disabilities. New construction accessibility provisions also apply to substantial alterations undertaken to a multifamily housing project with fifteen or more units. All other alterations are required to comply to the maximum extent feasible.

Section 504 prohibits discrimination on the basis of disability in any program, service or activity that received federal financial assistance. In housing, a housing provider cannot refuse to rent or sell to a person with disability and impose different policies that are different than those required of or provided to persons who are not disabled. Section 504 regulations impose specific physical accessibility requirements for new construction and alteration of housing facilities in HUD assisted programs. The technical criteria in the Uniform Federal Accessibility Standards (UFAS), or a standard that is equivalent or greater, may be used to meet the minimum technical requirements of the regulations.



Under Section 504 if a "substantial alteration" is undertaken, the project is required to meet the new construction provisions of 24 CFR 8.22, which requires 5 percent of the dwelling unit or at least one unit, whichever is greater, shall be made accessible to persons with mobility disabilities and an additional 2 percent of dwelling units or at least one, whichever is greater, shall be made accessible to persons with hearing or visual disabilities. A "substantial alteration" is defined as a project with 15 or more units and the cost of alteration is 75 percent or more of the replacement cost of the facility. Projects that are less than 15 units and less than 75 percent of the replacement costs are identified as "other alterations" which indicate that alterations to a dwelling unit, to the maximum extent feasible, be made readily accessible to and usable by individuals with disabilities. If alterations when considered together amount to an alteration of a dwelling unit, the entire unit shall be made accessible. For example, if the kitchen, bathroom, and doors are replaced this would be considered an alteration of an entire unit.

The Uniform Federal Accessibility Standards has been the accessibility standard for design, construction, and alteration under HUD's Section 504. Although, in March 2011, DOJ advised Federal agencies that they may provide covered entities the option of using the 2010 Standards as an acceptable alternative to UFAS. Programs and activities that are subject to HUD's Section 504 regulation are also subject to Title II of the ADA, which applies to public entities. HUD has identified certain provisions in the 2010 Standards that provide less accessibility than is currently required by UFAS and/or HUD's Section 504 regulations. As a result, HUD is not deeming use of those specific provisions of the 2010 ADA Standards as a means of providing accessibility under Section 504 because HUD cannot decrease the level of accessibility. Therefore, the 2010 ADA Standards under Title II may be utilized as an alternative for comply with HUD's Section 504 regulation with identified exception outlined in the Deeming Notice or UFAS.

Partner's review includes the physical accessibility elements of the property and does not include review of policies and practices.

***The property is not a recipient of federal financial assistance and is therefore not covered under Section 504.***

## 1.4   State/Local

The property was required to have met the building code in effect at the time of construction. Improvements or alterations made to the property after original construction are required to have met the building code in effect at the time of said alterations. Partner assumes all state and local building requirements and regulations for the property have been met.

***State and local building codes was not included as part of this review.***

## 1.5   Purpose

The purpose of this report is to assist the Client, in evaluation of the property's compliance with relevant provisions of the applicable accessibility requirements  and the impact that the property's compliance status may have on the Client's financial decisions.  To that end, Partner has reviewed the physical features of the property for construction related barriers as they relate to the ADA, FHAA, and Section 504, where applicable. , and has provided recommendations for barrier removal of the observed conditions, and an opinion of probable cost to correct the conditions.



## 1.6 Scope

The subject property has been evaluated for general ADA Title III and FHAA compliance. Based on the date of construction, Partner utilized the Fair Housing Act Design Manual, as the safe harbor for review unless otherwise identified on documents made available.

Unless otherwise noted herein, Partner's review engagement of the ADA covers Title III only and does not cover Title I – Employment, Title II State and Local Governments (unless requested), Title IV - Telecommunications, and Title V – Miscellaneous Provisions. These areas cover separate areas and entities for disability.

Upon determination that a condition exists that appears to be in non-compliance, a general repair recommendation and an anticipated cost for the repair is included in the table at the end of this report. Photographs to illustrate perceived deficiencies are also included.

## 1.7 Cost Analysis

Opinion of costs are based on construction costs developed by construction resources such as Marshall & Swift, RS Means, Partner's experience with past costs for similar projects, city cost indexes, consulting with local specialty contractors, client provided information., and assumptions regarding future economic conditions. Actual cost estimates may differ from Partner's opinion of costs provided in this report. Actual cost estimates are determined by many factors including but not limited to: choice and availability of materials, choice and availability of a qualified contractor, regional climate zone, quality of existing materials, site compatibility, scheduling and sequencing, and access to the subject property and buildings. Resolving or accounting for these variables are outside Partner's scope of work. It is not the intent of this report to provide design solutions or serve as construction documents, rather it is to identify the non-compliant issue and provide a recommendation to remove the barrier. Opinion of costs for corrective action involve a single solution without extensive study, destructive testing, or design. It is understood that there may be several solutions to one barrier, along with unforeseen or concealed conditions that can affect the method of corrective action. Opinion of costs represent material and labor cost only. Other factors such design, permitting, overhead, contingencies, and tenant coordination and management have not been included. Partner recommends consulting with a local design professional and contractor to provide cost efficient solutions to non-compliant issues.

## 1.8 Construction Tolerances

According to the ADA Standards, all dimensions are subject to conventional industry tolerances except where the requirement is stated as a range with specific minimum and maximum end points. Varying construction materials and methods have different industry tolerances; however, tolerances under the ADA cannot be predefined, rather must always be on a case-by-case basis considering the design, materials and methods, and field conditions. Select industries do not have recognized construction tolerances. This is true for concrete and asphalt surfaces. In these situations, Partner recognizes that there are limitations to accuracies of assessors tools used for measurements. Therefore, the following will be included as part of this report:

- Up to 2.4%, where 2.08% is allowed (2.5% will be called out as non-compliant)
- Up to 5.3% where 5.0% is allowed (5.4% will be called out as non-compliant)
- Up to 8.7% where 8.33% is allowed (8.8% will be called out as non-compliant)
- Up to 10.4% where 10.0% is allowed (10.5% will be called out as non-compliant)



- Up to 12.9% where 12.5% is allowed (13.0% will be called out as non-compliant)

Partner utilizes a tolerance of 1/8 inch where minimum and maximum dimensions are not indicated, both due to construction tolerance and the accuracy of each measuring tool, as it may vary by manufacturer. Partner has established the tolerances for this report as a reasonable measure for our assessment of existing buildings and new construction, but it should be understood that these tolerances have not been accepted or established by the DOJ, and is generally evaluated on a case-by-case basis in the event of a complaint process.

## 1.9 Statement of Limitations

Opinions and recommendations presented in this report are based on Partner's interpretation of the ADA and FHAA Guidelines and Standards; final determinations on any issue can be made only by the United States Department of Justice or HUD. Our review of the subject property consisted of a visual assessment of the site, the structure(s) and the interior spaces where access was granted. Verification by count or measurement is performed for typical components and in case of observed anomaly, but exhaustive or complete verification of all accessible elements is not performed. Any technical analyses made are based on the appearance of the improvements and the evaluator's judgment of the physical condition of the subject property components at the time of this assessment. Furthermore, Partner is not responsible for changes or alterations completed at the site after the day of the site observation.

The property was required to have met the building code in effect at the time of construction. Improvements or alterations made to the property after original construction are required to have met the building code in effect at the time of said alterations. Partner assumes all state and local building requirements and regulations for the property have been met.

## 1.10 User Reliance

Partner was engaged by the Addressee, or their authorized representative (collectively, "the Client"), to perform this assessment. The engagement agreement specifically states the scope and purpose of the assessment, as well as the contractual obligations and limitations of both parties. This report and the information therein, are for the exclusive use of the Client. This report has no other purpose and may not be relied upon, or used, by any other person or entity without the written consent of Partner. Third parties that obtain this report, or the information therein, shall have no rights of recourse or recovery against Partner, its officers, employees, vendors, successors or assigns. Any such unauthorized user shall be responsible to protect, indemnify and hold Partner, the Client and their respective officers, employees, vendors, successors and assigns harmless from any and all claims, damages, losses, liabilities, expenses (including reasonable attorneys' fees) and costs attributable to such use. Unauthorized use of this report shall constitute acceptance of, and commitment to, these responsibilities, which shall be irrevocable and shall apply regardless of the cause of action or legal theory pled or asserted.

This report has been completed under specific Terms and Conditions relating to scope, relying parties, limitations of liability, indemnification, dispute resolution, and other factors relevant to any reliance on this report. Any parties relying on this report do so having accepted the Terms and Conditions, a copy of which can be found at http: / www.partneresi.com/terms-and-conditions.php.



## 2.0 GENERAL INFORMATION

### 2.1 Facility Overview

| Property Name | Futura at Nona Cove Apartments |
|---|---|
| Address | 19465 Boggy Creek Road |
| City, State, Zip | Orlando, Florida 32832 |
| Year Built | 2023 |
| Alteration Date, if applicable | Not Applicable |
| Property Use | Multi-Family |
| Number Buildings | One |
| Stories or Floors | Residential Building – Five<br>Parking Garage - Six |
| Number of Units | 260 |
| Number of Elevators and Floors Accessed | Three elevators accessing all floors |
| Parcel Size (Acres) | 5.583 Acres |
| Gross Building Area (SF) | 331,150 Square Feet |
| Net Rentable Area (SF) | 226,260 Square Feet |
| Total Number of Parking Spaces | Parking Garage – 433 (per plans)<br>Clubhouse/Leasing - 9 (per plans) |
| Number of ADA Parking Spaces | Parking Garage – 6 ADA spaces (per plans)<br>Clubhouse/Leasing Office – 1 ADA space (per plans) |
| Units Accessed<br>Unit Number and Floor Plan Type | A1 – Units 236 and 448<br>A2 – Units 110 and 210<br>A3 – Units 229 and 419<br>B1 – Units 231 and 234<br>B2 – Units 230 and 232<br>B3 – Units 421 and 454<br>C1 – Units 416 and 417<br>S1 – Units 238 and 422 |
| Limiting Conditions | The project is not complete. The common use areas/leasing office have drywall installed only. The elevators are locked and are not available for evaluation. The parking garage is not striped and parking for the leasing office has not been completed.<br><br>*Partner reviewed completed areas for compliance but did not conduct a complete review of areas with ongoing building, as construction monitoring is outside the scope of this report.* |



| Unit Type name | Type | Quantity | Average Area (SF) | Total Square Footage |
|---|---|---|---|---|
| S1 | 1 Bed / 1 Bath | 20 | 623 | 12460 |
| A1 | 1 Bed / 1 Bath | 25 | 799 | 19975 |
| A2 | 1 Bed / 1 Bath | 2 | 873 | 1746 |
| A3 | 1 Bed /1 Bath | 60 | 888 | 53280 |
| B1 | 2 Bed /2 Bath | 40 | 1125 | 45000 |
| B2 | 2 Bed /2 Bath | 54 | 1158 | 62532 |
| B3 | 2 Bed /2 Bath | 44 | 1168 | 51392 |
| C1 | 3 Bed /2 Bath | 15 | 1425 | 21375 |
| | **Total** | 260 | 1062 | 226,260 |

## 2.2 Site Visit

| Date of Visit | May 18th and 19th, 2023 |
|---|---|
| Name of Assessor | Mandy Manning |
| Name, Title, and Company of Escort | Not Applicable |
| Additional Comments | Not Applicable |

## 2.3 Interviews

Interviews were not conducted during this site visit.

## 2.4 Document Review

The following documents were provided for review:

- Architectural construction documents prepared by Charlan, Brock & Associates and dated January 6, 2020
- ADA/FHA Field Reviews, prepared by LCM Architects and dated November 30, 2021, April 4, 2022, July 1, 2022, and February 10, 2023.



**APPENDIX A: FIGURES**

**PARTNER**



Futura at Nona Cove Apartments
19465 Boggy Creek Road
Orlando, Florida 32832

Parking Garage

Futura at Nona Cove

19465 Boggy Creek Rd

**KEY:**

| | |
|---|---|
| ——— | Site Boundaries reviewed |
| – – – | Accessible Route |
| S and V | Parking Location |
| ▭ | Cross slopes exceeding 2% |
| ▬ | Running slopes exceeding 5% |
| | Curb Ramps |
| CR# | |
| | |
| R# | Pedestrian Ramps |
| | |
| E# | Public Entrances |

N



**SITE PLAN**
Project No. 23-402327.4

**PARTNER**

**APPENDIX B: FINDINGS**

**PARTNER**

**Project Name** Futura at Nona Cove Apartments **Project No.** 23-402327.4

**Project Address** 19465 Boggy Creek Road, Orlando, FL 32832 **Date** June 29, 2023



**PARTNER**

**FINDINGS TABLE**
Futura at Nona Cove Apartments
Orlando, FL

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| | | | | |
|---|---|---|---|---|
| 1 - 1 | 2020 FAC Section: 303.2; 303.3<br><br>2010 ADAS Section: 303.3, 303.2<br><br>1986 ANSI A117.1 Section: 4.5.2, 4.5.2 | Exterior Route Between Covered Multifamily Dwelling Units and Common Use Amenities/Areas | The deck contains abupt vertical edges or variations over 1/4 inch and nails that are not flush with the deck surface.<br><br>Changes in level between 1/4 inch and 1/2 inch must be beveled at 1:2 or less. Changes in level greater than 1/2 inch must be by way of a ramp. | The nails in the deck will need to be level with the decking surface and the deck surface should have no variation in level greater than 1/4 inch.<br><br>This item was not included in the LCM reports. |  Open |
| 1 - 2 | 2020 FAC Section: 302.1<br><br>2010 ADAS Section: 302.1<br><br>1986 ANSI A117.1 Section: 4.5.1, 4.5.1 | Walking Trail | The walking trail surface contains loose gravel and surface materials that do not provide for a stable, firm, slip-resistant surface.<br><br>Floor and ground surfaces shall be stable, firm, and slip-resistant. | Walking trail will need to be maintained free of sand and gravel.<br><br>This item was not included in the LCM reports. |  Open |

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| | | | | | |
|---|---|---|---|---|---|
| 1 - 3 | 2020 FAC Section: 405.9, 405.9.1, 405.9.2<br><br>2010 ADAS Section: 405.9.2, 405.9.1, 405.9 | Walking Trail | The walking trail contains drop-offs greater than 6 inches and edge protection has not been provided. | Provide edge protection along the walking trail at areas with drop-offs greater than 6 inches. Quantity is estimated. Cost indicative of a concrete curb.<br><br>This item was not included in the LCM reports. |  Open |
| 1 - 4 | 2020 FAC Section: 303.2, 303.3<br><br>2010 ADAS Section: 303.3, 303.2<br><br>1986 ANSI A117.1 Section: 4.5.2, 4.5.2 | Walking Trail | The walking trail contains abrupt vertical edges over 1/4 inch.<br><br>Changes in level between 1/4 inch and 1/2 inch must be beveled at 1:2 or less. Changes in level greater than 1/2 inch must be by way of a ramp. | Modify the walking trail to alleviate changes in level greater than 1/4 inch.<br><br>This item was not included in the LCM reports. |  Open |

PARTNER

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| 2 - 1 | Parking Garage<br><br>2020 FAC Section: 208.2<br><br>2010 ADAS Section: 208.2 | There does not appear to be enough accessible parking stalls planned for residential parking within the parking garage.<br><br>There are six accessible parking stalls indicated on the civil plans (Sheet C0).<br><br>There should be a minimum of nine accessible parking stalls to meet minimum requirements for FHAA and FAC accessible parking counts. | Coordinate and verify the intended approach with designer of record, as the plans appear to conflict. Overall garage layout indicates 2 spaces per floor graphically, assumed to total 8, but text and parking tables indicate 6 total. Three additional accessible spaces appear to be required within this parking facility (residential garage). Cost not included, as this area is still under construction. Advisory comment. |  | Open |

PARTNER



**FINDINGS TABLE**
Futura at Nona Cove Apartments
Orlando, FL

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
|---|---|---|---|
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

No significant issues were observed

| | | | | |
|---|---|---|---|---|
| 4 - 1 | 2020 FAC Section: 307.2<br><br>2010 ADAS Section: 307.2<br><br>1986 ANSI A117.1 Section: 4.4.1, 4.4.1 | The stairwell by the leasing office projects into the headroom clearance in the circulation path.<br><br>Wall-mounted objects that have leading edges between 27 inches and 80 inches from the floor must not project more than 4 inches into the circulation path. Protruding objects that extend to the floor or within 27 inches of the floor are cane detectable and are therefore not hazardous. Where it is necessary or desirable to have objects protrude from the wall, a manner of cane detection must be provided. | Provide a barrier under the stairwell near the leasing office for cane detection.<br><br>This item was not included in the LCM reports. |   Open |
| 4 - 2 | 2020 FAC Section: 504.2<br><br>2010 ADAS Section: 504.2<br><br>1986 ANSI A117.1 Section: 4.9.2, 4.9.2 | The stairwell closest to the temporary office on the first floor was observed with stair risers that are not uniform in height. Measured 3 inches and 7 inches at the bottom riser and subsequent risers. Field team indicates the height discrepancy will be reconciled when concrete riser installation is complete.<br><br>On any given flight of stairs, all steps shall have uniform riser heights and uniform tread widths. | Ensure that the finished stairs provide uniform riser height as required. Verify the finished vertical dimension from the concrete to the top of the first tread will match that of all subsequent risers.<br><br>This item was not included in the LCM reports. |   Open |

**PARTNER**



**FINDINGS TABLE**
Futura at Nona Cove Apartments
Orlando, FL

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
|---|---|---|---|
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

No significant issues were observed



**FINDINGS TABLE**
Futura at Nona Cove Apartments
Orlando, FL

| Project Name | Futura at Nona Cove Apartments | | Project No. | 23-402327.4 |
| --- | --- | --- | --- | --- |
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | | Date | June 29, 2023 |

No significant issues were observed

**FINDINGS TABLE**
Futura at Nona Cove Apartments
Orlando, FL

Project Name     Futura at Nona Cove Apartments     Project No.     23-402327.4

Project Address     19465 Boggy Creek Road, Orlando, FL 32832     Date     June 29, 2023

**PARTNER**

| | | | | | Status |
|---|---|---|---|---|---|
| 7 - 1 | 1998 FHADM Section: 4.3<br><br>All Units (observed at 110,210 ,229,230,2 31,232,23 4,236,238, 416,417,4 19,421,42 2,448,& 454) | The route connecting the balcony/patios to the rest of the unit do not appear to comply with FHA Design Requirement 4, accessible route into and through the covered unit. The slope at the dwelling unit balcony exceeds 2 percent. Measured slopes up to 8.1 percent (unit 230).<br><br>At least one accessible route shall connect all spaces and elements that are a part of the unit. Page 4.15 of the FHA Design Manual indicates that an accessible route onto a balcony constructed of concrete, brick, or flagstone may be interrupted by a 4-inch step but does not exclude this area from the accessible route requirement. The referenced standard, ANSI A117.1-1986, indicates that an accessible route with a running slope greater than 1:20 is a ramp. Nowhere shall the cross slope of an accessible route exceed 1:50 (2%). It is Partner's understanding that due to the size and configuration of the balconies and patios, the entire surface requires a 2 percent maximum slope in all directions. | Reconstruct balconies at the dwelling units to provide a maximum slope of 2 percent in any direction on the balcony at the balcony entrance. Cost included in the PCA report. See PCA cost table for more information.<br><br>This issue was not documented in LCM reports. It appears that reports 1, 2, and 3 included observations at ground floor units only. Report 4 includes unit observation at level 5. |  | Open |
| 7 - 2 | 2020 FAC Section: 404.2.9<br><br>2010 ADAS Section: 404.2.9<br><br>1986 ANSI A117.1 Section: 4.6.3<br><br>All Units (observed at 110,210 ,229,230,2 31,232,23 4,236,238, 416,417,4 19,421,42 2,448,& 454) | The opening force at the dwelling unit entry doors were observed to require force beyond the maximum allowed, measuring up to 10 pounds.<br><br>The maximum allowable opening force is 5 pounds. | Adjust the door sweeps and spring hinges to provide a maximum opening force of 5 pounds a the dwelling unit's entry door. |  | Open |

FINDINGS TABLE
Futura at Nona Cove Apartments
Orlando, FL

**Project Name** Futura at Nona Cove Apartments

**Project Address** 19465 Boggy Creek Road, Orlando, FL 32832

**Project No.** 23-402327.4

**Date** June 29, 2023

| | | | | | |
|---|---|---|---|---|---|
| 7 - 3 | 1998 FHADM Section: 4.12 | All Units (observed at 110,210,229,230,231,232,234,236,238,416,417,419,421,422,448,& 454) | The secondary door threshold for all observed units measured 1/2 inch with the exception of Unit 210's which measured greater than 3/4 inch. The threshold is beveled at a slope greater than 1:2, as the observed interior condition contains no bevel at the noted 1/2" vertical change from the interior finish floor to the top of the threshold.<br><br>Thresholds at these exterior doors, including sliding door tracks, shall be no higher than 3/4 inch. Changes in level at these locations must be beveled with a slope no greater than 1:2. | Modify the door threshold to provide a compliant 1:2 beveled interior condition with a maximum height of 1/2 inch and adjust pan flashing. Changes in level greater than 1/4 inch must be beveled with a slope no steeper than 1:2.<br><br>This issue was noted in LCM report #4. | Open |

**PARTNER**

Project No. 23-402327.4
Page 10

**PARTNER**

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
|---|---|---|---|
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| | | | | | |
|---|---|---|---|---|---|
| 7 - 4 | 1998 FHADM Section: 7.7 | A1 (1 BR/1 BA) - Observed at Units #236 and #448 | The clearance between the wall and island counter in Unit 448 kitchen is less than 40 inches minimum, measured at 39 inches, and the clearance between the stove and counter in Unit 236 is less than 40 inches, measured at 39 inches.<br><br>Clearance between all opposing base cabinets, countertops, appliances, or walls within kitchen work areas shall be 40 inches minimum. | Adjust the island pony wall location and countertop to maintain a clearance of 40 inches throughout the kitchen. Cost included in the PCA report. See PCA cost table for more information.<br><br>Issues with kitchen island placement noted in LCM report #2 and report #4. |  | Open |

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| | | | | |
|---|---|---|---|---|
| 7 - 5 | A2 (1 BR/1 BA) - Observed in Units #110 and 210 | The centerline of the toilet in Units 110 and 210 is not the correct distance from the adjacent wall or fixture, measured at 25 inches from the tub to the center of the flange.<br><br>The centerline of the water closet shall be 18 inches from one side of the required clearance. | Reset the toilet flange to provide a toilet centerline of 18 inches exact, per FHA Design Manual.<br><br>This specific unit issue was not noted in LCM reports, but similar conditions were included. |  Open |
| 7 - 6 | A3 (1 BR/1 BA) - Observed in Units #229 and 419 | The route of travel between the hall bathroom door face and the opposing entry corridor wall measured only 35 inches wide with the door open 90 degrees. This creates a pinch point that measures deeper than 24 inches.<br><br>At least one accessible route shall connect all spaces and elements that are a part of the unit. | Modify the door opening location so provide a compliant 36-inch path of travel in the bathroom from the hallway as required.<br><br>This issue was not noted in the LCM reports. |  Open |

PARTNER

| | | | | |
|---|---|---|---|---|
| 7 - 7 | 1998 FHADM Section: 7.7 | A3 (1 BR/1 BA) - Observed in Units #229 and 419 | The clearance between the dishwasher and island counter in Unit 229 kitchen is less than 40 inches minimum, measured at 39-3/4 inches, and the clearance between the stove and counter, measured at 37-3/4 inches.<br><br>Clearance between all opposing base cabinets, countertops, appliances, or walls within kitchen work areas shall be 40 inches minimum. | Adjust the island pony wall location and countertop to maintain a clearance of 40 inches throughout the kitchen. Cost included in the PCA report. See PCA cost table for more information.<br><br>This deficiency was documented by LCM in Field Review #2 and #3. |  | Open |
| 7 - 8 | | A3 (1 BR/1 BA) - Observed in Units #229 and 419 | The restroom in Unit 229 has a toilet centerline that is not the correct distance from the adjacent wall or fixture, measured at 17 inches from the wall to the centerline.<br><br>The centerline of the water closet shall be 18 inches from one side of the required clearance. | Use an offset flange to provide a toilet centerline of 18 inches exact as required under FHA Design Manual. This condition was not observed in Unit 419. Therefore quantity is estimated.<br><br>This specific unit issue was not documented in LCM Reports, but similar conditions were included. |  | Open |

PARTNER

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| 7 - 9 | 1998 FHADM Section: 7.7 | B2 (2BR/2BA) - Observed in Units #230 and 232 | The clearance between the refrigerator and island counter in Unit 230 kitchen is less than 40 inches minimum, measured at 37 inches.<br><br>Clearance between all opposing base cabinets, countertops, appliances, or walls within kitchen work areas shall be 40 inches minimum. | The required clearance of 40 inches may be achieved by pushing the refrigerator to the wall. If 40-inch clearance is not obtained by pushing the appliance to the wall, relocation of the island pony wall or reconfiguration of the kitchen is recommended. Cost included in the PCA report. See PCA cost table for more information.<br><br>This specific unit issue was not documented in LCM Reports, but similar conditions were included. Kitchen clearance issues noted in LCM report #2 |  |  | Open |

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
|---|---|---|---|
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| | | | | |
|---|---|---|---|---|
| 7 - 10 | 2020 FAC Section: 302.3<br><br>2010 ADAS Section: 302.3<br><br>1986 ANSI A117.1 Section: 4.5.4, 4.5.4 | B3 (2BR/2BA)<br><br>Observed in Units #421 and 454 | There is an opening at the secondary door in Unit 421 that is greater than 1/2 inch.<br><br>Openings in the floor or ground surfaces shall not allow the passage of a sphere more than 1/2 inch in diameter. Elongated openings shall be placed so that the long dimension is perpendicular to the dominant direction of travel. | Fill the opening at the secondary door to alleviate gaps greater than 1/2 inch. Coordinate with interior bevel/threshold replacement outlined at barrier 7-1 (no cost). This condition is considered an outlying barrier and is not assumed to be present in other units of this layout. Quantity indicative of unit 421 only.<br><br>This issue was not documented in LCM Reports, as this unit was not included in observations. | Open |
| 7 - 11 | 1998 FHADM Section: 6.5 (Figure) | B3 (2BR/2BA) -<br><br>Observed in Units #421 and 454 | The restroom with a shower in Unit 454 has a toilet centerline that is not the correct distance from the adjacent wall or fixture, measured at 20 inches from the wall to the centerline.<br><br>The centerline of the water closet shall be 16 inches minimum and 18 inches maximum from one side of the required clearance. | Use an offset flange to provide a toilet centerline of 18 inches. Quantity estimated, as half of the units observed of this type contained a toilet centerline not at 18 inches.<br><br>This specific unit issue was not documented in LCM Reports, but similar conditions were included. | Open |
| 7 - 12 | 1998 FHADM Section: 7.7 | B3 (2BR/2BA) -<br><br>Observed in Units #421 and 454 | The clearance between the fridge and island counter in Unit 454 kitchen is less than 40 inches minimum, measured at 38-3/4 inches.<br><br>Clearance between all opposing base cabinets, countertops, appliances, or walls within kitchen work areas shall be 40 inches minimum. | Adjust the island countertop to maintain a clearance of 40 inches throughout the kitchen. Cost included in the PCA report. See PCA cost table for more information.<br><br>This deficiency was documented by LCM in Field Review #2. | Open |

**PARTNER**

PARTNER

| Project Name | Futura at Nona Cove Apartments | | Project No. | 23-402327.4 |
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | | Date | June 29, 2023 |

| | | | | | |
|---|---|---|---|---|---|
| 7 - 13 | 1998 FHADM Section: 4.3 | B3 (2BR/2BA) – Observed in Units #421 and 454 | In unit 454, the route of travel between the hall bathroom door face and the opposing entry corridor wall measured only 35 inches wide with the door open 90 degrees. This creates a pinch point that measures deeper than 24 inches.<br><br>At least one accessible route shall connect all spaces and elements that are a part of the unit. | Modify the door opening location so provide a compliant 36-inch path of travel in the bathroom from the hallway as required. Quantity estimated, as half of the units observed of this type contained this narrowed route condition.<br><br>This issue was not noted in the LCM reports. | Open |
| 7 - 14 | 1998 FHADM Section: 4.3 | C1 (3BR/2BA) – Observed Units 416 and 417 | In unit 416, the route of travel between the hall bathroom door face and the opposing entry corridor wall measured only 35 inches wide with the door open 90 degrees. This creates a pinch point that measures deeper than 24 inches.<br><br>At least one accessible route shall connect all spaces and elements that are a part of the unit. | Modify the door swing or provide alternate door stops to allow a 36-inch path of travel in the bathroom from the hallway entrance. Quantity estimated, as half of the units observed of this type contained this narrowed route condition.<br><br>This issue was not noted in the LCM reports. | Open |

**PARTNER**

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| 7 - 15 | S1<br>(1BR/1BA)<br>-<br>Observed<br>Units 238<br>and 422 | The restroom in Units 238 and 422 have toilet centerlines that are not the correct distance from the adjacent wall or fixture, measured at: 17 inches from the wall to the centerline.<br><br>The centerline of the water closet shall be 18 inches from one side of the required clearance. | Use an offset flange to provide a toilet centerline of 18 inches exact.<br><br>This issue was documented in LCM Report #1 in which the centerline measured 15-1/2 inches, and LCM Report #4 in which the centerline measured 17 inches. |  |  | Open |

**FINDINGS TABLE**
Futura at Nona Cove Apartments
Orlando, FL

| Project Name | Futura at Nona Cove Apartments | Project No. | 23-402327.4 |
|---|---|---|---|
| Project Address | 19465 Boggy Creek Road, Orlando, FL 32832 | Date | June 29, 2023 |

| 7 - 16 | 1998 FHADM Section: 7.56 | S1 (1BR/1BA) - Observed Units 238 and 422 | The minimum clearance for the shower compartment is not provided as the shower controls were installed on the incorrect wall. If a shower compartment is the only bathing facility, the shower compartment shall have dimensions of 36 inches minimum in width and 36 inches minimum in depth. A clearance of 48 inches minimum in depth, measured perpendicular to the shower head wall, and 30 inches minimum in depth, measured from the face of the shower compartment, shall be provided. Reinforcing for a shower seat is not required in shower compartments larger than 36 inches in width and 36 inches in depth. | Relocate shower controls to the far wall as designed in the architectural plans. Ensure that an unobstructed, close parallel approach is achievable against the outside edge of the shower and that no framing walls finish proud of the pan or reduce the 48 inches clear floor space required measured from the control wall.<br><br>This issue was noted in LCM report #2 and LCM report #4. Partner observed one shower with finishes removed and one shower with all finishes installed. |  | Open |
| | | | | |  | |

# APPENDIX C: QUALIFICATIONS

**PARTNER**



## Education

Bachelor of Science in Political Science, Florida State University
Bachelor of Science in International Affairs, Florida State University
Certification in Urban and Regional Planning, Florida State University

## Registrations

ADA Coordinator Certification (ADAC)

## Highlights

10 years of compliance and accessibility experience as it relates to the Americans with Disabilities Act (ADA)
ADA Compliance Assessments
Provide Quality Control

## Experience Summary

As a Project Manager Mandy's responsibilities include planning, executing, and finalizing projects according to deadlines and within in budget. Projects are focused on compliance with the Americans with Disabilities Act (ADA).

Mandy brings more than 10 years of compliance and accessibility experience to the team and is a certified ADA Coordinator. In the past several years she has helped numerous entities with the development of their self-evaluations and ADA transition plans. Her experience includes conducting field evaluations documenting ADA compliance and deficiencies in facilities, parks, and trails. Completing ADA compliance reports of facilities, park, and trails. Conducting program, services, and activities (PSA) reviews for ADA compliance and documenting finings in compliance reports.

## Contact

mmanning@partneresi.com

# PARTNER


## Education

BFA, Interior Design, Harrington College of Design, Chicago, Illinois

## Certifications

Certified Access Specialist (CASp), State of California

## Training

Certified Access Specialist Institute (CASI), In-Depth Scoping Requirements for Accessible Housing
Fair Housing Accessibility First, Design and Construction Requirements of the Fair Housing Act
Fair Housing Accessibility First, Strategies for Compliant Bathrooms
Fair Housing Accessibility First, Accessible Routes
Harvard University Graduate School of Design, ADA, and Other Access Standards to Public and Private Non-Residential Facilities and Programs
Harvard University Graduate School of Design, Fair Housing: Federal Accessibility Requirements for Multi-Family Housing
United States Access Board, 2010 Standards for Accessible Design
United States Access Board, Accessible Housing
United States Access Board, Alterations and Additions to Existing Facilities
United States Access Board, Department of Justice Title II and Title III Regulations: New Constructions, Alterations, and Barrier Removal

## Highlights

12 years of experience in the architectural, construction, and real estate industries
12 years of experience in Design and Construction Administration
9 years performing Accessibility Compliance Reviews, Property Condition Assessments, Limited Owner's Representation, and Property Acquisition Consulting Services

## Experience Summary

Ms. Miller serves as Senior Advisor of Accessibility Services for Partner Engineering and Science, Inc (Partner), where she is responsible for performing Accessibility Surveys for compliance with the Americans with Disabilities Act, Fair Housing Amendments Act, Section 504 of the Rehabilitation Act, and state and local building code requirements. Ms. Miller also performs Property Condition Assessments in accordance with American Society of Testing and Materials (ASTM) Standards.

Prior to joining Partner, Ms. Miller served as an Accessibility Specialist with a professional consulting firm in Denver, Colorado. She has acquired over 9 years of experience performing accessibility reviews based on standard requirements, including Property Condition Assessments (PCAs), pre-construction plan reviews, Construction Progress Monitoring, Americans with Disabilities Act (ADA) surveys, and Fair Housing Amendments Acts (FHAA) surveys. She has completed surveys for a variety of real estate investment stakeholders, including owners, investors, and developers. She has expertise with commercial building types ranging from multi-family residential, hospitality, mixed-use properties, and industrial facilities.

Ms. Miller leverages over 14 years of experience in the architectural, construction, and real estate industries, pairing her background in design and real estate with training in accessibility compliance/oversight and universal design. Ms. Miller began her career as an in-house Interior Designer for a major national developer, where she progressed into the role of Project Manager, overseeing the multi-faceted coordination of multifamily residential and commercial project portfolios ranging from $1 Million to $390 Million.

Ms. Miller is very active in the local disability community, serving as Chair of the Denver Commission for People with Disabilities and volunteering with the Denver Home Builders Foundation to support access and independence through home modifications.

## Project Experience

*Plans and Specification Review* - Ms. Miller has completed numerous reviews of construction documents across all disciplines for general accessibility compliance. Project types include including office, retail, industrial, multi-family residential, student housing, hospitality, and mixed-use developments. Information reviewed included construction documents, schedules, geotechnical reports, consultant and general construction contracts, and budgets.

*Construction Monitoring Services* - Ms. Miller has performed numerous site reviews of construction projects and monthly in-depth reviews of the contractor's pay application and documentation for mixed use, multi family, industrial, and commercial projects. Notable clients include LMC, A Lennar Company, CBRE, and ZOM Residential.

*ADA/FHA/Section 504/State Accessibility Reviews, various locations, US* - Ms. Miller conducted hundreds of Accessibility Reviews for properties across the country, including a portfolio of large shopping centers in Cincinnati, Ohio, Chicago, Illinois, and Denver, Colorado; FHA reviews of multi-family properties in Miami, Florida, Las Vegas, Nevada, and San Francisco, California; and hotels in nearly every state.

*Acquisition/Disposition/Lending/Refinance Property Condition Assessments* - Ms. Miller has managed assessments of hundreds of properties throughout the United States, including coordinating project teams, performing field work, preparing reports and opinion of capital cost budgets, performing quality control, directing technical consultants, and managing client relationships.

## Affiliations

Certified Access Specialist Institute (CASI), Professional Member
Accessibility Professionals Association (APA) - Rocky Mountain Chapter, Member

## Publications

*"In Multifamily, Shrinking Units Equals Growing Liability," Colorado Real Estate Journal, May 1, 2017.*
Ms. Miller contributed an article discussing the growing micro-unit trend in multi-family housing and how this may affect compliance with the various local, state, and federal accessibility requirements.

## Contact

mmiller@partneresi.com

**PARTNER**

# PARTNER



## Education

Bachelor of Architecture, California State Polytechnic University of Pomona
Minor in Music Performance
Architectural Studies at the National Technical University of Athens, Greece

## Registrations

Certification - Mold Assessment and Remediation in Buildings (Certificate with The Environmental Institute)
Certification – HUD Map Training, St. Louis, Missouri
Certification – 2010 ADA Standards for Accessible Design
Certification – Acoustical Building Design
Certification – Wood Destroying Organisms
Certification – Commercial Roofing Systems
AHERA Building Inspector

## Training

Commercial Roofing Systems
Below Grade Building Environments
Extensive building system training from various entities
AHERA Building Inspector

## Highlights

25+ years' experience in Architectural Due Diligence, Design and Consulting
20+ years performing Property Condition Assessments under ASTM Guidelines along with other Specific
   Client Scopes
20+ years performing Construction Progress Monitoring
15+ years performing Environmental Phase I's

## Experience Summary

Mr. McCreery is the Managing Director, Multifamily in a continually growing division within Partner Engineering and Science, Inc.  As Managing Director, he is responsible for understanding and communicating the nuances of agency reporting requirements as well as the unique needs of multifamily assessments to internal relationship managers and staff along with outward communication to various lenders, borrowers and housing agencies.  Mr. McCreery's multifamily role incorporates Agency, LIHTC, HUD, and multifamily Debt/Equity associated with all scopes (PCA, ESA, ALTA, Construction, Zoning, and IH) under one umbrella in order to provide a more holistic approach with refined tools and resources to help us cater to our clients and deliver the highest and most consistent quality. Through increased communication and thought leadership to the various entities and institutions including Fannie Mae, Freddie Mac, the Department of Housing and Urban Development, State Housing Authorities, and various multifamily national organizations, Mr. McCreery is instrumental in policy generation and maintaining Partner as an industry leader through collaboration and partnership.

Mr. McCreery is also the Technical Director for Agency services related to Fannie Mae and Freddie Mac. His responsibilities include overseeing all company standards associated with Agency Guidelines related to

Property Condition Assessments (PCAs), Environmental Assessments (Phase I, Phase II, Transaction Screens, etc.), ALTA Site Surveys, Construction, and Seismic Assessments and providing support services and technical guidance to Partner's extensive list of Relationship Managers, Project Managers and Assessment Staff. Mr. McCreery's attention to detail, knowledge, and longevity in the industry is a perfect complement to Partner's consulting service practice as an industry leader.

Mr. McCreery has significant experience in due diligence assessments for a variety of property types and the needs and requirements of varied number of reporting standards, including ASTM standards, CMBS, Fannie Mae, Freddie Mac, HUD – Multifamily Accelerated Processing (MAP), LIHTC, along with client specific requirements in order to facilitate with the Real Estate Loan Transactions. Specifically, Mr. McCreery has performed, coordinated and reviewed thousands of PCAs, Environmental Phase 1 investigations, Small Loan PCAs, Construction Progress Monitoring, Zoning Analysis, Document and Cost reviews, Probable Maximum Loss assessments, and Mold assessments.

Mr. McCreery has also been involved in national training of staff employees and various clients related to the performance of PCAs, ESAs, and Construction loan monitoring throughout the country and has been personally responsible for the quality control of due diligence reports and client relationships for over 100 separate clients including lenders, equity investors, and legal counsel advisory teams.

### Project Experience
The list below includes a variety of projects where Mr. McCreery either performed the assessment, reviewed or was involved in.

### Office Buildings:
*Citicorp Center, Los Angeles, CA* - 1,281,800 SF 49-Story Urban Office Tower
*AT&T Center, Los Angeles, CA* - 1,003,452 SF High Rise Office Complex.
*Arco Towers, Los Angeles, CA* - 1,000,000+ SF 2 separate 52-Story Office Towers
*One Wilshire, Los Angeles, CA* - 656,000 SF 30-Story Office/Telecom Building
*1000 2nd Avenue, Seattle, WA* - 588,000 SF 41-Story High Rise Up-Scale Office Tower
*One Bunker Hill, Los Angeles, CA* - 285,000 SF 14-Story High Rise Historic Office Bldg.

### Retail:
*The Village at Orange, Orange, CA* - 489,000 SF Regional Retail Mall
*Phoenix Spectrum Mall, Phoenix, AZ* - 466,000 SF Regional Retail Mall
*IntraWest Retail Portfolio, Mammoth Lakes, CA* - Squaw Valley, Ca, & Whistler, BC., Ski Resort Retail Complexes

### Industrial:
*Petsmart Distribution Center, McCarran, NV* - 871,866 SF Warehouse/Distribution Building
*Reno Industrial Center Portfolio, Reno, NV* - 9-Building, 750,000+ SF Industrial Buildings.

### Hotels:
*Extended Stay Portfolio, Southern California & Chicago, IL,*
*Four Seasons Hotel, Westlake Village, CA*
*Four Seasons Hotel, Hualalai, Hawaii*
*Bacara Resort and Spa, Santa Barbara, CA*



*Kauai Coconut Beach Hotel, Kauai, HI*
*The Edgewater Hotel, Seattle, WA*
*Playa Del Sol Los Cabos, Cabo San Lucas, Mexico* - Time Share Ocean Front Resort

**Residential and Other Facilities:**
*The Paramount, San Francisco, CA* - 486-Unit 40-Story Mixed-Use – Multi-Family & Retail Tower
*The Asbury, Los Angeles, CA* - 97-Unit, 12-Story Historic Apartment Building
Cathedral Hill Plaza, San Francisco, CA - 169-Unit, 14-Story Apartment Building
*700 Broadway, Seattle, WA* - 59-Unit 4-Story Mixed-Use – Multi-Family & Retail Building
*Courtney Village Apartments, Phoenix, AZ* - 368-Unit, 34-Apartment Buildings
*Aspen Villas, Park City, UT* - 88-Unit Apartment Complex
*Multi-Family Properties* - California, Nevada, Phoenix, New Mexico, Texas, Idaho, Washington, Oregon, Colorado and Utah
*American Golf Portfolio* - California, Hawaii, Arizona; Golf Courses and Clubhouses

Plus Mixed Use, Mobil Home Parks, and other Miscellaneous Projects.

## Speaking

Moderator; Property Condition Assessment Panel, 2015 / 2016 / 2017 / 2018 / 2019 / 2020 / 2021
Construction Lender Risk Management Roundtable

## Publications

*LIHTC, Construction, and Green, Oh My!,* GlobeSt.com, January 10, 2022
*FHFA to Increase Multifamily Radon Sampling Requirements,* GlobeSt.com, August 23, 2021
*Making Sense to Accessibility Laws in Multifamily Transactions,* GlobeSt.com, January 28, 2020
*Fannie/Freddie Due Diligence: Four Things to Know,* GlobeSt.com, August 22, 2019
Fannie Mae Takes Important Step to Align Agency Seismic Requirements, GlobeSt.com, August 29, 2017
*Understanding Freddie Mac's Requirements for Forward Commitment or Mod Rehab Projects,* California Mortgage Finance News, Winter, 2017
*Multifamily Green Revolution,* CMBA, January 2017
*New Lending Program Advances Appeal of Green Building,* Real Estate Weekly, September 7, 2016
*Inside Freddie Mac's Seismic Shift,* GlobeSt.com, October 29, 2015
*Freddie Mac's PCA Changes in a Nutshell,* GlobeSt.com, May 5, 2015
*Fannie Lowers Rates for Green-Certified Multifamily Properties,* GlobeSt.com, March 6, 2015
*What Lenders Need to Know About Fannie 2.0,* GlobeSt.com, December 11, 2015
*Fannie Mae Lowers Rates for Green-Certified Multifamily,* Multi-Housing News, August 27, 2015
*Fannie Mae's Property Guidelines Adjustment,* Multi-Housing News, May 4, 2015
*Freddie Mac Rolls Out new Small Loan Program,* GlobeSt.com, October 27, 2014

## Contact

dmccreery@partneresi.com



# Property Record - 32-24-31-5148-01-000

Orange County Property Appraiser   •
http://www.ocpafl.org

## Property Summary as of 06/07/2023

**Property Name**
Futura At Nona Cove

**Names**
Ln Apartments LLC

**Municipality**
ORL - Orlando

**Property Use**
1003 - Comm Vac Mult-Fam

**Mailing Address**
2901 Clint Moore Rd Unit 408
Boca Raton, FL 33496-2041

**Physical Address**
19465 Boggy Creek Rd
Orlando, FL 32832



**QR Code For Mobile Phone**







19465 BOGGY CREEK RD, ORLANDO, FL 32832  3/16/2022 11:45 AM



# Value and Taxes

## Historical Value and Tax Benefits

| Tax Year Values | | Land | Building(s) | | Feature(s) | | Market Value | Assessed Value |
|---|---|---|---|---|---|---|---|---|
| **2022** | ▨▧ | $4,164,260 | + | $0 | + | $0 = | $4,164,260 (.10%) | **$4,164,260** (.10%) |
| **2021** | ▨▧ | $4,160,100 | + | $0 | + | $0 = | $4,160,100 (0%) | **$4,160,100** (0%) |
| **2020** | ▨▧ | $4,160,100 | + | $0 | + | $0 = | $4,160,100 | **$4,160,100** |

## 2022 Taxable Value and Certified Taxes

| Taxing Authority | Assd Value | Exemption | Tax Value | Millage Rate | Taxes | % |
|---|---|---|---|---|---|---|
| Public Schools: By State Law (Rle) | $4,164,260 | $0 | $4,164,260 | 3.2140 (-7.88%) | **$13,383.93** | 18 % |
| Public Schools: By Local Board | $4,164,260 | $0 | $4,164,260 | 3.2480 (0.00%) | **$13,525.52** | 18 % |
| Orange County (General) | $4,164,260 | $0 | $4,164,260 | 4.4347 (0.00%) | **$18,467.24** | 24 % |
| City Of Orlando | $4,164,260 | $0 | $4,164,260 | 6.6500 (0.00%) | **$27,692.33** | 37 % |
| Library - Operating Budget | $4,164,260 | $0 | $4,164,260 | 0.3748 (0.00%) | **$1,560.76** | 2 % |
| South Florida Water Management District | $4,164,260 | $0 | $4,164,260 | 0.0948 (-10.65%) | **$394.77** | 1 % |
| South Florida Wmd Okeechobee Basin | $4,164,260 | $0 | $4,164,260 | 0.1026 (-10.47%) | **$427.25** | 1 % |
| South Florida Wmd Everglades Const | $4,164,260 | $0 | $4,164,260 | 0.0327 (-10.41%) | **$136.17** | 0 % |
| | | | | **18.1516** | **$75,587.97** | |

## 2022 Non-Ad Valorem Assessments

| Levying Authority | Assessment Description | Units | Rate | Assessment |
|---|---|---|---|---|
| CITY OF ORLANDO | ORLANDO STORM - DRAINAGE - (407)246-2370 | 202.10 | $1.00 | **$202.10** |
| | | | | **$202.10** |

## Tax Savings

| | |
|---|---|
| ▬▬ Estimated Gross Tax Total: | $79,569.39 |
| Your property taxes without exemptions would be | $79,367.29 |
| Your ad-valorem property tax with exemptions is | − $79,367.29 |
| Providing You A Savings Of | = $0.00 |

# Property Features

## Property Description

NONA COVE 101/128 LOT 1

## Total Land Area

243,064 sqft (+/-)              |              5.58 acres (+/-)              Deeded

## Land

| Land Use Code | Zoning | Land Units | Unit Price | Land Value | Class Unit Price | Class Value |
|---|---|---|---|---|---|---|
| 1003 - Comm Vac Mult-Fam | PD/AN | 260 UNIT(S) | $16,816.80 | $4,372,368 | $0.00 | $4,372,368 |
| 9950 - Pvt Strmwtr/Rtntn | PD/AN | 1 UNIT(S) | $100.00 | $100 | $0.00 | $100 |

## Buildings

## Extra Features

| Description | Date Built | Units | Unit Price | XFOB Value |
|---|---|---|---|---|
| There are no extra features associated with this parcel | | | | |

# Sales

## Sales History

| Sale Date | Sale Amount | Instrument # | Book/Page | Deed Code | Seller(s) | Buyer(s) | Vac/Imp |
|---|---|---|---|---|---|---|---|
| 06/11/2019 | $5,000,000 | 20190371817 / | | Special Warranty | Lake Nona Neighborhood Center LLC | Ln Apartments LLC | Vacant |

## Similar Sales

| Address | Sale Date | Sale Amount | $/SQFT | Deed Code | Beds/Baths | Instrument # | Book/Page |
|---|---|---|---|---|---|---|---|
| 919 Arlington St | 05/09/2023 | $4,800 | | Special Warranty Multiple | 0/0 | 20230273200 / | |
| 12183 Napiers Cir | 10/26/2022 | $325,000 | | Warranty Deed | 0/0 | 20220664024 / | |
| 3750 W D Judge Dr | 09/26/2022 | $2,299,900 | | Special Warranty | 0/0 | 20220599982 / | |
| 7020 Porter Rd | 09/20/2022 | $6,840,000 | | Special Warranty | 0/0 | 20220597509 / | |
| 45Th St | 09/13/2022 | $500,000 | | Special Warranty | 0/0 | 20220575754 / | |
| 4703 Hoffner Ave | 09/13/2022 | $1,500,000 | | Warranty Deed | 0/0 | 20220574011 / | |
| 5905 Caravan Ct | 09/12/2022 | $10,000,000 | | Special Warranty | 0/0 | 20220583301 / | |
| Juniper Pine Way | 09/09/2022 | $8,153,200 | | Special Warranty | 0/0 | 20220579656 / | |
| 5720 S Rio Grande Ave | 09/06/2022 | $60,000 | | Special Warranty | 0/0 | 20220557158 / | |
| 2100 Mercy Dr | 08/18/2022 | $2,069,400 | | Special Warranty Multiple | 0/0 | 20220513696 / | |

# Services for Location

## TPP Accounts At Location

| Account | Market Value | Taxable Value | Business Name(s) | Business Address |
|---|---|---|---|---|
| There are no TPP Accounts associated with this parcel. | | | | |

## Schools

Lake Nona (Middle School)

| | |
|---|---|
| **Principal** | Robert McCloe |
| **Office Phone** | 407.858.5522 |
| **Grades** | 2022: A | 2019: A | 2018: A |

Laureate Park (Elementary)

| | |
|---|---|
| **Principal** | Suzanne Workum |
| **Office Phone** | 407.730.8730 |
| **Grades** | 2022: A | 2019: A | 2018: A |

Lake Nona (High School)

| | |
|---|---|
| **Principal** | Nicolle Campbell |
| **Office Phone** | 407.956.8300 |
| **Grades** | 2022: A | 2019: A | 2018: B |

## Utilities/Services

| | |
|---|---|
| **Electric** | Orlando Utilities Commission |
| **Water** | Orlando Utilities Commission |
| **Recycling** | Orlando |
| **Trash (Monday, Thursday)** | Orlando |
| **Yard Waste (Tuesday)** | Orlando |

## Elected Officials

| | |
|---|---|
| State Representative | Fred Hawkins |
| State Senate | Linda Stewart |
| School Board Representative | Maria Salamanca |
| US Representative | Darren Soto |
| County Commissioner | Maribel Gomez Cordero |
| Orange County Property Appraiser | Amy Mercado |

# National Flood Hazard Layer FIRMette

FEMA



Basemap Imagery Source: USGS National Map 2023

ORANGE COUNTY
Unincorporated Areas
120179

AREA OF MINIMAL FLOOD HAZARD

CITY OF ORLANDO
120186

OSCEOLA COUNTY
UNINCORPORATED AREAS
120189

LOMR 19-04-3438P
eff. 6/17/2020
LOMR 22-04-0539P
eff. 10/25/2022

(EL 75.3 Feet)

12095C0675G
eff. 6/20/2018

T24S R31E S32

T24S PR1F S32

T25S R31E SS

12097C0105G
eff. 6/18/2013

(EL 63 Feet)

(EL 61 Feet)

81°14'25"W 28°21'12"N

81°13'49"W 28°21'12"N

81°14'25"W 28°20'44"N

81°13'49"W 28°20'44"N

0  250  500  1,000  1,500  2,000  Feet

1:6,000

## Legend

SEE FIS REPORT FOR DETAILED LEGEND AND INDEX MAP FOR FIRM PANEL LAYOUT

**SPECIAL FLOOD HAZARD AREAS**

Without Base Flood Elevation (BFE)
Zone A, V, A99

With BFE or Depth Zone AE, AO, AH, VE, AR

Regulatory Floodway

0.2% Annual Chance Flood Hazard, Areas of 1% annual chance flood with average depth less than one foot or with drainage areas of less than one square mile Zone X

Future Conditions 1% Annual Chance Flood Hazard Zone X

Area with Reduced Flood Risk due to Levee. See Notes. Zone X

Area with Flood Risk due to Levee Zone D

**OTHER AREAS OF FLOOD HAZARD**

NO SCREEN  Area of Minimal Flood Hazard Zone X

Effective LOMRs

**OTHER AREAS**  Area of Undetermined Flood Hazard Zone D

**GENERAL STRUCTURES**

Channel, Culvert, or Storm Sewer

Levee, Dike, or Floodwall

Cross Sections with 1% Annual Chance Water Surface Elevation

Coastal Transect

Base Flood Elevation Line (BFE)

Limit of Study

Jurisdiction Boundary

Coastal Transect Baseline

**OTHER FEATURES**

Profile Baseline

Hydrographic Feature

Digital Data Available

No Digital Data Available

**MAP PANELS**

Unmapped

The pin displayed on the map is an approximate point selected by the user and does not represent an authoritative property location.

This map complies with FEMA's standards for the use of digital flood maps if it is not void as described below. The basemap shown complies with FEMA's basemap accuracy standards

The flood hazard information is derived directly from the authoritative NFHL web services provided by FEMA. This map was exported on 6/8/2023 at 12:14 PM and does not reflect changes or amendments subsequent to this date and time. The NFHL and effective information may change or become superseded by new data over time.

This map image is void if the one or more of the following map elements do not appear: basemap imagery, flood zone labels, legend, scale bar, map creation date, community identifiers, FIRM panel number, and FIRM effective date. Map images for unmapped and unmodernized areas cannot be used for regulatory purposes.

# APPENDIX C: QUALIFICATIONS

**PARTNER**




**PARTNER** Thomas (TJ) Magliano,
Project Assessor

**Education**

Bachelor of Arts, Architecture, University of Illinois at Chicago, May 2020

**Training**

ASTM-2018 training course on property condition assessments

**Highlights**

Over 1.5 years performing Equity and Lender level Property Condition Assessments in accordance with the ASTM-2018 standard
1.5 years-experience with various building types such as industrial, warehouses, low-rise and high-rise multi-family, schools and universities, retail, hospitality, low-rise and high-rise office buildings, etc.
Construction Loan Monitoring
Experience performing forensic investigation for building enclosure system performance
Five years of experience maintaining building mechanical systems

**Experience Summary**

Mr. Magliano currently is a Project Assessor who is responsible for performing Property Condition Assessments at the Equity and Lender levels in accordance to the ASTM-2018 standard. Mr. Magliano is responsible for performing site visits to gather information on subject properties in order to develop an opinion on the general condition of the property. With the data gathered on site, he identifies deficiencies and deferred maintenance items, and recommends costs to remedy said deficiencies in a written report.

Mr. Magliano has over five years of experience maintaining building systems as a Maintenance Mechanic, where he performed repairs on HVAC equipment, electrical, and plumbing fixtures. He performed preventative maintenance on the fire and life safety equipment throughout the building, ensuring that the building would pass annual fire inspections and making the necessary repairs to achieve compliance. Mr. Magliano possesses the skills necessary to identify problem areas in building systems, including identifying failing roof systems, failing façade elements, plumbing fixtures, electronic devices, and HVAC equipment that may cause building damage or create a hazardous condition for building occupants when not addressed appropriately. He has experience with ADA in his time working for a retirement community, where he also gained experience working with health and life safety equipment. His experience with mechanical systems allows him to better identify problem areas that may occur throughout the various types of equipment viewed during a Property Condition Assessment (PCA). Mr. Magliano has extensive knowledge of building structural components as a result of his Architecture degree, which developed his skills in identifying certain areas that can become problematic over time. His knowledge of building structural systems and building envelope allows him to be able to provide accurate reports of building conditions to clients.

**Project Experience**

*Parkhouse Apartments, Thornton, CO* – Mr. Magliano performed forensic investigation of building envelope components (stucco, stacked stone veneer, and cementitious lap and panel cladding) to identify improper installation of building cladding and roofing systems. Following the investigation, Mr. Magliano recommended a course of repair and developed different pricing scopes for the client in a written report.

*The Northland Apartments, Chicago, IL,-* Mr. Magliano provided verification of repair for window installation on a midrise multifamily building in Chicago. This work consisted of review of manufacturer shop drawings and supervising a licensed window installer to verify proper installation of window components.

*Tulsa portfolio, Tulsa, OK,-* Mr. Magliano managed a portfolio of Equity level acquisitions of seven multifamily properties in Tulsa. Mr. Magliano also performed Property Condition assessments on each of the properties.

*The St. Louis Portfolio, St. Louis, MO,-* Mr. Magliano managed a portfolio of Equity level Property Condition Assessments on seventeen multifamily properties in located throughout St. Louis. Mr. Magliano performed several of the Property Condition Assessments himself.

*The Northside Portfolio, Chicago, IL,-* Mr. Magliano managed a portfolio of Lender level Property Condition Assessments on four multifamily properties in Chicago.

*5th and Broadway, Nashville, TN,-* Mr. Magliano performed a Property Condition Assessment on a mixed use property known as 5th and Broadway which is located adjacent to the historic Ryman Auditorium in downtown Nashville. This property was a large-scale property occupying a city block consisting of one high rise residential building, one high rise office building, and a three-story retail center.

*Enjet Aero, Bloomfield, CT,-* Mr. Magliano performed an Equity level Property Condition Assessment on a manufacturing plant responsible for manufacturing airplane jet engine components for Boeing aircraft.

**Contact**
tmagliano@partneresi.com

# PARTNER



### Education

Associate of Science, Business Management & Economics, State University of New York (S.U.N.Y.) – Empire State College, Saratoga Springs, NY 1994

Associate of Applied Science, HVAC & Refrigeration Technology, New England Technical Institute, New Britain, CT – 1986

### Registrations

Real Estate Sales Associate License, State of Florida

### Training

OSHA 10-hour Construction Safety & Health Certification (29CFR 1926)
New Zealand Building Construction Site Safe Passport, New Zealand Site Safe
Advanced First Aid / CPR, American Red Cross
Construction Quality Management for Contractors, U.S. Army Corps of Engineers (USACE) and Naval Facilities Engineering Command (NAVFAC)

### Highlights

Construction and Building Industry Experience 30+ Years
HVAC, Plumbing, Electrical, Fire Protection Systems Construction and Design/Build Experience 30+ Years
6 years in property condition assessments (ASTM E2018)

### Experience Summary

Tom Favino is a Technical Director with Partner Engineering and Science, Inc. and has over thirty years of experience in the building, construction and engineering fields. He grew up in the mechanical construction industry, as part of a family of contractors and engineers. In addition to his experience with equity level property condition assessments, Tom has worked as an apprentice, a service technician, a senior estimator, a senior project manager, and a vice president for firms within the construction industry. He is a subject matter expert in the fields of HVAC, Plumbing, Fire Protection and Electrical (M.E.P.) systems and building construction. With in-depth technical and operational construction management expertise, Mr. Favino has managed small and large multi-million dollar commercial, industrial and institutional projects. He has led teams in excess of 300 through all phases of construction; bids, design, preconstruction, estimation/budgeting, contract negotiations, purchasing and closeout. His experience spans hospitals, hotels, resorts, airports, banking centers, high/low rise buildings and multifamily structures. He has worked on projects extensively within the United States, as well as several years abroad; in New Zealand.

Mr. Favino is responsible for overseeing Equity Level Building Due Diligence projects. This includes specifically tailored scopes of work, projects that require "deep dive" M.E.P. technical expertise broader than a traditional due diligence consultant can offer. Having personally performed senior level project management for overall projects, as well as specifically for the M.E.P. systems, Mr. Favino provides a unique and in-depth insight perspective for commercial real estate projects, from many points of view. Additionally, Mr. Favino provides specialized construction support and due diligence for projects with large, complex M.E.P. systems.

## Project Experience

### Construction

*Modernization & Expansion of Academic Facilities* – Phases II & IV - United States Military Academy, West Point, NY: 750,000 SF complete "gut" and renovation to 3-science and academic buildings.

*RF Micro Devices - Fab III, Greensboro, NC* - Fast track construction microelectronic fabrication facility, 250,000 SF; $200mm.

*UNC Children's and Women's Hospital, University of North Carolina, Chapel Hill, NC* - 500,000 SF, 2-tower, children & women's hospital; 500,000 SF, $100mm.

*Marriott Renaissance Park Hotel & Conference Center, Spartanburg, SC* - 380,000 SF, 4-star luxury hotel and resort; $75mm.

*BNZ 80 Queen St - Deloitte Centre, Auckland, NZ* - 25-story tower, inclusive of a 4-level below grade parking garage, 250,000 SF - $200mm.

*Britomart East 1 & 2 Auckland, NZ* - 13-story low-rise tower, base build including 3-major tenancy and retail buildouts; 430,000 SF, $250mm

*Lee County Justice Center - Courts Tower Addition, Fort Myers, FL* - 11-story, multiple courtrooms and support facility addition, inclusive of a 3-story parking garage; 200,000 SF, $75mm.

*Brickell Flatiron Building Miami, FL* - 1,640,000 SF, 70-story building w/560-Residential Units; $300mm.

### Equity Property Condition Assessment

*Pacific Place, San Francisco, CA* - 436,000 SFG, mixed-use, $475MM.

*Philadelphia Marriot Downtown, Philadelphia, PA* - 1,400-room hotel.

*The Betsy, Miami Beach, FL* - 130-room hotel.

*The Tides and Village, Miami Beach, FL* - 125,000 SF mixed-use retail and hotel, 3-building complex with structured parking.

*Pittsfield Building, Chicago, IL* - 40-story mixed-use, historic building.

*11524 Wilmar Boulevard, Charlotte, NC* - 700,00 SF manufacturing facility.

*Focal Point Business Park, Nashville, TN* - 250,000 SF, 4-building, 11-acre, commercial office park.

*33 West, Davie, FL* - 380-unit, 14-building, 400,000 SF apartment complex.

*Astor Crowne Plaza Hotel, New Orleans, LA* - 380,000 SF, 700-room hotel.

*Tenet Healthcare Portfolio, FL* - 2.5mm SF, 4-healtchare centers and related support buildings.



*Marina Del Mar, Sunny Isles Beach, FL* - 17-story, 300-residential unit apartment building.

*Durham Office Complex, Durham, NC* - 800,000 SF, 2-building office complex.

*Plantation Walk Office Complex* - 250,000 SF, 7-story office building with 6-story parking garage.

*Park Line Palm Beaches, West Palm Beach, FL* - 26-story, 380,000 SF, 290-unit apartment building with 800-space parking structure.

*Miami Residential Portfolio, Miami Beach, FL* - 23-historic buildings, 322-apartment unit, multi-property portfolio.

*FedEx Warehouses* - 1mm SF, 2-locations, nationwide warehouse distribution centers.

*Oxford Portfolio* - 14.5 mm SF, 150-locations, industrial warehouse property portfolio.

*Hyde Park Portfolio, Tampa, FL* - 18-historic buildings, 312-apartment unit, multi-property portfolio.

**Contact**
tfavino@partneresi.com

# PARTNER

**Gerald J Delaune, REWC, RRC, RRO, CIT**
Technical Director



## Education

Engineering Technology – Delgado Junior College, New Orleans, LA

## Registrations

RRC – Registered Roof Consultant, IIBEC - January 2014
REWC – Registered Exterior Wall Consultant – IIBEC - April 2012
Level 1 Thermographer, November 2019
WUFI – ORNL5, WUFI-Pro 5 and Weather Analyzer 1.0, April 2011 ITC
Mobile Elevating Work Platform (MEWP), January 2020
Fall Protection Competent Person, January 2020
Electronic Leak Detection, January 2021

## Training

OSHA 10-hr Occupational Safety and Health Training Course
OSHA 30-hr Competent Person Training Course, March 2012
Basic Plus, August 2021
Scaffold User/Inspector Awareness Level, August 2021
Maritime Security Act, August 2021
Recra/Spill Prevention, August 2021

## Highlights

37 years of experience in all phases of Building Envelope design, renovation and repair
Subject Matter Expert
Expert Witness – Building Envelope
Roof Asset Management & Capital Planning
Building Envelope Commissioning and Testing – BECx
Construction Project Management & Testing
Roof/Facade Damage C&O Assessments
Owners Representative for Renovation Construction
Document and Cost Reviews & Construction Progress Monitoring

## Experience Summary

Mr. Delaune is a Technical Director for the Building Envelope Solutions team at Partner Engineering and Science, Inc. (Partner). Our team provides a full range of roof, exterior wall, waterproofing, and pavement consulting services across North America. Mr. Delaune has over 35 years of experience in all phases of building envelope design, renovation and repair as a consultant, designer and project manager for major roofing, waterproofing and exterior wall projects worldwide. Mr. Delaune has performed condition assessments, forensic testing, investigation and design on over 200 million square feet of building envelope systems. He has participated as a subject matter expert in numerous litigation cases for all building types. He brings a unique perspective to the design, material and installation of building envelope systems and parking garage repair.

Mr. Delaune's expertise includes the evaluation of existing roofing, waterproofing, and wall systems on commercial, industrial, and institutional buildings. These evaluations include locating sources of moisture infiltration, analysis of system conditions and system failures, as well as developing effective restoration solutions. His work includes the initial design of roofing and waterproofing systems, which incorporates drawings and specifications, peer review of roofing and waterproofing systems, and construction observations and field reporting.

Throughout Mr. Delaune's career, he has participated in a wide variety of projects for the investigation, evaluation, repair, and construction of structural, architectural, and material related building problems. He specializes in design peer review, building envelope commissioning, and failure investigation, evaluation, repair design, and construction monitoring of building envelope systems. Mr. Delaune is an active member of several professional societies, including IIBEC (RCI), where he serves on multiple exam development and technical committees.

Mr. Delaune also has a comprehensive background in construction project management and material in-situ testing.

In addition to his construction and building envelope experience, Mr. Delaune has significant experience in due diligence assessments for a variety of property types and understands the needs and requirements of the varied number of reporting standards and customized client formats. His in-depth knowledge of ASTM standards, as well as his ability to understand the needs of individual clients, enables Partner to develop and produce industry-leading reports.

**Project Experience**

*Scott & White Hospital Center for Advanced Medicine (CAM), Temple, TX* - Performed forensic investigation of the exterior wall substrates due to moisture intrusion into the occupied space. Additionally, he performed forensic investigation of the roofing systems due to crushing of the insulation. The initial contract was for expert witness litigation. After the initial contract, he designed replacement exterior wall substrate and roofing system. The building footprint included 88,000 square feet in plan with 6 story and 8 story towers.

*AT&T Winspear Opera House, Dallas, TX* - Performed forensic investigation of the roofing systems due premature failure (blistering) of the roofing system. The initial contract was for expert witness litigation. The building footprint included approximately 36,000 square feet in plan.

*Ector County Coliseum – Odessa, TX* - Conducted a forensic investigation regarding the structural capacity of the deck. The coliseum is a barrel vault. Designed new roofing system and performed periodic inspection during the installation. The building footprint included approximately 77,800 square feet of roofing.

*Georgia World Congress Center, Atlanta, GA* - Conducted storm damage assessments after the 2008 tornado event that struck the property. Prepared design on new roofing, EIFS repairs and glass/aluminum framing repairs. The property included over 1.5 million square feet in plan.

*XOM BOPCC – ExxonMobil Baytown Olefins Plant (BOP) – Base Control Center Roof – 3525 Decker Drive, Baytown, TX 77520* -Performed roof investigation in October 2019 at the request of client due to water intrusion into the server rooms after an explosion that occurred in July 2019. Identified huge water blisters and delamination of the roofing systems during the investigation. Contracted to provide Construction Documents and Project Manual in December 2019. Selected to provide Construction Management in



August 2020 for the reroofing project saving the client 20% of the initial project budgets. Partner Engineering Services has provided Construction Management, Construction Administration, Contract Administration and full-time project oversight for the client. Project is currently scheduled to be complete by December 31, 2020. Total cost for the project is $1,512,377.77.

*XOM MBPP – ExxonMobil Mont Belvieu Plastics Plant – Roof Assessments* - Performed roof assessments on North and South Control Center, North Lab Building and Lab Building. Assessed quality of roof, noted deficiencies, noted roof access/fall protection and Expected Useful Life (EUL) remaining. Part of a multiple site (50 roof) assessment program for ExxonMobil across the US and Canada.

*Strathcona Refinery Utilities Building – Imperial Oil Strathcona Refinery – Edmonton, Alberta, Canada* -The client engaged us to consult on a capital roof replacement project in a critical utility plant facility that could not be shut down during construction. The previous consultant recommended the entire roof be removed and replaced, including its structural deck, because of corrosion visible from the underside of the roof assembly. The building envelope team did extensive structural testing and found the previous consultant misdiagnosed the corrosion. The deck was not corroding from the bottom, but from the top - a result of a faulty insulation product used during the building's original construction. Our efficient solution reduced exposure to costly downtime that would have resulted from replacing the full deck unnecessarily. We mitigated the risks that would have occurred from a misdiagnosed replacement, and the project timeline was cut by more than half while still meeting the needs of our client. Our careful attention to detail saved the client more than $3M.

*Nanticoke Main Control Room (MCR) – Nanticoke, Ontario, Canada* -The building envelope team was called in to determine the causation of new roof leaks into the server room of the control center. The leaks shut down critical bulk tanker car loading facility. The building envelope team identified multiple points of moisture entry into the occupied through improperly installed details. The building envelope team identified an unorganized, uneducated, and untrained roofing crew that reflected in their work. By performing vigilant full-time observation and systematic testing of core cuts and infrared thermography, we found the new roof system to have unadhered vapor barrier and insulation board, and measurable amounts of trapped water. Our commissioning approach resulted in the reorganization of the on-site roofing crew. The new roofing crew removed defective roofing material and placed the new roofing per the design documents and specifications. This created a successful project delivery and prevention of possible systemic construction defects potentially leading to another shut-down. Our experience in system installation and testing procedures proved a valuable to the client without potential systemic issues. Approximately 11,100 SF.

**Expert Witness Experience**

Provide expert witness testimony for waterproofing, roofing, glass and curtainwall framing.

*Pearl River County School District v. RSUI* - No. 1:08-CV-364-HSO-JMR (Picayune, Mississippi) 2010

*Medistar Twelve OAKS PARTNERS, LTD. v. American Economy Insurance Company, Safeco Insurance Company of America, Liberty Mutual Insurance Compan* - No. 4:09- CV -03838 (Houston, Texas) June, 2011

**PARTNER**

*Scott & White Memorial Hospital F/K/A Scott and White Memorial Hospital and Scott, Sherwood and Brindley Foundation v. Manhattan Construction, Chamberlain Austin, LLC; Byrne Metals CORP.; Starcraft Interior Contractors LTD.; Win-Con Enterprises, INC.; Quality Brickworks II, LTD.; Balfour Beatty Construction, LLC.; and Page Southerland Page, LLP -* Cause No. 249368-C; 116th Judicial District Court of Bell County, Texas - February, 2014

*Paul Young Associates II, L.P. v. Building Materials Corporation of America, Inc. d/b/a/ GAF Materials Corporation -* Cause No. DC-13-13781; 95th Judicial District Court of Dallas County, Texas – May, 2014 United Commerce Centers, Inc. et al. v. The Travelers Lloyds Insurance Company, et al., Cause No. DC-14-04967; 95th Judicial District Court of Dallas County, Texas – January, 2015

*Terrasse Properties, LLC, V. Mirick Group, INC., Weather- Tight Waterproofing, Inc.; Johnny Ramon d/b/a Ramon Construction; JBJ Construction, Inc; Borg Construction, LLC; Plaster Inc., Mirick Group, INC. v. Childress Engineering Services, INC. and Nelson Architecture Group -* Cause No. DC-13-11081-C; 68th Judicial District Court of Dallas County, Texas – March, 2016

*Cannon Storage Systems, V. MEMC II LLC and Mike McDaniel -* Case No. AAA No. 01-17-0001-2289, Dallas County, Texas – December, 2017

*G&I VIII GLP JV LP, V. National Single Ply, Inc -* Case No. DC-17-04405, 101st Judicial District of Dallas County, Texas – July, 2018

*1400 FM 1417 LLC vs Certainteed Corporation -* Case No. JC1-21-0824, 15th District Court of Grayson County, TX May 2022

*Twin Shores Management, LLC, an Illinois limited liability company vs 83rd Street Development LLC, an Oklahoma limited liability company; and Travelers Casualty and Surety Company of America, a Connecticut corporation -* Case No. CJ-21-2184, District Court of Oklahoma County, State of Oklahoma September, 2022

## Affiliations

International Institute of Building Enclosure Consultants (IIBEC) – Consultant Member
International Institute of Building Enclosure Consultants (IIBEC), REWC Committee Member and Exam Task Force
Construction Specifications Institute (CSI) Professional Member
National Roofing Contractors Association (NRCA) Consultant Member
American Society for Testing and Materials (ASTM) Participating Member
> ASTM Committee D08 on Roofing and Waterproofing
> ASTM Committee C14 on Glass and Glass Products
> ASTM Committee E06 on Performance of Buildings

## Speaking

Electronic Field Vector Mapping, Dallas AIA, Dallas, TX (February 21, 2017)

Drones: The New Frontier in Building Performance – NFMT, High Performance Building + Workplace, Arlington, TX (May 17, 2017)

Safety Moment – Slips, Trips & Falls, CBRE ACS Group (July 2020)

Safety Moment – Ladders, CBRE ACS Group (July 2020)

Safety Moment – Heat Stress Presentation (July 2022)

Rooftop Safety – Overview of Rooftop Safety (October 2022)

## Publication

IIBEC Manual of Practice: Roofing, Waterproofing, and Exterior Wall Consulting and Quality Observation, 2020, Contributing Author

## Contact

GDelaune@partneresi.com

# PARTNER



## Education

State University of New York at Buffalo, Buffalo, NY, Bachelor of Science, Civil Engineering
NYSERDA / BPI Multifamily Building Analyst Training Program
OSHA 10-hour Occupational Safety and Health Training Course in Construction Safety and Health
Introduction to Corporate Finance by University of Pennsylvania
Adventures in Commercial Real Estate – Accelerator Real Estate Financial Modeling

## Registrations

Professional Engineering License, State of New York
STAAD Certified Engineer
LEED Accredited Professional
Continuing Education Seminar Presenter – Using Permeable Pavement on Long Island
LEED Accredited Professional Building Construction & Design
Real Estate Salesperson License, New York State
Real Estate Broker Exam, New York State
Real Estate Salesperson License, State of Connecticut

## Experience Summary

Justin Lia, PE, LEED AP is a Managing Director with Partner Engineering and Science, Inc. With a degree in Civil Engineering, and experience as a consultant, contractor, construction inspector, design engineer, forensic engineer, expert witness, and in real estate brokerage Justin brings a unique perspective to real estate due diligence. Over more than 20 years, Justin has been integral in the development and maintenance of client relationships in the private equity, REIT, family office, and corporate sectors. In addition to his experience with equity level property condition assessments, Justin is well versed in civil, structural/geotechnical engineering, forensic assessments, capital planning, and facility condition assessments.

Some of Justin's most notable projects have included:

- Pacific Place, San Francisco, CA, 436,000 SFG, mixed-use, $475MM
- Terminal Stores, New York, NY, 1,200,000 SFG, mixed-use, $800MM
- Equity Office Properties Disposition, Silicon Valley, CA, 8,200,000 SFG, $3.5B
- Philadelphia Marriot Downtown, Philadelphia, PA, 1,400+ rooms hotel
- Bayonne Military Operations Terminal of Bayonne (MOBTY), NJ, industrial development, 156 acres, 1,600,000 SFG
- Pappas Commerce Center, Boston, MA, waterfront industrial park/redevelopment site, 38.5 acres, 750,000 SFG
- Amazon Warehouses, 50+ locations, nationwide (distribution centers, cross-dock facilities, last-mile
- Catholic Health Initiatives, sale-leaseback, 52 MOBs, $725MM
- Grainger CMMS / Capital Planning, Nationwide, 500+ locations, 3,500,000+ SFG
- Big Box Store CMMS / Capital Planning Pilot Program for 800 locations, nationwide
- Dallas County Capital Planning, Dallas County, TX, 7,000,000 SFG, 70+ locations including the courts, prisons, office and lab buildings

- Brookhaven National Laboratory, Light Source II, Department of Energy, excavation safety and slope analysis, 400,000 SFG, Particle Accelerator, $900MM
- Evergreen Retaining Wall Design, Huntington Station, NY, 1,000' long, 50' high retaining wall design, local stability, pseudostatic global stability analysis, finite element mesh analysis for footing design
- Nordstrom, roof structure, structural analysis, retrofit design, and construction inspections to strengthen roof structure to support revised loading, Huntington, NY
- Marine Travel Lift, geotechnical evaluation, pile design, construction oversight, Long Island, NY
- Center for Advanced Medicine at iPark (North Shore LIJ, Northwell), site/civil design, 135,000 SFG, $50MM, Lake Success, NY
- Forensic Engineering Evaluation of 40+ commercial and residential buildings in the NY Metro area, following Hurricane Irene and Super Storm Sandy
- Big Box Retail site evaluations, 100+ conceptual plans, NY Metro Area
- Five Towns College, Dix Hills, NY, 34-acre campus, capital planning/budgeting and site planning and engineering services in support of campus renovation and expansion
- MSU Student Housing Portfolio, East Lansing, MI, 319,800 SFG, student housing

**Contact**

jlia@partneresi.com

**PARTNER**

# PARTNER

**Drew H. McCreery**
**Managing Director – Multifamily, Principal**



## Education

Bachelor of Architecture, California State Polytechnic University of Pomona
Minor in Music Performance
Architectural Studies at the National Technical University of Athens, Greece

## Registrations

Certification - Mold Assessment and Remediation in Buildings (Certificate with The Environmental Institute)
Certification – HUD Map Training, St. Louis, Missouri
Certification – 2010 ADA Standards for Accessible Design
Certification – Acoustical Building Design
Certification – Wood Destroying Organisms
Certification – Commercial Roofing Systems
AHERA Building Inspector

## Training

Commercial Roofing Systems
Below Grade Building Environments
Extensive building system training from various entities
AHERA Building Inspector

## Highlights

25+ years' experience in Architectural Due Diligence, Design and Consulting
20+ years performing Property Condition Assessments under ASTM Guidelines along with other Specific Client Scopes
20+ years performing Construction Progress Monitoring
15+ years performing Environmental Phase I's

## Experience Summary

Mr. McCreery is the Managing Director, Multifamily in a continually growing division within Partner Engineering and Science, Inc. As Managing Director, he is responsible for understanding and communicating the nuances of agency reporting requirements as well as the unique needs of multifamily assessments to internal relationship managers and staff along with outward communication to various lenders, borrowers and housing agencies. Mr. McCreery's multifamily role incorporates Agency, LIHTC, HUD, and multifamily Debt/Equity associated with all scopes (PCA, ESA, ALTA, Construction, Zoning, and IH) under one umbrella in order to provide a more holistic approach with refined tools and resources to help us cater to our clients and deliver the highest and most consistent quality. Through increased communication and thought leadership to the various entities and institutions including Fannie Mae, Freddie Mac, the Department of Housing and Urban Development, State Housing Authorities, and various multifamily national organizations, Mr. McCreery is instrumental in policy generation and maintaining Partner as an industry leader through collaboration and partnership.

Mr. McCreery is also the Technical Director for Agency services related to Fannie Mae and Freddie Mac. His responsibilities include overseeing all company standards associated with Agency Guidelines related to

Property Condition Assessments (PCAs), Environmental Assessments (Phase I, Phase II, Transaction Screens, etc.), ALTA Site Surveys, Construction, and Seismic Assessments and providing support services and technical guidance to Partner's extensive list of Relationship Managers, Project Managers and Assessment Staff. Mr. McCreery's attention to detail, knowledge, and longevity in the industry is a perfect complement to Partner's consulting service practice as an industry leader.

Mr. McCreery has significant experience in due diligence assessments for a variety of property types and the needs and requirements of varied number of reporting standards, including ASTM standards, CMBS, Fannie Mae, Freddie Mac, HUD – Multifamily Accelerated Processing (MAP), LIHTC, along with client specific requirements in order to facilitate with the Real Estate Loan Transactions. Specifically, Mr. McCreery has performed, coordinated and reviewed thousands of PCAs, Environmental Phase 1 investigations, Small Loan PCAs, Construction Progress Monitoring, Zoning Analysis, Document and Cost reviews, Probable Maximum Loss assessments, and Mold assessments.

Mr. McCreery has also been involved in national training of staff employees and various clients related to the performance of PCAs, ESAs, and Construction loan monitoring throughout the country and has been personally responsible for the quality control of due diligence reports and client relationships for over 100 separate clients including lenders, equity investors, and legal counsel advisory teams.

### Project Experience
The list below includes a variety of projects where Mr. McCreery either performed the assessment, reviewed or was involved in.

### Office Buildings:
*Citicorp Center, Los Angeles, CA* - 1,281,800 SF 49-Story Urban Office Tower
*AT&T Center, Los Angeles, CA* - 1,003,452 SF High Rise Office Complex.
*Arco Towers, Los Angeles, CA* - 1,000,000+ SF 2 separate 52-Story Office Towers
*One Wilshire, Los Angeles, CA* - 656,000 SF 30-Story Office/Telecom Building
*1000 2nd Avenue, Seattle, WA* - 588,000 SF 41-Story High Rise Up-Scale Office Tower
*One Bunker Hill, Los Angeles, CA* - 285,000 SF 14-Story High Rise Historic Office Bldg.

### Retail:
*The Village at Orange, Orange, CA* - 489,000 SF Regional Retail Mall
*Phoenix Spectrum Mall, Phoenix, AZ* - 466,000 SF Regional Retail Mall
*IntraWest Retail Portfolio, Mammoth Lakes, CA* - Squaw Valley, Ca, & Whistler, BC., Ski Resort Retail Complexes

### Industrial:
*Petsmart Distribution Center, McCarran, NV* - 871,866 SF Warehouse/Distribution Building
*Reno Industrial Center Portfolio, Reno, NV* - 9-Building, 750,000+ SF Industrial Buildings.

### Hotels:
*Extended Stay Portfolio, Southern California & Chicago, IL,*
*Four Seasons Hotel, Westlake Village, CA*
*Four Seasons Hotel, Hualalai, Hawaii*
*Bacara Resort and Spa, Santa Barbara, CA*



*Kauai Coconut Beach Hotel, Kauai, HI*
*The Edgewater Hotel, Seattle, WA*
*Playa Del Sol Los Cabos, Cabo San Lucas, Mexico* - Time Share Ocean Front Resort

**Residential and Other Facilities:**
*The Paramount, San Francisco, CA* - 486-Unit 40-Story Mixed-Use – Multi-Family & Retail Tower
*The Asbury, Los Angeles, CA* - 97-Unit, 12-Story Historic Apartment Building
Cathedral Hill Plaza, San Francisco, CA - 169-Unit, 14-Story Apartment Building
*700 Broadway, Seattle, WA* - 59-Unit 4-Story Mixed-Use – Multi-Family & Retail Building
*Courtney Village Apartments, Phoenix, AZ* - 368-Unit, 34-Apartment Buildings
*Aspen Villas, Park City, UT* - 88-Unit Apartment Complex
*Multi-Family Properties* - California, Nevada, Phoenix, New Mexico, Texas, Idaho, Washington, Oregon, Colorado and Utah
*American Golf Portfolio* - California, Hawaii, Arizona; Golf Courses and Clubhouses

Plus Mixed Use, Mobil Home Parks, and other Miscellaneous Projects.

## Speaking

Moderator; Property Condition Assessment Panel, 2015 / 2016 / 2017 / 2018 / 2019 / 2020 / 2021
Construction Lender Risk Management Roundtable

## Publications

*LIHTC, Construction, and Green, Oh My!,* GlobeSt.com, January 10, 2022
*FHFA to Increase Multifamily Radon Sampling Requirements,* GlobeSt.com, August 23, 2021
*Making Sense to Accessibility Laws in Multifamily Transactions,* GlobeSt.com, January 28, 2020
*Fannie/Freddie Due Diligence: Four Things to Know,* GlobeSt.com, August 22, 2019
Fannie Mae Takes Important Step to Align Agency Seismic Requirements, GlobeSt.com, August 29, 2017
*Understanding Freddie Mac's Requirements for Forward Commitment or Mod Rehab Projects,* California Mortgage Finance News, Winter, 2017
*Multifamily Green Revolution,* CMBA, January 2017
*New Lending Program Advances Appeal of Green Building,* Real Estate Weekly, September 7, 2016
*Inside Freddie Mac's Seismic Shift,* GlobeSt.com, October 29, 2015
*Freddie Mac's PCA Changes in a Nutshell,* GlobeSt.com, May 5, 2015
*Fannie Lowers Rates for Green-Certified Multifamily Properties,* GlobeSt.com, March 6, 2015
*What Lenders Need to Know About Fannie 2.0,* GlobeSt.com, December 11, 2015
*Fannie Mae Lowers Rates for Green-Certified Multifamily,* Multi-Housing News, August 27, 2015
*Fannie Mae's Property Guidelines Adjustment,* Multi-Housing News, May 4, 2015
*Freddie Mac Rolls Out new Small Loan Program,* GlobeSt.com, October 27, 2014

## Contact

dmccreery@partneresi.com

