# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

CRUM & FORSTER SPECIALTY
INSURANCE COMPANY,                          Case No. 6:24-cv-1416-JSS-DCI

            Plaintiff,

vs.

LN APARTMENTS, LLC, PORTRAIT
CONSTRUCTION OF FLORIDA, INC.,
ARMSTRONG AIR & ELECTRIC, INC.,
BARRIOS ROOFING & WATERPROOFING,
LLC, BFARR EXTERIORS, LLC, CEMPLEX
GROUP FLORIDA, LLC, EXPRESS
PLUMBING, INC., FLORIDA
CONSTRUCTION & FRAMING, LLC,
SOUSA CABINETS, INC., and
KP'S CONTRACT FLOORING, LLC,

            Defendants.

_____/

## SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF

CRUM & FORSTER SPECIALTY INSURANCE COMPANY ("CFSIC")

sues LN APARTMENTS, LLC ("LN" or the "Owner"), PORTRAIT

CONSTRUCTION OF FLORIDA, INC. ("Portrait"), ARMSTRONG AIR &

ELECTRIC, INC. ("Armstrong"), BARRIOS ROOFING & WATERPROOFING,

LLC ("Barrios"), BFARR EXTERIORS, LLC ("BFarr"), CEMPLEX GROUP

FLORIDA, LLC ("Cemplex"), EXPRESS PLUMBING, INC. ("Express"),

FLORIDA CONSTRUCTION & FRAMING, LLC ("FCF"), SOUSA CABINETS,

1

INC. ("Sousa"), and KP'S CONTRACT FLOORING, LLC ("KP") (collectively referred to herein as "Defendants"), and states:

## NATURE OF ACTION

1. This is an action for declaratory relief under 28 U.S.C. § 2201 for the purpose of determining a question of actual controversy by and between the parties, wherein CFSIC seeks a judicial determination of its rights and obligations to Defendants under a project-specific commercial general liability policy and form-following excess liability policy in an Owner Controlled Insurance Program.

## THE PARTIES

2. At the time this action was commenced, CFSIC was a Delaware corporation with a statutory home office in Delaware and principal place of business in Morristown, New Jersey. Thus, CFSIC was a Delaware and New Jersey citizen at the time this action was commenced.

3. CFSIC is authorized as a surplus lines insurer in the state of Florida and issued the surplus lines insurance policies at issue in this action under which all Defendants are Named Insureds.

4. At the time this action was commenced, LN was a Florida limited liability company whose sole member was FLN Apts, LLC, whose sole member was Futura Holdings Company LLC, whose sole member was John Lourie, who was domiciled in Florida at the time this action was commenced. Consequently, LN was a Florida citizen at the time this action was commenced.

5. At the time this action was commenced, Portrait was a Florida corporation with its principal place of business in Altamonte Springs, Florida. Thus, Portrait was a Florida citizen at the time this action was commenced.

6. At the time this action was commenced, Armstrong was a Florida corporation with its principal place of business in Winter Garden, Florida. Thus, Armstrong was a Florida citizen at the time this action was commenced.

7. At the time this action was commenced, Barrios was a Florida limited liability company, whose sole members were Ismael Barrios and Peter Reca, both of whom were domiciled in Florida at the time this action was commenced. Thus, Barrios was a Florida citizen at the time this action was commenced.

8. At the time this action was commenced, BFarr was a Florida limited liability company, whose sole member was BFarr Holdings, LLC, whose sole member was Brian J. Farr, who was domiciled in Florida at the time this action was commenced. Thus, BFarr was a Florida citizen at the time this action was commenced.

9. At the time this action was commenced, Cemplex was a Florida limited liability company, whose sole members were Charles Harrison Jr. and Nathan Shirley, both of whom were domiciled in Oklahoma at the time this action was commenced. Thus, Cemplex was an Oklahoma citizen at the time this action was commenced.

10. At the time this action was commenced, Express was a Florida corporation with its principal place of business in Lake City, Florida. Thus, Express was a Florida citizen at the time this action was commenced.

11. At the time this action was commenced, FCF was a Florida limited liability company, whose sole member was Michael Sheeks, who was domiciled in Florida at the time this action was commenced. Thus, FCF was a Florida citizen at the time this action was commenced.

12. At the time this action was commenced, Sousa was a Florida corporation with its principal place of business in Orlando, Florida. Thus, Sousa was a Florida citizen at the time this action was commenced.

13. At the time this action was commenced, KP was a Florida limited liability company, whose sole member was Kevin J. Patrick, who was domiciled in Florida at the time this action was commenced. Thus, KP was a Florida citizen at the time this action was commenced.

## JURISDICTION AND VENUE

14. Jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000, exclusive of attorney's fees, interest, and costs.

15. Venue is proper in this district because a substantial part of the events giving rise to the claim occurred in this district. 28 U.S.C. § 1391(a)(2). Specifically, the underlying lawsuit is venued in this district, the underlying claims accrued in this district, and the construction project from which the claims arise is located in this district.

16. All conditions precedent have occurred, been performed, or have been waived.

## FACTS

### A.   The Project

17.   This action relates to an in-progress, five-story, 260-unit rental apartment project with an attached 6-story garage located at 19465 Boggy Creek Road, Orlando, Florida 32832, known as Futura at Nona Cove Apartments (the "Project"). The Project is Phase I of a larger, three-phase construction project.

18.   Construction of the Project commenced in November 2020 under a contract between LN, as the owner, and Portrait, as the general contractor.

### B.   The Underlying Lawsuit

19.   On March 22, 2023, Portrait filed a lawsuit against the Owner in Orange County, Florida Circuit Court styled, *Portrait Construction of Florida, Inc. v. LN Apartments, LLC*, Case No. 2023-CA-008213-O, seeking payment for work performed under the construction contract (the "Underlying Lawsuit").

20.   On April 29, 2024, Portrait filed its Second Amended Complaint in which Portrait alleges that, on April 10, 2023, the Owner wrongfully terminated Portrait as the general contractor on the "in-progress construction" Project when it was "approximately 92% complete" and that the Project has "not reached the stage of completion under Section 558.003." On June 12, 2025, Portrait filed a Third Amended Complaint that contains these same allegations. (True and correct copies of Portrait's

Second Amended Complaint, without exhibits, and Third Amended Complaint, with exhibits, are attached hereto as **Composite Exhibit A**.)[1]

21.     On August 30 2023, the Owner filed an Answer and Affirmative Defenses, and Amended Counterclaim against Portrait, in which it asserts counts against Portrait for Breach of Contract (Count I), Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II), Liquidated Damages (Count III), Fraudulent Lien (Count IV), Violation of Fla. Stat. § 553.84 (Count V), and Violation of Florida Deceptive and Unfair Trade Practices Act (Count VI). (A true and correct copy of the Answer and Affirmative Defenses, and Amended Counterclaim is attached hereto as **Exhibit B**.) The Amended Counterclaim seeks damages for, among other things, the costs of completing the project and repairing or replacing allegedly faulty work.

22.     On May 15, 2024, the Owner filed an Answer and Affirmative Defenses to Portrait's Second Amended Complaint. In that pleading the Owner asserts in a footnote that "LN expressly preserves and re-states its First Amended Counterclaim as previously asserted in LN's Answer and Affirmative Defenses, and Counterclaim, filed by LN on August 30, 2023."

23.     On June 30, 2025, the Owner filed an Answer and Affirmative Defenses to Portrait's Third Amended Complaint. In that pleading the Owner asserts in a

---

[1] CFSIC does not attach the exhibits to Portrait's Second Amended Complaint in the Underlying Lawsuit because those documents are voluminous, were attached to CFSIC's Amended Complaint, and are therefore already in the record in this action at ECF No. 96-1 at 22-336.

footnote that "LN expressly preserves and re-states its First Amended Counterclaim as previously asserted in LN's Answer and Affirmative Defenses, and Counterclaim, filed by LN on August 30, 2023."

24.    The Owner's count for breach of contract alleges various contractual breaches and other contract-related malfeasance by Portrait, including that Portrait installed "damaged, defective, non-conforming product / work or material, including but not limited  to . . . plumbing and HVAC system, roof and structure systems, window and door waterproofing, exterior stucco and painting, cabinetry and countertops, balconies, and various other defective and non-compliant work."

25.    In its count for Liquidated Damages, the Owner alleges that the parties' contract calls for daily liquidated damages if Portrait failed to achieve "Substantial Completion" by a pre-set deadline, which Portrait failed to meet. The Owner alleges that, as a result, liquidated damages "will continue to accrue and increase until [the Owner] is able to achieve the Project's Substantial Completion Deadline . . . using a replacement contractor." The Owner seeks liquidated damages in excess of $2 million.

26.    The violation of Florida Building Code count references a June 14, 2023 expert report, which is attached as Exhibit "A" to the Amended Counterclaim. The report details a significant amount of incomplete work, states that the Project "is currently under construction and is approximately 80% complete," and chronicles various instances of allegedly shoddy or defective work in multiple building systems that does not comply with the contract or the Florida Building Code.

27.    On April 29, 2024, Portrait filed a Third-Party Complaint asserting pass-through contractual claims and negligence claims related to non-conforming or defective work allegedly causing property damage against its subcontractors. On December 23, 2024, Portrait filed its Amended Third-Party Complaint. The Amended Third-Party Complaint asserts claims against the following subcontractors: Armstrong Air (HVAC); Barrios (roofing); BFarr (exterior cladding); Cemplex (elevated concrete and gypcrete); Express (plumbing); FCF (framing and rough carpentry); Sousa (cabinetry); and KP (flooring) (collectively referred to below as the "Subcontractors"). (A true and correct copy of the Amended Third-Party Complaint is attached hereto as **Exhibit C**.)

### C.    The Primary Policy

28.    The Project is insured under an Owner Controlled Insurance Program ("OCIP") in which CFSIC issued to the Owner, as the First Named Insured, commercial general liability policy number GLO-067512, effective from September 30, 2020 to August 31, 2024.  (the "Primary Policy"). (A true and correct copy of the Primary Policy is attached hereto as **Exhibit D**.)

29.    The Primary Policy is subject to limits of liability of $2 million per occurrence, $1 million personal & advertising injury, $2 million general aggregate, and $2 million products-completed operations aggregate.

30.    None of the Primary Policy's limits of liability have been paid, in full or in part, in connection with the claims asserted in the Underlying Lawsuit.

31.    The Primary Policy contains a Commercial General Liability Coverage Form (CG 00 01 04 13) (the "CGL Coverage Form"), which is amended by a "Construction Project Endorsement – OCIP/CCIP Version 8" endorsement (CFSIC-GL-2624A(07/2019) (the "OCIP Endorsement").

32.    As amended by the OCIP Endorsement, the Coverage A insuring agreement in the CGL Coverage Form provides, in part, as follows:

**COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

**1.    Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply. . . .

* * *

    **b.**    This insurance applies to 'bodily injury' and 'property damage' only if:

        **(1)**    The 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory';

        **(2)**    The 'bodily injury' or 'property damage' occurs during the policy period, or during the Coverage Extension Periods as set forth under Paragraph **F.** of this endorsement; and

* * *

9

**(4)** The 'bodily injury' or 'property damage' occurs at the Project(s) or arises out of construction operations performed at the Project(s) shown and as described in the **Project Schedule** (hereafter referred to as the Project), and pursuant to a contract involving an owner controlled insurance program or a contractor controlled insurance program, whichever is applicable.

33. The Primary Policy's CGL Coverage Form contains the following

definitions relevant to the Primary Policy's Coverage A insuring agreement:

**13.** 'Occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

* * *

**17.** 'Property damage' means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the 'occurrence' that caused it. . . .

34. The OCIP Endorsement contains the following Project Schedule:

### Project Schedule

**Project Name:**    Nona Cove

**Project Location:** Apartments Lot 1: 32-24-31-5148-01-000 19465 Boggy Creek Rd – leasing office/apartments 19467 Boggy Creek Rd - trash compactor/dumpster pad 19463 Boggy Creek Rd - illuminated monument sign; Storage / Retail Lot 3: 32-24-31-5148-03-000 14800 Narcoossee Rd - retail units 14804 Narcoossee Rd - transformer 14808 Narcoossee Rd - transformer 14812 Narcoossee Rd - storage building;

Retail Lot 4 32-24-31-5148-04-000 Lot 5 32-24-31-5148-05-000 Lot 2 32-24-31-5148-02-000, Orlando, FL 32832

**Project Description:** Phase I – Apartments + Parking - Apartments 5 story wood frame – 260 units with 6 story parking garage(GC: Mark Portrait Construction); Phase II – Commercial/Retail Space - 28,000 square feet of commercial/retail space (GC: Mark Construction); Phase III – Self Storage Facility - 122,000 Square feet, four story, climate controlled building (GC: Park & Eleazer). All construction operations taking place within 1,000 feet of the project location that are directly related to the designated project, including staging areas within 1,000 feet.

35.    The OCIP Endorsement further adds to the Primary Policy a coverage extension period applicable to Coverage A, which in part states as follows:

**F.    Coverage Extension Period**

1.    This insurance for the Project(s) is extended for an additional period of time with respect to liability for 'bodily injury' or 'property damage' included within the 'products-completed operations hazard.' This Coverage Extension Period will commence at the earlier of:

   a.    the date that 'your work' is 'completed'; or

   b.    the end of the policy period shown in the Declarations

2.    This insurance for the Project(s) is extended for an additional period of time for 'bodily injury' or 'property damage' not included in the 'products-completed operations hazard' arising out of 'repair work' performed after the Project(s) is 'completed,' provided such 'repair work' was performed:

   a.    By a licensed contractor(s) 'enrolled' during the policy period; and

   b.    Pursuant to a statute or express warranty pertaining to such 'repair work.'

11

This Coverage Extension Period will commence at the earlier of:

**(1)**    the date that 'your work' is 'completed'; or

**(2)**    the end of the policy period shown in the Declarations.

Any damages we pay for 'bodily injury' or 'property damage' arising out of such 'repair work' will reduce and be subject to the Products-Completed Operations Aggregate Limit rather than the General Aggregate Limit.

**3.**    The Coverage Extension Periods set forth under subparagraphs **F. 1.** and **F. 2.** above will be equal to the time period imposed under the statute of repose or statute of limitations, whichever is applicable, for any claim or 'suit' for such 'bodily injury' or 'property damage' as provided by the controlling law of the jurisdiction where the Project(s) is located.

36.    The OCIP Endorsement amends the "Product-Completed Operations Hazard" definition in the CGL Coverage Form and defines the term "completed" as follows:

**H.**    The following definitions are added to **SECTION V – DEFINITIONS:**

**1.**    Paragraph **a.** of definition **16.** 'Products-completed operations hazard' is deleted and replaced with the following:

**16.**    'Products-completed operations hazard':

**a.**    Includes all 'bodily injury' and 'property damage' arising out of 'your product' or 'your work' except:

12

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, 'your work' will be deemed completed at the earliest of the following times:

**(a)** Completion and acceptance of the entire Project(s) by all parties designated in its construction agreement;

**(b)** When all of the work to be done at a location shown in the **Project Schedule** has been completed if the Project(s) calls for work at more than one location;

**(c)** When that part of the work done at the Project(s) has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project(s).

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

**2.** The following definitions are added:

**a.** 'Completed' means deemed completed as set forth under subparagraph **a. (2)** of Definition **16.** 'products-completed operations hazard' (in paragraph **H. 1.** above).

37. Section B. of the OCIP Endorsement adds a course of construction exclusion ("COCE") to the CGL Coverage Form that provides:

13

This insurance does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of construction. The Project(s) or any part of the Project(s) will be deemed to be within the course of construction until the Project(s) is 'completed.'

38.     The Coverage B insuring agreement in the CGL Coverage Form provides, in part, as follows:

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.     Insuring Agreement**

    **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies.  We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any 'suit' seeking damages for 'personal and advertising injury' to which this insurance does not apply. . . .

39.     The Primary Policy's CGL Coverage Form contains the following definitions relevant to the Coverage B insuring agreement quoted above:

    **14.**     'Personal and advertising injury' means injury, including consequential 'bodily injury' arising out of one or more of the following offenses:

        **a.**     False arrest, detention or imprisonment;

        **b.**     Malicious prosecution;

        **c.**     The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

14

**d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

**e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.** The use of another's advertising idea in your 'advertisement'; or

**g.** Infringing upon another's copyright, trade dress or slogan in your 'advertisement'.

40. The Primary Policy's CGL Coverage Form states, in part, as follows with respect to exclusions applicable to Coverage B:

**2. Exclusions**

This insurance does not apply to:

\* \* \*

**f. Breach Of Contract**

'Personal and advertising injury' arising out of a breach of contract, except an implied contract to use another's advertising idea in your 'advertisement'.

**D. The Excess Policy**

41. As part of the OCIP, CFSIC also issued to the Owner, as the First Named Insured, excess liability insurance policy number SEO-110003, effective from September 30, 2020 through August 31, 2024 (the "Excess Policy"). (A true and correct copy of the Excess Policy is attached hereto as **Exhibit E**.)

42. The Excess Policy applies in excess of all underlying insurance, including the Primary Policy, which is "controlling underlying insurance."

15

43.    The insuring agreement in the Excess Policy states, in relevant part, that it follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

44.    The Excess Policy provides no duty to defend until the applicable limits of the underlying insurance have "been paid in full."

**E.    The Coverage Dispute**

45.    Portrait and each of the Subcontractors tendered their defense and indemnity against the claims respectively pleaded against them in the Underlying Lawsuit to CFSIC, and, therefore, Portrait and the Subcontractors appear to believe they are entitled to coverage for those claims under the Primary Policy.

46.    CFSIC has declined to defend Portrait against the Owner's Amended Counterclaim.

47.    CFSIC is defending the Subcontractors against Portrait's Amended Third-Party Complaint, subject to complete reservations of rights.

48.    CFSIC has incurred and will continue to incur expenses associated with the investigation, defense, and handling of the claims.

49.    All conditions precedent to bringing this action have been performed or otherwise waived.

**CLAIM FOR DECLARATORY JUDGMENT**

50.    A justiciable controversy exists between CFSIC and the Defendants about whether the Primary and Excess policies provide coverage for the claims alleged against the Defendants in the Underlying Lawsuit.

16

51.     CFSIC thus seeks the Court's declaration of the parties' rights and duties under the policies under 28 U.S.C. § 2201.

## COUNT I – NO DUTY TO DEFEND PORTRAIT UNDER THE PRIMARY AND EXCESS POLICIES

52.     CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

53.     The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

54.     The application of the COCE turns on whether the Project has been "completed," not on whether Portrait finished or abandoned its scope of work on the Project or was terminated from the Project.

55.     The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

56.     Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project was not "completed" with respect to Portrait because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or Portrait's work, specifically, was put to its intended use by any person or organization other than another contractor or subcontractor working on the Project.

57.     Any claims for "property damage" against Portrait that can be discerned from the Owner's Amended Counterclaim are excluded from coverage under the Primary Policy's course of construction exclusion.

58.     The Primary Policy does not cover the remaining claims against Portrait in the Owner's Amended Counterclaim because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within the Coverage A insuring agreement; (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement; or (3) seek damages that fall within the Breach of Contract exclusion applicable to Coverage B.

59.     Because the Primary Policy does not cover the damages sought from Portrait in the Underlying Lawsuit, CFSIC has no duty to defend Portrait under the

Primary Policy with respect to the claims made against Portrait in the Underlying Lawsuit.

60.     The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

61.     Because the Primary Policy does not cover the damages sought from Portrait in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from Portrait in the Underlying Lawsuit and CFSIC has no duty to defend Portrait under the Excess Policy with respect to the claims made against Portrait in the Underlying Lawsuit.

62.     The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

63.     CFSIC also has no duty to defend Portrait under the Excess Policy with respect to the claims made against Portrait in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a.     That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, and Portrait under the Primary and Excess Policies; and,

b.     That the Court declare that CFSIC has no obligation to defend Portrait in the Underlying Lawsuit under the Primary or Excess Policies.

19

## COUNT II – NO DUTY TO INDEMNIFY PORTRAIT UNDER THE PRIMARY AND EXCESS POLICIES

64.    CFSIC re-alleges paragraphs 1 through 51 and 53 through 63 as if fully set forth herein.

65.    Because CFSIC has no duty to defend Portrait under the Primary Policy with respect to the claims made against Portrait in the Underlying Lawsuit, CFSIC has no duty to indemnify Portrait against those claims under the Primary Policy.

66.    The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

67.    Because CFSIC has no duty to indemnify Portrait under the Primary Policy with respect to the claims made against Portrait in the Underlying Lawsuit, CFSIC has no duty to indemnify Portrait against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a.    That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, and Portrait under the Primary and Excess Policies;

b.    That the Court declare that CFSIC has no obligation to defend Portrait in the Underlying Lawsuit under the Primary or Excess Policies; and,

c.    That the Court declare that CFSIC has no duty to indemnify Portrait in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no obligation to defend Portrait in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT III – NO DUTY TO DEFEND ARMSTRONG UNDER THE PRIMARY AND EXCESS POLICIES

68.    CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

69.    The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

70.    The application of the COCE turns on whether the Project has been "completed," not on whether Armstrong finished or abandoned its scope of work on the Project or was terminated from the Project.

71.    The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

72.    Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project

21

was not "completed" with respect to Armstrong because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or Armstrong's work, specifically, was put to its intended use by any person or organization other than another contractor or subcontractor working on the Project.

73.   Any claims against Armstrong for "property damage" that can be discerned from Portrait's Amended Third-Party Complaint are excluded from coverage under the Primary Policy's course of construction exclusion.

74.   The Primary Policy does not cover the remaining claims against Armstrong in Portrait's Amended Third-Party Complaint in the Underlying Lawsuit because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within the Coverage A insuring agreement or (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement.

75.   Because the Primary Policy does not cover the damages sought from Armstrong in the Underlying Lawsuit, CFSIC has no duty to defend Armstrong under the Primary Policy with respect to the claims made against Armstrong in the Underlying Lawsuit.

76.   The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

77. Because the Primary Policy does not cover the damages sought from Armstrong in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from Armstrong in the Underlying Lawsuit and CFSIC has no duty to defend Armstrong under the Excess Policy with respect to the claims made against Armstrong in the Underlying Lawsuit.

78. The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

79. CFSIC also has no duty to defend Armstrong under the Excess Policy with respect to the claims made against Armstrong in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a. That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Armstrong under the Primary and Excess Policies; and,

b. That the Court declare that CFSIC has no obligation to defend Armstrong in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT IV – NO DUTY TO INDEMNIFY ARMSTRONG UNDER THE PRIMARY AND EXCESS POLICIES

80. CFSIC re-alleges paragraphs 1 through 51 and 69 through 79 as if fully set forth herein.

81. Because CFSIC has no duty to defend Armstrong under the Primary Policy with respect to the claims made against Armstrong in the Underlying Lawsuit,

CFSIC has no duty to indemnify Armstrong against those claims under the Primary Policy.

82.    The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

83.    Because CFSIC has no duty to indemnify Armstrong under the Primary Policy with respect to the claims made against Armstrong in the Underlying Lawsuit, CFSIC has no duty to indemnify Armstrong against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a.    That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Armstrong under the Primary and Excess Policies;

b.    That the Court declare that CFSIC has no obligation to defend Armstrong in the Underlying Lawsuit under the Primary or Excess Policies; and,

c.    That the Court declare that CFSIC has no duty to indemnify Armstrong in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no obligation to defend Armstrong in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT V – NO DUTY TO DEFEND BARRIOS UNDER THE PRIMARY AND EXCESS POLICIES

84.    CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

85.    The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of

24

construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

86.     The application of the COCE turns on whether the Project has been "completed," not on whether Barrios finished or abandoned its scope of work on the Project or was terminated from the Project.

87.     The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

88.     Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project was not "completed" with respect to Barrios because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or Barrios's work, specifically, was put to its

intended use by any person or organization other than another contractor or subcontractor working on the Project.

89. Any claims against Barrios for "property damage" that can be discerned from Portrait's Amended Third-Party Complaint are excluded from coverage under the Primary Policy's course of construction exclusion.

90. The Primary Policy does not cover the remaining claims against Barrios in Portrait's Amended Third-Party Complaint in the Underlying Lawsuit because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within the Coverage A insuring agreement or (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement.

91. Because the Primary Policy does not cover the damages sought from Barrios in the Underlying Lawsuit, CFSIC has no duty to defend Barrios under the Primary Policy with respect to the claims made against Barrios in the Underlying Lawsuit.

92. The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

93. Because the Primary Policy does not cover the damages sought from Barrios in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from Barrios in the Underlying Lawsuit and CFSIC has no duty to defend

Barrios under the Excess Policy with respect to the claims made against Barrios in the Underlying Lawsuit.

94.    The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

95.    CFSIC also has no duty to defend Barrios under the Excess Policy with respect to the claims made against Barrios in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a.    That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Barrios under the Primary and Excess Policies; and,

b.    That the Court declare that CFSIC has no obligation to defend Barrios in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT VI – NO DUTY TO INDEMNIFY BARRIOS UNDER THE PRIMARY AND EXCESS POLICIES

96.    CFSIC re-alleges paragraphs 1 through 51 and 85 through 95 as if fully set forth herein.

97.    Because CFSIC has no duty to defend Barrios under the Primary Policy with respect to the claims made against Barrios in the Underlying Lawsuit, CFSIC has no duty to indemnify Barrios against those claims under the Primary Policy.

98.    The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

99.     Because CFSIC has no duty to indemnify Barrios under the Primary Policy with respect to the claims made against Barrios in the Underlying Lawsuit, CFSIC has no duty to indemnify Barrios against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a.      That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Barrios under the Primary and Excess Policies;

b.      That the Court declare that CFSIC has no obligation to defend Barrios in the Underlying Lawsuit under the Primary or Excess Policies; and,

c.      That the Court declare that CFSIC has no duty to indemnify Barrios in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no obligation to defend Barrios in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT VII – NO DUTY TO DEFEND BFARR UNDER THE PRIMARY AND EXCESS POLICIES

100.   CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

101.   The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

28

102.   The application of the COCE turns on whether the Project has been "completed," not on whether BFarr finished or abandoned its scope of work on the Project or was terminated from the Project.

103.   The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

104.   Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project was not "completed" with respect to BFarr because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or BFarr's work, specifically, was put to its intended use by any person or organization other than another contractor or subcontractor working on the Project.

105. Any claims against BFarr for "property damage" that can be discerned from Portrait's Amended Third-Party Complaint are excluded from coverage under the Primary Policy's course of construction exclusion.

106. The Primary Policy does not cover the remaining claims against BFarr in Portrait's Amended Third-Party Complaint in the Underlying Lawsuit because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within the Coverage A insuring agreement or (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement.

107. Because the Primary Policy does not cover the damages sought from BFarr in the Underlying Lawsuit, CFSIC has no duty to defend BFarr under the Primary Policy with respect to the claims made against BFarr in the Underlying Lawsuit.

108. The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

109. Because the Primary Policy does not cover the damages sought from BFarr in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from BFarr in the Underlying Lawsuit and CFSIC has no duty to defend BFarr under the Excess Policy with respect to the claims made against BFarr in the Underlying Lawsuit.

110.    The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

111.    CFSIC also has no duty to defend BFarr under the Excess Policy with respect to the claims made against BFarr in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a.    That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and BFarr under the Primary and Excess Policies; and,

b.    That the Court declare that CFSIC has no obligation to defend BFarr in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT VIII – NO DUTY TO INDEMNIFY BFARR UNDER THE PRIMARY AND EXCESS POLICIES

112.    CFSIC re-alleges paragraphs 1 through 51 and 101 through 111 as if fully set forth herein.

113.    Because CFSIC has no duty to defend BFarr under the Primary Policy with respect to the claims made against BFarr in the Underlying Lawsuit, CFSIC has no duty to indemnify BFarr against those claims under the Primary Policy.

114.    The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

115.    Because CFSIC has no duty to indemnify BFarr under the Primary Policy with respect to the claims made against BFarr in the Underlying Lawsuit, CFSIC has no duty to indemnify BFarr against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a.      That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and BFarr under the Primary and Excess Policies;

b.      That the Court declare that CFSIC has no obligation to defend BFarr in the Underlying Lawsuit under the Primary or Excess Policies; and,

c.      That the Court declare that CFSIC has no duty to indemnify BFarr in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no obligation to defend BFarr in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT IX – NO DUTY TO DEFEND CEMPLEX UNDER THE PRIMARY AND EXCESS POLICIES

116.    CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

117.    The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

118.    The application of the COCE turns on whether the Project has been "completed," not on whether Cemplex finished or abandoned its scope of work on the Project or was terminated from the Project.

119.    The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed

operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

120. Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project was not "completed" with respect to Cemplex because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or Cemplex's work, specifically, was put to its intended use by any person or organization other than another contractor or subcontractor working on the Project.

121. Any claims against Cemplex for "property damage" that can be discerned from Portrait's Amended Third-Party Complaint are excluded from coverage under the Primary Policy's course of construction exclusion.

122. The Primary Policy does not cover the remaining claims against Cemplex in Portrait's Amended Third-Party Complaint in the Underlying Lawsuit because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within

33

the Coverage A insuring agreement or (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement.

123. Because the Primary Policy does not cover the damages sought from Cemplex in the Underlying Lawsuit, CFSIC has no duty to defend Cemplex under the Primary Policy with respect to the claims made against Cemplex in the Underlying Lawsuit.

124. The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

125. Because the Primary Policy does not cover the damages sought from Cemplex in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from Cemplex in the Underlying Lawsuit and CFSIC has no duty to defend Cemplex under the Excess Policy with respect to the claims made against Cemplex in the Underlying Lawsuit.

126. The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

127. CFSIC also has no duty to defend Cemplex under the Excess Policy with respect to the claims made against Cemplex in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a. That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Cemplex under the Primary and Excess Policies; and,

b.      That the Court declare that CFSIC has no obligation to defend Cemplex in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT X – NO DUTY TO INDEMNIFY CEMPLEX UNDER THE PRIMARY AND EXCESS POLICIES

128.   CFSIC re-alleges paragraphs 1 through 51 and 117 through 127 as if fully set forth herein.

129.   Because CFSIC has no duty to defend Cemplex under the Primary Policy with respect to the claims made against Cemplex in the Underlying Lawsuit, CFSIC has no duty to indemnify Cemplex against those claims under the Primary Policy.

130.   The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

131.   Because CFSIC has no duty to indemnify Cemplex under the Primary Policy with respect to the claims made against Cemplex in the Underlying Lawsuit, CFSIC has no duty to indemnify Cemplex against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a.      That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Cemplex under the Primary and Excess Policies;

b.      That the Court declare that CFSIC has no obligation to defend Cemplex in the Underlying Lawsuit under the Primary or Excess Policies; and,

c.      That the Court declare that CFSIC has no duty to indemnify Cemplex in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no

obligation to defend Cemplex in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT XI – NO DUTY TO DEFEND EXPRESS UNDER THE PRIMARY AND EXCESS POLICIES

132.    CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

133.    The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

134.    The application of the COCE turns on whether the Project has been "completed," not on whether Express finished or abandoned its scope of work on the Project or was terminated from the Project.

135.    The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

36

136. Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project was not "completed" with respect to Express because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or Express's work, specifically, was put to its intended use by any person or organization other than another contractor or subcontractor working on the Project.

137. Any claims against Express for "property damage" that can be discerned from Portrait's Amended Third-Party Complaint are excluded from coverage under the Primary Policy's course of construction exclusion.

138. The Primary Policy does not cover the remaining claims against Express in Portrait's Amended Third-Party Complaint in the Underlying Lawsuit because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within the Coverage A insuring agreement or (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement.

139. Because the Primary Policy does not cover the damages sought from Express in the Underlying Lawsuit, CFSIC has no duty to defend Express under the Primary Policy with respect to the claims made against Express in the Underlying Lawsuit.

140. The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

141. Because the Primary Policy does not cover the damages sought from Express in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from Express in the Underlying Lawsuit and CFSIC has no duty to defend Express under the Excess Policy with respect to the claims made against Express in the Underlying Lawsuit.

142. The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

143. CFSIC also has no duty to defend Express under the Excess Policy with respect to the claims made against Express in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a.    That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Express under the Primary and Excess Policies; and,

b.    That the Court declare that CFSIC has no obligation to defend Express in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT XII – NO DUTY TO INDEMNIFY EXPRESS UNDER THE PRIMARY AND EXCESS POLICIES

144. CFSIC re-alleges paragraphs 1 through 51 and 133 through 143 as if fully set forth herein.

145. Because CFSIC has no duty to defend Express under the Primary Policy with respect to the claims made against Express in the Underlying Lawsuit, CFSIC has no duty to indemnify Express against those claims under the Primary Policy.

146. The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

147. Because CFSIC has no duty to indemnify Express under the Primary Policy with respect to the claims made against Express in the Underlying Lawsuit, CFSIC has no duty to indemnify Express against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a.    That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Express under the Primary and Excess Policies;

b.    That the Court declare that CFSIC has no obligation to defend Express in the Underlying Lawsuit under the Primary or Excess Policies; and,

c.    That the Court declare that CFSIC has no duty to indemnify Express in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no obligation to defend Express in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT XIII – NO DUTY TO DEFEND FCF UNDER THE PRIMARY AND EXCESS POLICIES

148. CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

149. The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of

construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

150.  The application of the COCE turns on whether the Project has been "completed," not on whether FCF finished or abandoned its scope of work on the Project or was terminated from the Project.

151.  The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

152.  Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project was not "completed" with respect to FCF because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or FCF's work, specifically, was put to its

intended use by any person or organization other than another contractor or subcontractor working on the Project.

153.    Any claims against FCF for "property damage" that can be discerned from Portrait's Amended Third-Party Complaint are excluded from coverage under the Primary Policy's course of construction exclusion.

154.    The Primary Policy does not cover the remaining claims against FCF in Portrait's Amended Third-Party Complaint in the Underlying Lawsuit because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within the Coverage A insuring agreement or (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement.

155.    Because the Primary Policy does not cover the damages sought from FCF in the Underlying Lawsuit, CFSIC has no duty to defend FCF under the Primary Policy with respect to the claims made against FCF in the Underlying Lawsuit.

156.    The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

157.    Because the Primary Policy does not cover the damages sought from FCF in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from FCF in the Underlying Lawsuit and CFSIC has no duty to defend FCF under the Excess Policy with respect to the claims made against FCF in the Underlying Lawsuit.

158. The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

159. CFSIC also has no duty to defend FCF under the Excess Policy with respect to the claims made against FCF in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a.    That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and FCF under the Primary and Excess Policies; and,

b.    That the Court declare that CFSIC has no obligation to defend FCF in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT XIV – NO DUTY TO INDEMNIFY FCF UNDER THE PRIMARY AND EXCESS POLICIES

160. CFSIC re-alleges paragraphs 1 through 51 and 149 through 159 as if fully set forth herein.

161. Because CFSIC has no duty to defend FCF under the Primary Policy with respect to the claims made against FCF in the Underlying Lawsuit, CFSIC has no duty to indemnify FCF against those claims under the Primary Policy.

162. The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

163. Because CFSIC has no duty to indemnify FCF under the Primary Policy with respect to the claims made against FCF in the Underlying Lawsuit, CFSIC has no duty to indemnify FCF against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a.      That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and FCF under the Primary and Excess Policies;

b.      That the Court declare that CFSIC has no obligation to defend FCF in the Underlying Lawsuit under the Primary or Excess Policies; and,

c.      That the Court declare that CFSIC has no duty to indemnify FCF in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no obligation to defend FCF in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT XV – NO DUTY TO DEFEND SOUSA UNDER THE PRIMARY AND EXCESS POLICIES

164.    CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

165.    The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

166.    The application of the COCE turns on whether the Project has been "completed," not on whether Sousa finished or abandoned its scope of work on the Project or was terminated from the Project.

167.    The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed

operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

168. Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project was not "completed" with respect to Sousa because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or Sousa's work, specifically, was put to its intended use by any person or organization other than another contractor or subcontractor working on the Project.

169. Any claims against Sousa for "property damage" that can be discerned from Portrait's Amended Third-Party Complaint are excluded from coverage under the Primary Policy's course of construction exclusion.

170. The Primary Policy does not cover the remaining claims against Sousa in Portrait's Amended Third-Party Complaint in the Underlying Lawsuit because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within

the Coverage A insuring agreement or (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement.

171.   Because the Primary Policy does not cover the damages sought from Sousa in the Underlying Lawsuit, CFSIC has no duty to defend Sousa under the Primary Policy with respect to the claims made against Sousa in the Underlying Lawsuit.

172.   The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

173.   Because the Primary Policy does not cover the damages sought from Sousa in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from Sousa in the Underlying Lawsuit and CFSIC has no duty to defend Sousa under the Excess Policy with respect to the claims made against Sousa in the Underlying Lawsuit.

174.   The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

175.   CFSIC also has no duty to defend Sousa under the Excess Policy with respect to the claims made against Sousa in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a.   That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Sousa under the Primary and Excess Policies; and,

b.    That the Court declare that CFSIC has no obligation to defend Sousa in the Underlying Lawsuit under the Primary or Excess Policies.

## COUNT XVI – NO DUTY TO INDEMNIFY SOUSA UNDER THE PRIMARY AND EXCESS POLICIES

176.    CFSIC re-alleges paragraphs 1 through 51 and 165 through 175 as if fully set forth herein.

177.    Because CFSIC has no duty to defend Sousa under the Primary Policy with respect to the claims made against Sousa in the Underlying Lawsuit, CFSIC has no duty to indemnify Sousa against those claims under the Primary Policy.

178.    The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

179.    Because CFSIC has no duty to indemnify Sousa under the Primary Policy with respect to the claims made against Sousa in the Underlying Lawsuit, CFSIC has no duty to indemnify Sousa against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a.    That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and Sousa under the Primary and Excess Policies;

b.    That the Court declare that CFSIC has no obligation to defend Sousa in the Underlying Lawsuit under the Primary or Excess Policies; and,

c.    That the Court declare that CFSIC has no duty to indemnify Sousa in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no

obligation to defend Sousa in the Underlying Lawsuit under the Primary or Excess Policies.

**COUNT XVII – NO DUTY TO DEFEND KP UNDER THE PRIMARY AND EXCESS POLICIES**

180.   CFSIC re-alleges paragraphs 1 through 51 as if fully set forth herein.

181.   The COCE provides that the Primary Policy "does not apply to 'property damage' to the Project(s) or any part of the Project(s) that occurs during the course of construction" and that "[t]he Project(s) or any part of the Project(s) will be deemed to be within the course of construction until **the Project(s) is 'completed.'**" (emphasis added.)

182.   The application of the COCE turns on whether the Project has been "completed," not on whether KP finished or abandoned its scope of work on the Project or was terminated from the Project.

183.   The Primary Policy defines "completed" to mean "deemed completed as set forth under subparagraph **a.(2)**" of the definition of "products-completed operations hazard," which in turn provides that work will be "deemed completed at the earliest of" three milestones: (a) the completion and acceptance of the entire Project; (b) when all the work to be done at one location of the Project has been completed if the Project calls for work at more than one location; or (c) when that part of the work done at the Project has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same Project.

184. Per the allegations of Portrait's Third Amended Complaint, the Owner's Amended Counterclaim, and Portrait's Amended Third-Party Complaint, the Project was not "completed" with respect to KP because (a) the entire Project was not completed and accepted; (2) the Project did not call for work at more than one location and, even if it did, no such work had been completed; and, (3) no part of the Project (*i.e.*, an apartment building), generally, or KP's work, specifically, was put to its intended use by any person or organization other than another contractor or subcontractor working on the Project.

185. Any claims against KP for "property damage" that can be discerned from Portrait's Amended Third-Party Complaint are excluded from coverage under the Primary Policy's course of construction exclusion.

186. The Primary Policy does not cover the remaining claims against KP in Portrait's Amended Third-Party Complaint in the Underlying Lawsuit because those claims (1) do not seek damages because of "property damage" caused by an "occurrence," as those terms are defined in the Primary Policy, and are thus not within the Coverage A insuring agreement or (2) do not seek damages because of "personal and advertising injury," as that term is defined in the Primary Policy, and are thus not within the Coverage B insuring agreement.

187. Because the Primary Policy does not cover the damages sought from KP in the Underlying Lawsuit, CFSIC has no duty to defend KP under the Primary Policy with respect to the claims made against KP in the Underlying Lawsuit.

188. The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

189. Because the Primary Policy does not cover the damages sought from KP in the Underlying Lawsuit, the Excess Policy does not cover the damages sought from KP in the Underlying Lawsuit and CFSIC has no duty to defend KP under the Excess Policy with respect to the claims made against KP in the Underlying Lawsuit.

190. The Excess Policy also provides no duty to defend until the applicable limits of the Primary Policy have "been paid in full."

191. CFSIC also has no duty to defend KP under the Excess Policy with respect to the claims made against KP in the Underlying Lawsuit because the applicable limits of the Primary Policy have not "been paid in full."

**WHEREFORE**, CFSIC respectfully requests the following:

a. That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and KP under the Primary and Excess Policies; and,

b. That the Court declare that CFSIC has no obligation to defend KP in the Underlying Lawsuit under the Primary or Excess Policies.

## <u>COUNT XVIII – NO DUTY TO INDEMNIFY KP UNDER THE PRIMARY AND EXCESS POLICIES</u>

192. CFSIC re-alleges paragraphs 1 through 51 and 181 through 191 as if fully set forth herein.

193. Because CFSIC has no duty to defend KP under the Primary Policy with respect to the claims made against KP in the Underlying Lawsuit, CFSIC has no duty to indemnify KP against those claims under the Primary Policy.

194. The Excess Policy follows "the same provisions, exclusions, conditions and limitations that are contained in the" Primary Policy.

195. Because CFSIC has no duty to indemnify KP under the Primary Policy with respect to the claims made against KP in the Underlying Lawsuit, CFSIC has no duty to indemnify KP against those claims under the Excess Policy.

**WHEREFORE**, CFSIC respectfully requests the following:

a. That the Court take jurisdiction and adjudicate the rights of CFSIC, the Owner, Portrait, and KP under the Primary and Excess Policies;

b. That the Court declare that CFSIC has no obligation to defend KP in the Underlying Lawsuit under the Primary or Excess Policies; and,

c. That the Court declare that CFSIC has no duty to indemnify KP in the Underlying Lawsuit under the Primary or Excess Policies because CFSIC has no obligation to defend KP in the Underlying Lawsuit under the Primary or Excess Policies.

DATED: January 19, 2026.        Respectfully submitted,

**KENNEDYS CMK LLP**
*Counsel for Crum & Forster Specialty Insurance Company*
1111 Brickell Avenue, Suite 1300
Miami, FL 33131
Tel: (305) 371-1111
Fax: (305) 374-8066

*/s/ Spencer R. Booth*
**JORGE A. MAZA**
Fla. Bar No. 94882
Email: jorge.maza@kennedyslaw.com
Secondary: jamservice@kennedyslaw.com
**HOLLY S. HARVEY**
Fla. Bar No. 970190
Email: holly.harvey@kennedyslaw.com
**SPENCER R. BOOTH**
Fla. Bar No. 1017750
Email: spencer.booth@kennedyslaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 19, 2026, I electronically filed the foregoing by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Spencer R. Booth*
**SPENCER R. BOOTH**